UNITED STATES DISTRICTC COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:   17-CV-81152-BLOOM/REINHART

DONALD BURNS,

Plaintiff,

v.

TOWN OF PALM BEACH, a
   Florida Municipal corporation,

Defendant.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT [DE 21]

Before the Court for decision is Defendant's Motion to Dismiss and/or for Summary Judgment ("the Motion") (DE 21), which was referred to the undersigned by the District Court by Order dated April 18, 2018.  DE 53.  At a status conference on April 16, 2018, the parties agreed that the Court should treat the Motion as a Motion for Summary Judgment under Federal Rule of Civil Procedure 56 on the issue of liability, only.  Based upon this agreement, the Court deems the Motion to be a Motion for Partial Summary Judgment and will apply the legal standards application to this kind of motion.  For the reasons stated herein, the undersigned **RECOMMENDS** that the District Court **GRANT** the Motion and enter judgment for Defendant on Counts 1 and 2.

The Court has reviewed the Motion (DE 21), its supporting Memorandum of Law (DE 22), the Defendant's Statement of Undisputed Facts ("DSOF")(DE 23), the exhibits in support of the Motion, (DE 24, 27), the Response to the Motion (DE 35), its supporting Appendix and Evidence (DE 36, 38, 39, 40, 41, 42)), the Plaintiff's Statement of Undisputed Facts

("PSOF")(DE 56), and the Defendant's Replies (DE 45, 68).   The Court also has reviewed supplemental briefs (DE  60, 61) filed in response to the Court's Order dated April 24, 2018.  DE 54.  Additionally, the Court has reviewed Plaintiff's Notice of Supplemental Authority (DE 65) an Defendant's Notices of Intent to Rely filed at DE 69, 70.  The Court held oral argument on the Motion on May 17, 2018.  The Court also reviewed post-argument briefs and responses (DE 81, 82, 85, 86) This matter is now ripe for decision.[1]

---

[1] On December 22, 2017, in response to Defendant's Motion for Partial Summary Judgment, Burns filed a Declaration (DE 41) pursuant to Federal Rule of Civil Procedure 56(d) asserting that he could not present facts essential to opposing the Motion because Defendant moved for summary judgment before responding to the Complaint and before the parties had conducted any discovery.  *See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to a motion for summary judgment], the court may (1) defer considering the motion or stay it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.").  This Court conducted an oral argument on May 17, 2018, almost 5 months after the filing of the Rule 56(d) declaration.  In the interim, Burns was free to take discovery, obtain affidavits, or otherwise prepare an opposition to the Motion.   Burns has not filed a renewed Rule 56(d) declaration.   He fully briefed a response to the Motion and participated in oral argument.  Nevertheless, in his post-argument supplemental briefing, Burns renews his request that the Court not rule against him for lack of evidence until he can conduct additional discovery.  DE 82 at 4; DE 86 at 6-7. The Court finds that Burns has waived any objection to the Court ruling on the Motion based on lack of sufficient discovery.  "The protection afforded by Rule 56[d] is an *alternative* to a response in opposition to summary judgment under 56(e) . . ." *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 833 (10th Cir. 1986) (emphasis in original).  "When, as here, a party has responded to a summary judgment motion under 56(e), that party waives any option it may have had to proceed under Rule 56[d]." *Villa v. Bd. of Cty. Comm'rs of the Cty. of Arapahoe*, 931 F.2d 900 at * 4 (10th Cir. May 1, 1991).

TABLE OF CONTENTS

# Table of Contents

I.     BACKGOUND ................................................................................................................ 3

II.    LEGAL ARGUMENTS ................................................................................................ 4
    A.    Burns' Claims ..................................................................................................... 4
    B.    Town's Motion for Partial Summary Judgment .............................................. 6

III.   UNDISPUTED MATERIAL FACTS ........................................................................ 8

IV.   DISCUSSION .............................................................................................................. 12
    A.    Legal Principles Applicable to Multiple Claims ........................................... 12
        1.   Subject Matter Jurisdiction ...................................................................... 12
        2.   Summary Judgment .................................................................................. 15
        3.   Facial Constitutional Challenge ............................................................... 15
    B.    Section 18-146 ................................................................................................... 16
    C.    First Amendment Expressive Speech ............................................................. 17
        1.   Expressive Conduct .................................................................................. 20
        2.   Expressive Merchandise ........................................................................... 21
        3.   Architecture Cases .................................................................................... 25
        4.   Legal Standards Applicable to Burns' Structure ..................................... 27
    D.    Fourteenth Amendment Claims ...................................................................... 33
        1.   Void for Vagueness ................................................................................... 33
        2.   Overbreadth .............................................................................................. 36
        3.   Due Process Arbitrary and Capricious (Substantive Due Process) ......... 37
        4.   Equal Protection ....................................................................................... 41

V.    RECOMMENDATION ............................................................................................... 45

NOTICE OF RIGHT TO OBJECT ................................................................................. 45

APPENDIX 1 ...................................................................................................................... 46

APPENDIX 2 ...................................................................................................................... 48

## I.   BACKGOUND

Defendant Town of Palm Beach ("the Town") is a municipal corporation organized under the laws of the State of Florida.  The Town is governed by a Town Council.  The Town Council has adopted a Code of Ordinances ("Code") for the Town.  Chapter 18, Article III, of the Code establishes an Architectural Commission ("ARCOM").   Code Section 18-146 articulates the purposes of the ARCOM as follows:

**Sec. 18-146. - Statement of findings and purpose.**

(a) The town council has found that Palm Beach is internationally known and has become a worldwide synonym for beauty, quality and value.

(b) In recognition of the fact that beautiful communities can be created only through a deliberate search for beauty on the part of the community leadership, architects, planners, realtors and the building industry, backed by an appreciation of the visual world by the people, the town council has created the architectural commission.

(c) Public action for improving community appearance, as embodied in the architectural commission, will provide the ultimate designers of individual structures with the larger contexts in which their particular works will be viewed. Since the beauty of a community involves the aesthetic quality of all one sees in moving about, it goes far beyond the design of individual architectural facades.

(d) The comprehensive plan and zoning codes are the most powerful legal enforcement of an overall urban concept, but alone they do not create beauty, aesthetic order, or amenity. The task of the architectural commission is therefore to preserve various elements of urban beauty and require that new projects enhance the existing elements.

(e) The essential foundation of beauty in communities is harmony. The plan for achieving beauty must grow out of special local characteristics of site, aesthetic tradition and development potential. Some local areas of natural beauty are the beaches, ocean and intracoastal waterway. The vistas and visual delight of these should be allowed only to be enhanced. It is the intent of this article to achieve a pleasant and comprehensive cohesiveness in community development.

DE 1, Exhibit A.  Certain construction projects within the boundaries of the Town require prior review and approval by the Town Council and/or the ARCOM.  *See, e.g.,* Code § 18-175

(Issuance of Building Permits); §§ 134-126, *et seq* (Site Plan Review).

As more fully discussed below, Plaintiff Donald Burns ("Burns") owns a residence at 1021 N. Ocean Boulevard in the Town.  Beginning in or about 2014, Plaintiff sought to replace his existing residence with a new residence in a more modern architectural style.  He applied to the Town Council for approval of his new construction.  The Town Council referred the matter to the ARCOM, which ultimately declined to authorize Burns' design proposal.  The ARCOM denial was based upon portions of Section 18-205 of the Code, which is entitled "Criteria for building permit" (reprinted in full as Appendix 1).

Under the Section 18-177 of the Code, Burns could have appealed the ARCOM decision to the Town Council and ultimately to Palm Beach Circuit Court.   He did not. Instead, he filed the instant action challenging the constitutionality of Sections 18-146 and 18-205 ("the Ordinances")

## II.  LEGAL ARGUMENTS

A.  Burns' Claims

In a two-count Complaint (DE 1), Burns alleges that the Town unconstitutionally denied him the right to have a residence of his chosen design at 1021 N. Ocean Boulevard, all in violation of 42 U.S.C. § 1983.  Count One alleges that the Town's actions deprived Burns of:

(a) his right to due process because the Ordinances are "vague, overbroad and fail to provide objective and verifiable standards . . . [such that] on their face, and as applied here [they] deprive the plaintiff of the right to be fully informed of the standards for review of proposed plans for the use of his property."  (*Id.* at ¶ 32(a)), and

(b) his right to equal protection of the law because "the historical applications of

the challenged [Ordinances] have had anomalous results vis-à-vis the issuance of building permits in the Town of Palm Beach.   Application of the vague and overbroad provisions have allowed dissimilar structures to be approved and constructed [such that] denying the Plaintiff's structure constitutes a denial of the right to equal treatment under the law."  Id. at ¶ 32(b).

In his Supplemental Brief (DE 61), Burns clarified, "in Count I, Plaintiff has asserted due process arbitrary and capricious claims (both facial and as applied) and equal protection claims (both facial and as applied)."  DE 61 at 3.[2]  At oral argument, Burns also clarified that he was not asserting a procedural due process claim.  DE 90 (hereinafter "Hearing Transcript") at 16.[3]

Count Two alleges, "[a]rchitecture and architectural design are forms of expression that are protected by the First Amendment."  DE 1 at ¶ 34.  Therefore (the Complaint alleges), the

---

[2] As Burns correctly notes, the Eleventh Circuit has identified four Fourteenth Amendment based claims that typically are asserted when challenging a state or local zoning ordinance  -- (1) due process just compensation claims, (2) due process takings claims, (3) due process arbitrary and capricious claims, and (4) equal protection claims.  *See Eide v. Sarasota County,* 908 F.2d 716, 720-22 (11th Cir. 1990).  What *Eide* defines as a "due process arbitrary and capricious claim" is also commonly designated a "substantive due process" claim.  *See Restigouche, Inc. v. Town of Jupiter,* 59 F.3d 1208, 1211 & n.1 (11th Cir. 1995); *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573-74 (11th Cir. 1989).  Burns is not pursuing due process just compensation or a due process takings claim.  DE 61 at 3.  Moreover, as discussed below, since deciding *Eide,* the Eleventh Circuit has limited the circumstances in which a substantive due process claim can be brought in the land-use context.

[3] The Complaint also references possible claims under the Fifth and Fifteenth Amendments.  DE 1 at ¶¶ 2, 33.  At oral argument, Burns conceded that the reference to the Fifteenth Amendment was a scrivener's error.  Burns' justification for his Fifth Amendment claim was that the "due process clause [ ] was made applicable to the States through the Fourteenth Amendment."  *See* Hearing Transcript at 10:10-12.  The Fifth Amendment's due process clause applies only to the federal government, not to state or local officials. *See Hester v. Lowndes Cty. Comm'n.,* 2006 WL 2547430, at *3 (M.D. Ala. Sept. 1, 2006) (citing *Knoetze v. U.S. Dep't of State,* 634 F.3d 207, 211 (5th Cir. 1981)).   Therefore, Burns cannot assert a Fifth Amendment claim here.  Finally, although the Complaint discusses prior occasions when Burns pointed out inconsistent application by the Town of its own ordinances, Burns does not assert that the Town retaliated against him based on his First Amendment speech on those occasions.  *See* Hearing Transcript at 93:2-8.

Ordinances denied and infringed Burns' First Amendment right of expression.  *Id.* at ¶ 35.

In summary, Burns challenges the Ordinances on their faces and as applied, as follows:

1.  Facial substantive due process challenge to Section 18-146
2.  Facial equal protection challenge to Section 18-146
3.  Facial first amendment challenge to Section 18-146
4.  As-applied substantive due process challenge to Section 18-146
5.  As-applied equal protection challenge to Section 18-146
6.  As-applied first amendment challenge to Section 18-146
7.  Facial substantive due process challenge to Section 18-205
8.  Facial equal protection challenge to Section 18-205
9.  Facial first amendment challenge to Section 18-205
10. As-applied substantive due process challenge to Section 18-205
11. As-applied equal protection challenge to Section 18-205
12. As-applied first amendment challenge to Section 18-205
13. Void for vagueness challenge to Section 18-205

*See* Hearing Transcript at 11:11-12:4. Burns seeks a declaratory judgment that the Ordinances are unconstitutional on their face and as applied to Burns.  He also seeks an order enjoining the ordinances and enjoining the Town from denying Burns the right to construct the home of his chosen design.  Finally, he seeks monetary damages, attorneys' fees and costs.[4]

B.  <u>Town's Motion for Partial Summary Judgment</u>

The Town asserts that it is entitled to judgment as a matter of law because:

(a)  The Ordinances on their faces do not violate the substantive due process requirement of the Fourteenth Amendment because they are rationally related to the legitimate government purpose of maintaining the aesthetic beauty of the Town and because they are sufficiently limited so as to not be unconstitutionally subjective or vague.  DE 21 at ¶¶ 10, 11.

(b)  The Ordinances as applied to Burns do not violate the substantive process requirement of the Fourteenth Amendment because Burns

---

[4] As noted above, the parties agree that the issue of the appropriate remedy (if any) is not presently before the Court for decision.

received constitutionally adequate procedural due process.  Alternatively, the Town asserts that ARCOM's decision was rational and does not shock the judicial conscience.  *Id.* at ¶¶ 12-13.

(c)     The Ordinances on their faces treat all properties alike, so they do not violate the Equal Protection Clause.  *Id.* at ¶ 18.

(d)     The Ordinances, as applied, do not violate the Equal Protection Clause because of the unique nature of real property and architecture. *Id.* at ¶ 19. Alternatively, Burns has not identified a "similarly situated" property that was treated differently for an irrational reason. *Id*. at ¶ 20.

(e)     Residential architecture is not protected expression under the First Amendment, DE 21 at ¶ 22, or alternatively the Ordinances are valid time, place and manner restrictions.  DE 81 at 23; DE 85 at 10-12.

(f)     For prudential reasons, the Court should require Burns to exhaust other available remedies before deciding the constitutional issues.  DE 60 at 8-10.

### III.     UNDISPUTED MATERIAL FACTS[5]

Burns owns real property at 1201 N. Ocean Boulevard, Palm Beach, Florida.  DE 38-1 at

¶1.  Burns has lived there for over 18 years.  *Id.*  The real property comprises an ocean-front lot

and an existing residence.  In December 2014, Burns applied to the Town Council for permission

to demolish the existing structure and build a new residence on the site ("the 2014 Application").

DE 24-1 through 24-5.  The new structure would be in the "International Style," a more modern

style of architecture than the existing home. *See* Opinion Letter of Architect David Chase dated

January 8, 2016 (DE 42-3); *see also* Photographs of 3D Model (DE 42-1).  Burns wanted his

new residence to convey his "personal philosophy" which "embrace[s] simplicity in lifestyle and

living, with an emphasis on fewer personal possession."  *See* Burns Dec. at ¶ 4 (DE 38-1).  He

wanted his home to "communicate that I am unique and different from my neighbors." *Id.*  "To

communicate these messages" Burns sought to employ specific design elements, such as

"[s]imple lines, minimal decorative elements, and open spaces built of solid, quality materials."

*Id.* at ¶ 5.

Because the lot was not wide enough to conform to the applicable zoning standards for

new construction, Burns needed a special exception and site plan approval from the Town

---

[5] Each party submitted Proposed Statements of Undisputed Facts (DE 23, DE 56, DE 68).  The Court finds that many of those proposed facts (whether disputed or not) are not material to the legal issues presented by the Defendant's Motion for Partial Summary Judgment.  Only the material facts are summarized herein.  The Court also considers other material evidence in the record that was not cited with particularity by either party.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Burns argued that some of the Town's undisputed "facts" were legal arguments, but did not present specific record citations in opposition to those assertions. *See* DE 56.  To the extent the Court believes that a particular paragraph in either party's proposed statement of undisputed fact contains an assertion of material fact and no contradictory material in the record is cited, that assertion of fact is deemed admitted if it is supported by evidence in the record. *See* Fed. R. Civ. P. 56(c)(A); Local Rule 56.1(b) ("If a party fails to controvert a proposed statement of material fact, that fact will be deemed admitted if it is supported by evidence in the record.").

Council.  DE 24-2 at 2-3.  When the Town Council met in February 2015 to consider the 2014 Application, neighbors opposed the proposed new structure; they argued that it did not conform to the existing neighborhood, had excessive height and massing, and similar concerns.  DSOF at ¶ 10. At Burns' request, the Town Council twice deferred action on the 2014 Application; eventually, the Burns withdrew the 2014 Application.  *Id. at* ¶ 11.

In November 2015, Burns submitted a new application for special exception and site plan approval ("the 2015 Application").  *Id.* at ¶ 12; *see also* DE 24-19, 24-20.  The revised design of the residence was similar to that proposed in the 2014 Application; it remained an International Style structure.  DSOF at ¶ 13; PSOF at ¶ 13; DE 24-19 through 24-25. The Town Council considered the 2015 Application at a meeting on January 13, 2016.  DSOF at ¶ 14.  Witnesses testified in support of, and in opposition to, the application, including Burns' architect and landscape architect.  DSOF at ¶ 18; PSOF at ¶¶ 14, 18.  The primary opposition arguments were that the structure was too large and too dissimilar in style to the surrounding homes. DSOF at ¶ 18.  The Town Council unanimously voted to defer a final decision on the 2015 Application until the ARCOM reviewed the project.  DSOF at ¶ 15; DE 24-27 at 14; DE 39-1 at 23-25.

The ARCOM first met on the 2015 Application on May 25, 2016.  DSOF at ¶ 18.  It heard witnesses in support of, and in opposition to, the proposal; the witnesses who opposed the project argued it was too large for the lot, too dissimilar with the neighborhood, had an inappropriate glass to mass ratio, and invaded the privacy of neighbors.  *Id.,* DE 24-41 at 5-7, DE 24-44.  Burns introduced testimony from an architect that in the period between 1954 and 2015, the Town considered fifteen international/modern architectural designs, ultimately approving all but one; the one proposal was rejected because it was "excessively dissimilar regarding the neighborhood fabric context within 200 feet." *See* DE 39-2 (Testimony of David Chase at May

25, 2016, ARCOM meeting) at 68:3-10; 79:22-80:1.   Architect Chase highlighted eight other properties on which owners had proposed building international/modern style homes over the past few decades. *See Id.* at 72:18-78:13 (discussing homes by address); DSOF (Reply) DE 68 at ¶ 42.  The ARCOM approved Burns' application to demolish his existing home.  DE 24-41 at 6. It voted 4-3 to defer a decision on Burns' proposed residential design so he could revise it.  DE 24-41 at 7.

The ARCOM met again on August 24, 2016.  DSOF at ¶ 20.  Burns presented a revised project that was approximately 25% smaller than the previous version, moved the residence farther from the seawall, increased the amount of landscaped space, and reduced the amount of glass.  DSOF (Reply) DE 68 at ¶ 43.  Burns also cited comparators, arguing that modern or "International Style" homes, similar to Burns' proposal, had been approved by prior ARCOM committees over the years elsewhere throughout the Town.  Neighbors continued to object that the proposed house did not fit in the neighborhood, was too massive for the site, had an excessive glass to mass ratio, and other concerns.  DE 24-50 at 5-7.  Some members of the ARCOM shared the neighbors' concerns.  Others believed that the structure as modified should be approved.  *Id.*  A member of the ARCOM moved to deny approval based on Section 18-205(a)(6) and (8), but this motion was rejected by a 4-3 vote.  DE 24-50 at 7.  Ultimately, the ARCOM voted to defer a decision for another month to allow the Burns to again revise his proposal.  DSOF at ¶ 45.

At the next ARCOM meeting on September 28, 2016, Burns reviewed changes that had been made since the last ARCOM meeting, presented a PowerPoint, discussed the "International Style" of comparators, and presented expert testimony in support of the proposal.  DSOF at ¶ 23; PSOF at ¶¶ 23, 46; DE 39-4.  Neighbors (personally and through architects they hired to appear

before the ARCOM) continued to object to the project, including persisting in their argument that it was too massive, and dissimilar to the existing neighborhood. DE 24-58 at 3-6. They and their attorneys also argued that Burns' proposed comparators were not, in fact, comparable. The ARCOM voted 5-2 to deny approval for the project. DSOF at ¶29; DE 24-58 at 6. Each ARCOM member spoke and explained his/her vote. DE 39-4 at 68-82.

ARCOM filed a written denial which stated that the basis for its decision was that the proposed residence did not conform to the following requirements of Section 18-205:[6]

(4)     The proposed building or structure is not in harmony with the proposed developments on land in the general area

. . .

(6)     The proposed building or structure is excessively dissimilar in relation to any other structure . . . within 200 feet of the proposed site in respect to one or more of the following features:

(c)     Architectural compatibility.

(d)     Arrangement of the components of the structure.

(e)     Appearance of mass from the street or from any perspective visible to the public or adjoining property owners.

(f)     Diversity of design that is complimentary with size and massing of adjacent properties.

---

[6] Burns submitted a Declaration stating that he was not provided with a copy of the ARCOM written denial. DE 57 at ¶5. It is not disputed that ARCOM filed this denial. Nor is it disputed that Burns was aware that his proposal had been rejected and the reasons for the rejection. The transcript of the September 28, 2106, ARCOM meeting shows that Burns and his counsel were present. DE 39-4 at 16-17. In any event, whether Burns was provided a copy of the denial is not material to the issues before the Court.

(8)     The proposed development is not in conformity with the standards of this

Code and other applicable ordinances insofar as the location and

appearance of the buildings and structures are involved.

DE 24-64 at 2-4.  Burns did not appeal the decision of ARCOM to the Town Council nor did he

file a petition for certiorari in state circuit court seeking further review.[7]

## IV.   DISCUSSION

A. Legal Principles Applicable to Multiple Claims

*1.   Subject Matter Jurisdiction*

Federal courts are courts of limited subject matter jurisdiction. A court has an

independent obligation to ensure its own jurisdiction. *United States v. Hays*, 515 U.S. 737, 742

(1995); *Wilson v. Minor*, 220 F.3d 1297, 1303 n. 11 (11th Cir. 2000) ("Of course, a federal court

has an independent obligation to ensure that it has jurisdiction over any claim brought before it

even if jurisdictional questions are not raised by either party.").  "Article III of the Constitution

restricts the power of federal courts to 'Cases' and 'Controversies.'" *Chafin v. Chafin,* 568 U.S.

165, 171 (2013).  In order to be a justiciable case or controversy, the party seeking relief must

have "standing" to bring the claim and the matter must be "ripe" for decision.  The party

invoking federal jurisdiction bear the burden of establishing that that they have standing to sue

and that this case is ripe for review.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561

(1992); *Am. Civil Liberties Union of Florida, Inc. v. Dixie Cnty., Fla.*, 690 F.3d 1244, 1247

(11th Cir. 2012).

The Court applies a three-part test to determine if a party has standing.

---

[7] Although not documented in the evidence submitted to the Court, both parties have noted in
their pleadings that Burns did not seek further review of the ARCOM decision, so the Court
deems it a stipulated fact.

> First, the plaintiff must have suffered an "injury in fact" -- an invasion of a legally
> protected interest which is (a) concrete and particularized, and (b) "actual or
> imminent, not conjectural or hypothetical." Second, there must be a causal
> connection between the injury and the conduct complained of -- the injury has to
> be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . the
> result of the independent action of some third party not before the court." Third, it
> must be "likely," as opposed to merely "speculative," that the injury will be
> "redressed by a favorable decision."

*Lujan,* 504 U.S. at 560–61, cited and quoted in *Bochese v. Town of Ponce Inlet,* 405 F.3d 964,

980 (11th Cir. 2005).

Even if Article III standing exists, the controversy may not be ripe for decision. "The

ripeness inquiry requires a determination of (1) the fitness of the issues for judicial decision, and

(2) the hardship to the parties of withholding court consideration. *Digital Properties, Inc. v. City

of Plantation,* 121 F.3d 586, 589 (11th Cir. 1997) (citations omitted). A matter is ripe only if "the

claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective

decisionmaking by the court." *Id.*

In the context of government zoning regulations, a justiciable as-applied claim does not

exist until the regulation is applied to a person's property. *See, e.g., Eide v. Sarasota Cty.,* 908

F.2d 716, 724, 726 (11th Cir. 1990) (as-applied challenge to zoning ordinance not ripe because

landowner did not "demonstrate that the sector plan has been applied to his property."").

Nevertheless, a facial challenge to a zoning regulation is ripe even if the regulation has not been

applied to the property in question. *See Id.* at n.14; *see generally Hodel v. Virginia Surface

Mining and Reclamation Ass'n,* 452 U.S. 264, 294 (1981) (premature to consider as-applied

challenge to Surface Mining Act where no property had "been taken by operation of the Act";

facial challenge permitted but rejected on the merits).

Ripeness also encompasses prudential considerations that may result in a court's refusal

to exercise jurisdiction, even when constitutional requirements are met. *Konikov v. Orange Cty.,*

13

*Fla.*, 410 F.3d 1317, 1322 (11th Cir. 2005) (citing *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997)).   The goal is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, Fla.*, 727 F.3d 1349, 1356 (11th Cir. 2013) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003)).   An additional purpose is to "shield agencies from judicial interaction until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."   *Id.* (quoting *Konikov*, 410 F.3d at 1322).   Particularly in the context of land use litigation, federal courts generally seek to limit their role in an effort to avoid "usurp[ing] the roles of agencies, review boards, and state courts . . ." *DeKalb Stone, Inc. v. County of DeKalb, Ga.*, 106 F.3d 956, 960 (11th Cir.1997).   "There is an important reason for this policy: a state should have the first chance to correct the mistakes it makes when reasonably regulating the land within its borders."   *Romero v. Watson,* 2009 WL 1361714, at *2 (N.D. Fla. May 13, 2009) (citing *Eide*, 908 F.2d at 726 ("zoning is a delicate area where a county's power should not be usurped without giving the county an opportunity to consider concrete facts and the merits prior to a court suit.").

Here, the Town argues that prudential concerns should foreclose Burns' lawsuit at this stage because he failed (1) to appeal the ARCOM's denial to the Town Council or the Circuit Court, and (2) to make a "good faith" proposal for a smaller house more compatible with the neighborhood.   DE 81 at 42.   The Town also contends that while the ARCOM rejected Burns' "toned-down" proposal, "[n]o one knows what [the] Town Council would have done on appeal . . . [because it] was never given the opportunity to address the issue."   *Id.* at 43.   Despite these prudential concerns, the Town concedes that the matter is ripe for this Court's review, and thus,

the Court declines to defer its decision.

       2.    *Summary Judgment*

The legal standard for summary judgment is well-settled:

> A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including *inter alia,* depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." A fact is material if it "might affect the outcome of the suit under the governing law." The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor.
> . . .
>
> The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. Once this burden is satisfied, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in his favor.

*Rubenstein v. Fla. Bar,* 72 F. Supp. 3d 1298, 1307–08 (S.D. Fla. 2014) (J. Bloom) (citations

omitted).

       3.    *Facial Constitutional Challenge*

A facial challenge to a government regulation "is an attack on a statute itself as opposed

to a particular application." *City of Los Angeles, Calif. v. Patel,* __ U.S. __, 135 S. Ct. 2443,

2449 (2015); *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.,* 452 U.S. 264, 295

(1981) (facial challenge attacks the "mere enactment" of a regulation.).  The party challenging

the regulation bears the burden of establishing that it is facially unconstitutional. *Jacobs v. The*

*Fla. Bar,* 50 F.3d 901, 906 n. 20 (11th Cir. 1995) (citing *N.Y. State Club Ass'n, Inc. v. City of*

*N.Y.,* 487 U.S. 1, 11 (1988).

A plaintiff mounting a facial challenge "must establish that no set of circumstances exists under which the [statute or regulation] would be valid." *United States v. Salerno,* 481 U.S. 739, 745 (1987).  That is, "when a plaintiff attacks a law facially, the plaintiff bears the burden of proving that the law could never be constitutionally applied." *Jacobs,* 50 F.3d at 906 n. 20.  This heavy burden makes such an attack "the most difficult challenge to mount successfully against an enactment."  *Salerno,* 481 U.S. at 745.  "Interpretation of a statute or ordinance is a question of law and therefore may be determined by the court on a motion for summary judgment." *Rectory Park, L.C. v. City of Delray Beach*, 208 F. Supp. 2d 1320, 1329 (S.D. Fla. 2002) (J. Hurley) (citing *United States v. Prosperi*, 201 F.3d 1335, 1342 (11th Cir. 2000)).

B.  <u>Section 18-146</u>

Burns' challenge to the constitutionality of Section 18-146 is not justiciable.  Section 18-146 is a statement of purpose, only.  It does not mandate that a property owner comply with particular procedures, it does not empower the Town to grant or deny any privileges to a property owner, it does not contain any enforcement provisions.  It merely explains why the Town is creating the ARCOM.  Therefore, because Section 18-146 does not (and could not) act as a restriction on Burns, it cannot give rise to an injury-in-fact that creates a "case or controversy."  Burns lacks standing to bring a constitutional challenge against Section 18-146. *See Patel,* 135 S. Ct. at 2451

Even if Burns had standing, his as-applied and facial challenges to Section 18-146 must be rejected.  His as-applied challenge to Section 18-146 is not ripe because that ordinance has not been used to deprive him of any rights, so his claim is not sufficiently mature.  For the same reason, Burns' Section 1983 claims (even if ripe) fail on the merits insofar as they challenge Section 18-146.  Section 1983 requires proof that a citizen was deprived of constitutional rights

under color of law.  Because Section 18-146 creates no limits on individual rights and contains no enforcement mechanism, the undisputed facts fail to show that it was used (or could be used) to deprive Burns of a constitutional right.  Therefore, to the extent Burns challenges the constitutionality of Section 18-146, those challenges should all be rejected as a matter of law.

C.   First Amendment Expressive Speech

The First Amendment's free speech clause, as applied to the States through the Fourteenth Amendment's due process clause, protects more than pure written and oral speech.  It protects, *inter alia,* certain expressive conduct, music, and (as relevant here) visual art.  *See, e.g., Texas v. Johnson,* 491 U. S. 397, 404 (1989)(flag burning), *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557 (1995)(parading); *Ward v. Rock Against Racism,* 491 U.S. 781 (1989)(music); *Bery v. City of New York,* 97 F.3d 689 (2d Cir. 1996) (paintings, photographs, prints and/or sculptures).  Nevertheless, the First Amendment does not protect every action or tangible object that in some way implicates expression.  *See United States v. O'Brien,* 391 U.S. 367, 376 (1968)("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.").  The Supreme Court's decision in *Spence v. Washington,* 418 U.S. 405 (1974) establishes a baseline for the free speech clause:  as a threshold matter, an act or an object, taken in context, must be "sufficiently imbued with elements of communication."  *Id.* at 409-10.

Burns asserts, "Architecture and architectural design are forms of expression that are protected by the First Amendment."  DE 1 at ¶34. [8]  Building on this assertion, he argues that the

---

[8] Even assuming *arguendo* that architecture and architectural design are forms of expression, the Supreme Court has made clear that not every expression receives First Amendment protection, and that this determination is factually individualized, based in part on context.  Therefore, as

specific residential structure he proposed to build at 1201 N. Ocean Boulevard was visual art which intrinsically expressed certain of Burns' personal values.  *See* DE 38-1 (Declaration of Donald Burns).[9]  He argues that the Town, through the ARCOM, abridged his protected First Amendment rights by denying him the right to create and display this art.

Burns bears the initial burden of proving that his expression falls within the protection of the First Amendment.  *E.g., Clark v. Cmty for Creative Non-Violence,* 468 U.S. 288, 293 n.5. If he does, the burden shifts to the Town to justify any restriction on that expression.  *Dills v. Cobb Cty., G*a., 755 F.2d 1473, 1474 (11th Cir. 1985); *Towbin v. Antonacci*, 885 F. Supp. 2d 1274, 1280 (S.D. Fla. 2012) (J. Williams) ("the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction."). Therefore, for purposes of the as-applied First Amendment claim, Burns must show that the specific residential structure that he proposed to build at 1201 N. Ocean Boulevard, taken in its particular context, is expression that is entitled to First Amendment protection.  For purposes of the facial First Amendment claim, Burns must show that *all* forms of architecture and architectural design that are regulated by the Ordinances are protected expression.

Notably, the parties suggest similar standards for determining whether Burns' proposed residence qualifies as First Amendment expression. Burns argues that the Court should follow Justice Marshall's dissenting opinion in *Clark v. Community for Creative Non-Violence,* 468

---

discussed more fully below, the Court does not (and cannot) resolve the broader issue of whether all architecturally-designed structures categorically qualify as visual art protected by the First Amendment.

[9] Notably, Burns does not allege that either the act of building the residence or the act of living in the constructed residence would be expressive conduct.  *See, e.g.,* DE 82 at 9 ("The expression is not the act of building the home; it is the artistic design that conveys the message."); DE 86 at 4.

U.S. 288 (1984).  DE 82 at 5.  That is, the Court should look "first to the intent of the speaker – whether there was an intent to convey a particularized message – and second to the perception of the audience – whether the likelihood was great that the message would be understood by those who viewed it."  *Clark,* 468 U.S. at 305 (internal quotations omitted).  Burns also relies on *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557 (1995) as establishing "when conduct rises to the level of expression that is protected speech" (DE 61 at 8), and for the propositions that "pure art is protected and any infringement of that activity must be analyzed under the strict scrutiny standard" (DE 82 at 10), and that "a narrow, succinctly articulable message is not a condition of constitutional protection." *Id.; see also* Hearing Transcript at 69:25-71:4 (referencing *Hurley*).  According to Burns, he intended the design of his home to communicate his "evolving personal philosophy with an emphasis on fewer personal possessions and simplicity in lifestyle" and he believes that message "would be reasonably understood by those who viewed it" in that "at least some people would clearly understand that the architecture of a home is intended to be expressive."  DE 82 at 7-8; DE 86 at 3-4.

The Town, arguing that the First Amendment only protects conduct that is "inherently expressive," applies a similar two-part test.  DE 81 at 12 ("whether an intent to convey a particularized message was present," and "whether the likelihood was great that the message would be understood by those who viewed it") (citing *Texas v. Johnson,* 491 U.S. 397, 404 (1989)).  Unlike Burns, the Town concludes that "there is little likelihood that the general public passing by Burns' house would understand that it was his intent to convey a message that he is a non-traditionalist, seeking a simplistic lifestyle, and is expressing his 'inner-self.'"  DE 60 at 14.  Moreover, applying a "dominant purpose" test (*see Mastrovincenzo v. City of New York,* 435 F.3d 78, 95 (2d Cir. 2006)), the Town concludes that the primary purpose of a residence "is a

dwelling in which to live, not to convey a message." DE 81 at 14.

Assuming that the residence qualifies as expression protected by the First Amendment, Burns (citing *Hurley*) argues that the Court should apply strict scrutiny in determining whether the Ordinances are proper time, place, and manner restrictions. *See* Hearing Transcript at 60:23-62:22; DE 35 at 10-11; DE 82 at 10-13. The Town argues that intermediate scrutiny applies, citing *United States v. O'Brien*, 391 U.S. 367 (1968) and *Ward*, 491 U.S. at 791. *See* Hearing Transcript at 35:21-37:1; 121:2-13; DE 60 at 15-20; DE 81 at 19-24.

Neither party has cited (nor has the Court found) a reported appellate decision addressing whether a residential structure constitutes visual art protected by the First Amendment. The Court is not without guidance, however. Two lines of related First Amendment jurisprudence inform how this issue should be resolved. One is the line involving expressive conduct, that is, public actions that are intended by the actor to communicate an expressive message. The second involves expressive merchandise, that is, tangible objects that have a function independent of expression, but that also involve an element of expression. As discussed more fully below, relying on the expressive conduct jurisprudence, the Washington Supreme Court held that a church building was entitled to First Amendment protection. Relying on the same test, the District of Nevada held that certain residential structures did not fall within the First Amendment.

### 1. *Expressive Conduct*

In the Eleventh Circuit, expressive conduct receives First Amendment protection if (1) the actor intends for the conduct to communicate a message, and (2) there is a great likelihood that a reasonable person observing the conduct in the context of the surrounding circumstances would understand the conduct to be communicative. *Holloman ex rel Holloman v. Harland,* 370

F.3d 1252, 1270 (11ᵗʰ Cir. 2004).[10] A particularized message is not required. *Id.* (citing *Hurley* 515 U. S. at 569). Instead, "in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman,* 370 F.3d at 1270. *See also Hurley*, 515 U.S. at 569-70 ("a narrow, succinctly articulable message is not a condition of constitutional protection . . . a private speaker does not forfeit constitutional protection simply by . . . failing to edit their themes to isolate an exact message").

Whether certain expressive conduct is deemed to be "sufficiently imbued with elements of communication" to fall within the First Amendment depends on "'the nature of [the] activity, combined with the factual context and environment in which it was undertaken . . .'" *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144, 158 (3d Cir. 2002) (quoting *Spence v. Washington*, 418 U.S. 405, 409–10 (1974). "Context is crucial to evaluating an expressive conduct claim because the context may give meaning to the . . . act in question." *Id.* This "context-dependent inquiry" is "fact-sensitive." *Id.*

2. *Expressive Merchandise*

Some situations involve the sale of objects that combine expression with a non-expressive function ("expressive merchandise"). Like Burns, the proprietors of this merchandise do not assert that the act of selling is expressive; they claim that the objects themselves inherently express artistic sentiments.

The seminal case on expressive merchandise is *Bery v. City of New York,* 97 F.3d 689 (2d Cir. 1996), a case involving the sale of paintings, prints, sculpture, and photography by street vendors in New York City. A group of painters, photographers, and sculptors challenged a New

---

[10] *Holloman* involved a public school student who raised his fist in protest of another student being disciplined for refusing to say the Pledge of Allegiance.

York City ordinance that required all street vendors to obtain a vending license, at the risk of a fine, imprisonment, and forfeiture of merchandise for non-compliance.  The vendors sought an injunction, arguing that enforcement of the ordinance against them violated their First Amendment right to freedom of expression.   Although the City argued that the vendors' expression was not their art but the peddling of their art, the plaintiffs in *Bery* did not assert that the act of selling their merchandise was protected speech.  *Id.* at 695.  Rather, they argued that the merchandise itself was art that contained an intrinsic expressive message. *Id.* at 695 ("Visual artwork is as much an embodiment of the artist's expression as is a written text").  The district court denied the injunction, but the Second Circuit reversed.  97 F.3d at 699.

The *Bery* court noted that different forms of visual art contain different levels of expressive content, not all of which was entitled to First Amendment protection.  It differentiated objects that were "potentially expressive" from those that were "presumptively expressive." *See Mastrovincenzo*, 435 F.3d at 93 (discussing *Bery*).  The Second Circuit distinguished "the crafts of the jeweler, the potter and the silversmith . . . [which] *may at times* have expressive content, [from] paintings, photographs, prints and sculptures . . . [which] *always* communicate some idea or concept to those who view it, and as such are entitled to full First Amendment protection."  *Id.* at 696 (emphasis added).  "Courts must determine what constitutes expression within the ambit of the First Amendment and what does not.  This surely will prove difficult at times, but that difficulty does not warrant placing all visual expression in limbo outside the reach of the First Amendment's protective arm." *Id.*  Thus, while *Bery* acknowledged that *some* visual art receives First Amendment protection, it acknowledged that some would not.

Having found that the paintings, prints, sculpture, and photography were entitled to full First Amendment protection, the *Bery* court then analyzed whether the New York City ordinance

was a valid content-neutral time, place, and manner restriction.  Finding that it was not, the Second Circuit reversed the district court's denial of a preliminary injunction.  On remand, the City stipulated to a permanent injunction that prohibited it from enforcing the ordinance against "paintings, photographs, prints and/or sculptures" (i.e., the presumptively expressive arts).

*Bery* left unresolved when potentially-expressive visual art should receive First Amendment protection.  A follow-up case forced the Second Circuit to revisit this unresolved question and to refine *Bery*.  In *Mastrovincenzo*, appellants were unlicensed street vendors of clothing painted with customized graffiti. They argued that the street vendor ordinance unconstitutionally abridged their first amendment right of expression; they claimed that each article of their clothing was an individual work of art.  The trial court found that the merchandise constituted "expressive works of art" and issued the injunction.  435 F.3d at 87-88.

The Second Circuit declined to decide whether the clothing was "art," which it described as "a famously malleable concept the contours of which are best defined not by courts, but in the proverbial 'eye of the beholder.'"  *Id.* at 90.  Instead, it applied a two-part test to determine if the clothing warranted First Amendment protection: (1) was the sale of plaintiffs' items "predominantly expressive," and if so (2) did the licensing ordinance fail an intermediate standard of First Amendment scrutiny.  *Id.* at 91.  In resolving the first inquiry, the Second Circuit applied a predominant purpose test, that is, "whether the disseminators of that clothing are genuinely and primarily engaged in artistic self-expression or whether the sale of such goods is instead a chiefly commercial exercise."  *Id.*  "Because the most reliable means of resolving this difficult question is to examine objective features of the merchandise itself, we begin by analyzing whether plaintiffs' items, on their face, appear to serve predominantly expressive purposes."  *Id.*  The "threshold analysis of the objective characteristics of" the clothing was "the

first step of a large inquiry into whether plaintiffs are engaged in protected speech – an inquiry that may also be informed by other, more subjective considerations." *Id.* For potentially-expressive items, an individualized, case-by-case inquiry is required to determine if the particular work is sufficiently expressive. *Id.* at 93. In making this analysis, "the most reliable means of determining whether a vendor is primarily engaged in an act of self-expression is not to consult the vendor himself (who will, in most instances, have a strong incentive to emphasize his artistic motivations), but rather to examine the expressive content of the materials being sold." *Id.* at 94.

> Once a court has determined that an item possesses expressive elements, it should then consider whether that item also has a common non-expressive purpose or utility. Because merchandise that clearly has an alternative, non-expressive purpose . . . is more likely to possess only marginal expressive content or to have been minimally embellished for the purpose of avoiding regulation, courts should exercise great skepticism in designating such items as "expressive merchandise." The fact that an object serves some utilitarian purpose does not, however, automatically render it non-expressive; rather, upon a finding that the item in question possesses some common non-expressive purpose, a court should then determine whether that non-expressive purpose is dominant or not. Where an object's dominant purpose is expressive, the vendor of such an object has a stronger claim to protection under the First Amendment; conversely, where an object has a dominant non-expressive purpose, it will be classified as a "mere commercial good[]," the sale of which likely falls outside of the First Amendment.

*Id.* at 95 (brackets in original). By way of example, the Second Circuit identified several items that had dominant non-expressive purposes: "A cufflink fastens the cuff and keeps the shirtsleeve from crowding the wrist; a pot serves as a tidy and dry depository for food and other objects, and cutlery (or, for that matter, a silver plate), even if wrought with substantial skill and artistry, most often serves a predominantly non-expressive purpose." *Id.* at 95.

The Second Circuit ultimately found that the *Mastrovincenzo* plaintiffs' clothing was predominantly expressive, which "provide[d] a strong indication that plaintiffs are engaged in protected speech, yet it does not end our inquiry." Nevertheless, the Court also looked to other

factors "that shed light on how and why an object is being sold or disseminated." *Id.* at 96. The *Mastrovincenzo* court considered whether the motivation for producing and selling the item was a desire to communicate ideas and whether the sale of the items was an act of self-expression or a mere commercial transaction. *Id.* at 96-97. The Court made clear that these factors were a non-exhaustive, suggested list "that courts may wish to consider in future circumstances, which may differ in unpredictable ways from the case at bar." *Id.*

The Second Circuit did not analyze the clothing under the expressive conduct doctrine of the First Amendment. "We need not apply the doctrine of expressive conduct here because plaintiffs' conduct – namely, the sale and dissemination of their artistic objects – does not itself contain any expressive content. That is, plaintiffs' claims to First Amendment protection are not predicated on the theory that the act of distributing their artistic objects itself conveys a separate "particularized message" likely to be understood by an audience. Rather, plaintiffs assert that by disseminating to the public objects that they have invested with meaning through their artistry they are communicating directly through those objects – in short, that they are engaging in protected speech." 435 F.3d at n.9.

### 3. Architecture Cases

The parties have identified only one reported federal court case that addressed the question whether a residential structure is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Committee for Reasonable Regulation of Lake Tahoe v. Tahoe Regional Planning Agency,* 311 F. Supp. 2d 972, 1004 (D. Nev. 2004) (quoting and citing *Spence*). This decision pre-dated *Mastrovincenzo.* It involved, *inter alia*, a First Amendment facial challenge to an ordinance that regulated "the size, color, appearance, visibility, and other aspects of residential housing on littoral and shoreland

properties in the Lake Tahoe basin." 311 F. Supp. 2d at 975.  It was asserted by an amicus that residential housing should be treated as speech protected by the First Amendment.  *Id.*   The court modified the question presented to more accurately reflect the issue before the Court: "[t]he question is not whether a residential home is speech, but whether the remodeling or rebuilding of a home that affects the design, color, size, visibility and other aspects of the home's overall appearance is speech." *Id.* (citation omitted).  The court applied the two-part test from *Spence* and *Clark*: "(1) whether the actor had an intent to convey a particular message, and (2) in context, would the act or symbol reasonably be understood by the viewer to be communicative." *Id.* at 1005.  It found that the plaintiffs had failed to meet this burden.  *Id.*  Regarding the second factor, the Court said, "Although some residential remodels or rebuilds *may* involve an intent to convey an artistic, political, or self-expressive message, the great majority of remodeling or rebuilding projects involving residential housing are functional in nature and are not commonly associated with expression."  *Id.* at 1005 (emphasis in original).  Nevertheless, the court left open the possibility that some other residential structure could qualify for First Amendment protection.

Separately, in a decision that predated *Mastrovincenzo* and *Bery,* the Washington Supreme Court addressed a First Amendment challenge to a Landmarks Preservation statute that would have limited a church's ability to make changes to the exterior of its structure.  *First Covenant Church of Seattle v. City of Seattle,* 120 Wash. 2d. 203 (1992).  The court held that the statute infringed the church's right to free speech.  *Id.* at 216.  It applied the *Spence* and *Johnson* tests:  whether considering the speech in context, there was an intent to convey a particularized message and a great likelihood that the message would be understood by those who observed it. *Id.* at 216-17.  The Court accepted that the "church building itself 'is an expression of Christian

belief and message' and that conveying religious beliefs is part of the building's function." *Id.* at 217. It concluded that an observer would understand that the building (both interior and exterior) were "freighted with religious meaning." *Id.* Therefore, it held that the statute violated the Church's right to free speech.

### 4. *Legal Standards Applicable to Burns' Structure*

The Court finds that the residential structure here is best analogized to potentially-expressive merchandise. It has both a communicative component and a meaningful non-communicative functional purpose; this factor differentiates the instant case from the expressive conduct cases.

Expressive conduct tracks closer to pure speech and the core of the First Amendment than does potentially-expressive merchandise.[11] Therefore, in delineating which expressive conduct receives First Amendment protection (i.e., whether it is sufficiently imbued with elements of communication), it is appropriate to apply the *Hurley* standard and ask whether a reasonable observer would discern *any* message from the conduct. This standard best manages the risk that protected speech, in the form of expressive conduct, is not abridged.

When dealing with potentially-expressive tangible objects, however, a more limited approach is warranted because there is less risk of abridging core First Amendment principles, and more risk of prohibiting government regulation of objects that are not primarily expressive. A broad spectrum of tangible objects could be deemed to be expressing *some* message, even a *de minimis* one – a beautifully plated meal could be expressing the chef's artistic philosophy; a hybrid car may communicate the owner's concern about greenhouse gases (or their desire to use

---

[11] "The Eleventh Circuit applies the same legal test to both pure speech and expressive conduct. *Holloman,* 370 F. 3d at 1270.

the HOV lane on a crowded highway); a couture garment could communicate the wearer's sense of individuality; a residence in a particular neighborhood or community could communicate a love of the ocean, an embracing of new urbanism, a desire for solitude, or many other messages.[12]  *See Mastrovincenzo,* 435 F.3d at 87 (Noting that the trial court had "conceded that 'almost every object can conceivably be interpreted as having some expressiveness,' and that 'not everything labeled or hawked as art [should be considered expressive art].'")(citations omitted)(brackets in original).  In fact, many corporations market their goods by emphasizing that the product inherently communicates a message about the person using the product – Pepsi ("the choice of a new generation"); Apple ("think different"); Nike ("just do it"); BMW ("the ultimate driving machine"); Montblanc ("the art of writing").  The government's police power to regulate health, safety, and general welfare would be unduly restricted if every potentially-expressive tangible object obtained First Amendment protection whenever the proponent subjectively intended to communicate a message and a reasonable observer would discern *any* expressive message from the object.  *Id.* at 92 ("The observation that *any* object with a size, shape and density has the potential to be art . . .  is a truism, and in legal terms, not entirely helpful.  To say that the First Amendment protects the sale or dissemination of all objects ranging from 'totem poles' to television sets does not take us far in trying to articulate or understand a jurisprudence of ordered liberty; indeed, it would entirely drain the First Amendment of meaning.")(citations omitted)(emphasis in original).  Because of the fundamental differences between expressive conduct cases and tangible object cases, this Court finds that the

---

[12]  Conversely, almost any piece of presumptively-expressive visual art could have a non-expressive use, albeit not a predominant one.  For example, a Faberge egg could be used as a paperweight; a Lladro figurine could be used as a door stop; a Rodin sculpture could be used to block a right-of-way; a Picasso painting can be used to cover a whole in the wall.  Thus, it is clear that visual art does not automatically lose First Amendment protection because it may have *some* non-expressive use.

*Holloman/Hurley* test alone is not sufficient for deciding if a residential structure warrants First Amendment protection.

The Court finds that the Second Circuit's "predominant purpose" framework adds a necessary limitation when dealing with potentially-expressive tangible objects. The Court will incorporate this framework into the *Spence* and *Johnson* tests applied in the above-discussed architecture cases and the *Holloman* test applied by the Eleventh Circuit to expressive conduct. Therefore, in determining whether a particular residential structure receives First Amendment protection, the Court will employ the following test:

(1)    Is the owner of the structure subjectively intending to communicate a message?

(2)    Is the predominant purpose of the structure to communicate a message?

(3)    Is there a great likelihood that a reasonable person observing the structure in the context of the surrounding circumstances would understand it to be predominantly communicating some message, albeit not necessarily the particularized message intended by the owner?[13]

Having derived the proper test, the Court next must determine if Burns' First Amendment claims are properly decided on summary judgment. Defendant concedes (and the undisputed facts support) that Burns subjectively intended to convey a message. DE 81 at 9 n.2. Burns has satisfied the first element of the Court's test. The Court makes an objective determination of the predominant purpose of the structure. As the *Mastrovincenzo* court noted, the artist's subjective intent may be relevant but is not controlling. Here, the Court can decide from the undisputed

---

[13] The decision in *First Covenant Church* is consistent with this test. A court would be well within its discretion to conclude that the predominant purpose of a church or other house of worship is to communicate a message of religious belief, and that a reasonable observer would identify a predominantly expressive message.

evidence in the record whether Burns has met his burden of showing that the predominant purpose of the structure was expressive.  The parties agree that it is an issue of law whether there is a great likelihood that a reasonable person observing the proposed structure in context would understand it to be communicative.  DE 82 at 5; DE 81 at 21-23.  Neither party has identified a disputed issue of fact material to this legal determination. Finally, whether the Ordinances constitute a content-neutral time, place, and manner restriction is an issue of law.  *See Granite State Outdoor Advert., Inc. v. City of St. Petersburg, Fla*., 348 F.3d 1278, 1283 (11th Cir. 2003) (on *de novo* review, Court ruled in favor of defendant on summary judgment finding that its content-neutral time, place, and manner restriction on protected speech passed constitutional muster).  Summary judgment is appropriate.

The Court finds that, in context, the predominant purpose of Burns' structure was non-expressive.[14]  It is a privately-owned residential structure.  It would be located in a residential neighborhood; there is no evidence that it would be in a public forum or commercial district. The architectural drawings submitted to the ARCOM demonstrate that the structure is, first and foremost, a residence.  As originally presented, it would be a permanent structure of over 14,000 square feet, consisting of two stories above a basement containing a garage, laundry, wine storage, and a steam room. DE 1 at ¶17.  The plans detailed numerous bedrooms and bathrooms, terraces, balconies, an elevator, and a pool.  DE 24-3.  The home's placement on an oceanfront lot, with expansive windows facing the water, strongly suggest that it would exist primarily as a space for the enjoyment of its occupant, not as an expressive piece of art.  Moreover, the original elevation drawings show that the overall design incorporated a privacy wall and heavy landscaping on the west side of the property to provide a buffer between the public thoroughfare

---

[14] Copies of the architectural drawings and elevations are reprinted as Appendix 2.

and the structure.  This buffer is more consistent with incorporating solitude into a private residence than creating a piece of expressive art for public expression.  The structure is thickly landscaped on both the north and south to limit the neighbors' sight lines.  Again, this feature reduces the structure's expressive function.  The Court finds that the predominant purpose of the structure is to serve as a residence, not as a piece of visual art.

The Court also finds that the undisputed material facts fail to show that there is a great likelihood that a reasonable person observing the proposed structure in context would understand it to be predominantly communicating a message.[15]  In *Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015), a symbolic speech case, the Tenth Circuit analogized the *Spence-Johnson* test to the *"reasonable observer"* analysis used in Free Exercise Clause cases.  It stated, "[s]imilarly, in the symbolic-speech context, the reasonable person focuses on 'context [to] give meaning to [a] symbol' and is cognizant of the 'then-current domestic and foreign affairs of his government,' 'issue[s] of intense public concern,' the 'environment' in which an expressive act occurs, and the reasons for the speaker's expression."  *Id.* at 958 (citing *Spence,* 418 U.S. at 410) (brackets in original).

Here, the undisputed facts fail to show a great likelihood that a reasonable observer would consider the proposed structure to be predominantly for an expressive purpose.  As noted above, the overall context of the structure is to be a private residence largely concealed from the public and the neighbors.  The only unobstructed viewpoint is from the Atlantic Ocean.  The fact that the residence is a custom design militates in favor of an observer discerning some expressive

---

[15] Burns argues, "[h]ere, when observing [Plaintiff's] home, *at least some people* would infer that [Plaintiff], through his homes' [sic] design, intended to convey a message of lifestyle simplicity."  DE 82 at 10 (emphasis added).  Plaintiff misstates the applicable test.  The legal issue is not whether *some people* would discern a communicative message, it is whether in context there is a great likelihood that *a reasonable viewer* would identify a communication as the predominant purpose of the structure.  *See Holloman,* 370 F.3d at 1270.

message.  Nevertheless, that message is ambiguous.  It equally could be Burns' subjective message, or that the owner believes the house fits the lot well, or that the owner could afford this particular design, or that the owner likes modern architecture, or that the owner likes this particular architect. The fact that the structure is a different style from the neighboring structures (and from the existing structure) sends a similarly ambiguous message to an observer.  Perhaps the owner likes a different style than his neighbors.  Perhaps he believes a house made of glass and sturdy materials will be more energy efficient or hurricane resistant.  Perhaps he wanted to upgrade to a bigger house, a better view, or more or different amenities.  Finally, nothing about the structure identifies Burns as the owner, so to the extent the structure communicates a message, the speaker is not readily identified, which affects the viewer's understanding of the reasons for any expressive message.  Considering all these factors, the Court finds that Burns has not shown a great likelihood that a reasonable observer would conclude that the predominant purpose of the structure was expressive rather than residential or functional.

Because the Court finds that Burns has not met his initial burden of establishing that his conduct is protected by the First Amendment, the Court need not address whether the Ordinances are content-neutral time place manner restrictions, or otherwise are constitutionally acceptable limitations on speech.  Additionally, because the Court finds that the Ordinances can be constitutionally applied to Burns' proposed structure, his facial challenge must also be rejected. Even if the as-applied challenge succeeded, the Court would still reject the facial challenge. Given the fact-intensive nature of the First Amendment inquiry, the Court cannot hold that in every instance and every context an architecturally-designed structure receives First Amendment protection.  As such, the Court finds that Burns has not met his burden of showing that the Ordinances in all instances violate the First Amendment.  His facial challenge should be

denied.[16]

D.  Fourteenth Amendment Claims

1.      *Void for Vagueness*

Whether a law is void for vagueness is a question of law for the court.  *United States v. Paradies,* 98 F.3d 1266, 1284 (11th Cir. 1996); *Rectory Park, L.C. v. Delray Beach,* 208 F. Supp. 2d 1320, 1329 (S.D. Fla. 2002) (J. Hurley).  "Vagueness arises when a statute is so unclear as to what conduct is applicable that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *United States v. Gilbert*, 130 F.3d 1458, 1462 (11th Cir. 1997).

The "[v]agueness doctrine . . . does not forbid the legislature from acting toward any end it wishes, but only requires it to act with enough clarity that reasonable people can know what is required of them and judges can apply the law consistent with their limited office."  *Sessions v. DiMaya,* __ U.S. __, 138 S. Ct. 1204, 1233 (Gorsuch, J.) (concurring in part and concurring in the judgment).  When evaluating a statute for vagueness, the court must determine whether a "person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited," and whether the statute provides "explicit standards" so as to prevent arbitrary and discriminatory enforcement.  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "To find a civil statute void for vagueness, the statute must be 'so vague and indefinite as really to be no rule or standard at all.'" *Rectory Park, L.C.,* 208 F. Supp. 2d at 1331 (quoting *Boutilier v. INS*, 387 U.S. 118, 123 (1967)).

---

[16] The Court also rejects Burns' compelled speech facial challenge. Burns asserts, "The ordinance itself compels certain speech by compelling certain designs. By compelling conformity with the houses around it is compelling the design and therefore the speech." Hearing Transcript at 107:13-16.  Even assuming that the design of a particular residential structure was First Amendment protected speech, nothing within the Ordinances compels the owner to build the structure.

"When addressing a facial challenge to a law on vagueness grounds, 'a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct . . . such as speech or expression under the First Amendment, or other fundamental rights under the Fourteenth Amendment . . . such as those related to family, marriage, procreation or child-rearing." *Rectory Park, L.C.,* 208 F. Supp. 2d at 1329-30 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982).  Where the court finds that the challenged statute does not impinge on any protected conduct, "a void-for-vagueness challenge is more difficult to sustain because '[t]he degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment." *Rectory Park, L.C.,* 208 F. Supp. 2d at 1330 (where an ordinance "does not implicate substantial constitutionally-protected conduct, the court will examine it with somewhat less exacting scrutiny") (quoting *Hoffman Estates*, 455 U.S. at 498).  [17]

This Court has already found that Burns' asserted expression of his personal beliefs through his home's architecture is not entitled to First Amendment protection.  Nor do the facts alleged in Burns' Complaint implicate a fundamental right, either.  *See McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994).  Therefore, the Court will apply the "less exacting scrutiny" employed in *Rectory Park, L.C.*, where the plaintiff property owners facially challenged on

---

[17] There is some question whether a valid facial challenge can be brought where a regulation does not implicate a constitutionally-protected right.  *See United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."); *DiMaya*, 138 S. Ct. at 1242 (Thomas J.)(dissenting)("[I]f the vagueness doctrine has any basis in the Due Process Clause, it must be limited to cases in which the statute is unconstitutionally vague as applied to the person challenging it."); *see also United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001) (declining to consider facial vagueness challenge when statute did not involve the First Amendment); *United States v. Jae Gab Kim*, 449 F.3d 933, 942 (9th Cir. 2006) ("vagueness challenges to statutes that do not involve First Amendment violations must be examined as applied to the defendant").  The Town has not raised this argument, however, so the Court will address Burns' facial vagueness challenge to Section 18-205 on the merits.

vagueness grounds a city ordinance restricting the permissible density of certain building projects as measured by eight performance standards. *Rectory Park,* 208 F. Supp. 2d at 1328-29. In that case, the court deferred to the city's interpretation of its ordinance because it was "a permissible construction," and the court concluded that the plaintiff property owners "failed to meet their burden to demonstrate that the ordinance is impermissibly vague in all of its applications." *Id*. at 1329-1330 (citing *Southlake Property Assoc., Ltd. v. City of Morrow*, 112 F.3d 1114, 1118 (11th Cir. 1997)). The court found the city's performance standards to be "sufficiently clear" for ordinary people to understand and "sufficiently definite" in the details provided. *Id.* at 1330. The court relied on the "clear import of the section as a whole [ ] that the more a project meets each of the standards, the greater will be the amount of increased density granted." *Id.*

Here, Burns contends that the criteria set forth in Section 18-205 are too vague and are subject to "an individual's personal tastes or whim," thus affording ARCOM "unbridled discretion." DE 35 at 12-13. The Town counters that the Ordinance contains "definitive criteria" which "guide and constrain the discretion of ARCOM." DE 22 at 6.

As in *Rectory Park, L.C.,* this Court finds that the criteria outlined in Section 18-205 of is sufficiently clear and definite to withstand a void for vagueness challenge. Indeed, the Ordinance lists specific design elements that cannot be "excessively dissimilar" to other structures within a radius of 200 feet, such as the height of the structure, the materials used, and the size and mass of the structure. *See* Code § 18-205 (6)(a), (b), (f). The Ordinance emphasizes that "other structures in the immediate area" must be taken into consideration to ensure that the proposed structure has "architectural compatibility" and "is in harmony" with those around it. *Id.* at (4), (6)(c), (8). This language, read in conjunction with the subsection requiring that the

proposed structure also not be excessively similar to the other structures nearby (*id.* at (5)), is sufficient to put a person of ordinary intelligence on notice as to what types of structures are prohibited.  That the Ordinance affords the Town some discretion in applying these criteria is not fatal. *See Rectory Park, L.C.,* 208 F. Supp. 2d at 1332 ("in land-use regulation the decision-maker is permitted to exercise some discretion where the matter concerns a concept as inherently subjective as 'compatibility'").  Given that the Ordinance contains explicit standards regarding the specific design elements that will judged, as well as the parameters for an acceptable proposal (i.e., structures that are neither excessively similar nor dissimilar to those within 200 feet), the Court finds that the Town is adequately constrained so as to prevent arbitrary or discriminatory enforcement.

> ### 2.      Overbreadth

The Supreme Court in *Salerno* acknowledged an exception to the "unconstitutional-in-every-conceivable-application" rule governing facial substantive due process challenges in cases involving the overbreadth doctrine in "the limited context of the First Amendment." *Horton v. City of St. Augustine, Fla.*, 272 F.3d 1318, 1331 (11th Cir. 2001) (quoting *Salerno*, 481 U.S. at 745).  The "overbreadth doctrine" allows a litigant to assert a facial challenge to a statute because it could compromise the First Amendment rights of parties not before the Court. *Id.* Thus, the litigant challenges the statute on facts that apply to others.  *See CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1271 (11th Cir. 2006).  As a result, facial challenges may be successful though the application of the ordinance in the case under consideration may be constitutionally unobjectionable. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992)). The Supreme Court reserves this exception for cases involving restrictions on the right to free speech because "the very existence of some broadly written laws has the potential to chill

the expressive activity of others not before the court." *Id.*  Here, given that the First Amendment is not implicated, Burns' claim that the Ordinances are overbroad must fail.

      3.      *Due Process Arbitrary and Capricious (Substantive Due Process)*

Burns cannot assert an as-applied substantive due process challenge to Section 18-205 because zoning enforcement actions (as so-called "executive acts") not involving a fundamental right are not subject to substantive due process challenge.   Burns can assert a facial challenge to Section 18-205 (as a so-called "legislative act"), but that facial challenge fails on the merits.

Unless a fundamental right is implicated, a party who has received procedural due process cannot challenge an "executive act" as arbitrary and capricious under the substantive component of the Fourteenth Amendment due process clause.  *See McKinney v. Pate,* 20 F.3d 1550, 1556-57 & n.9 (11th Cir. 1994) (en banc); s*ee also  Greenbriar Village, L.L.C. v. Mountain Brook, City,* 345 F.3d 1258, 1262 (11th Cir.2003) ("[N]on-legislative deprivations of state-created rights, which would include land-use rights, cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrarily and irrationally. Constitutional due process is satisfied for these deprivations when proper procedures are employed.").   Nevertheless, substantive due process challenges to "legislative acts" affecting non-fundamental rights continue to exist.  *See Kentner v. City of Sanibel,* 750 F.3d 1274, 1279–80 (11th Cir. 2014) ("There is, however, at least one exception to this Circuit's general rule that there are no substantive due process claims for non-fundamental rights. Where a person's state-created rights are infringed by a "legislative act," the substantive component of the Due Process Clause generally protects that person from arbitrary and irrational governmental action.") (citation omitted).

Whether governmental conduct is an "executive act" or a "legislative act" is an issue of federal law to be determined by the Court. *Lewis v. Brown*, 409 F.3d 1271, 1273-74 (11th Cir. 2005). "Executive acts characteristically apply to a limited number of persons (and often to only one person); executive acts typically arise from the ministerial or administrative activities of members of the executive branch. The most common examples are employment terminations. Legislative acts, on the other hand, generally apply to a larger segment of – if not all of – society; laws and broad-ranging executive regulations are the most common example." *McKinney*, 20 F.3d at 1557 n.9. "A legislative act also involves policy-making rather than mere administrative application of existing policies." *Kentner v. City of Sanibel*, 750 F.3d 1274, 1280 (11th Cir. 2014)(citing and quoting *DeKalb Stone, Inc. v. County of DeKalb, Ga.,* 106 F.3d 956, 959 (11th Cir.1997)). The Eleventh Circuit has repeatedly stated that enforcing zoning regulations is an executive act. *See, e.g., Lewis v. Brown,* 409 F.3d at 1274*; DeKalb Stone, Inc. v. County of DeKalb, Ga.,* 106 F.3d 956, 959 (11th Cir.1997) (quotation omitted); *Boatman v. Town of Oakland,* 76 F.3d 341, 346 (11th Cir. 1996)(argument that denial of certificate of occupancy was arbitrary and capricious, in violation of plaintiff's substantive due process rights, was "novel" and "frivolous").

A party may challenge a zoning ordinance on its face on substantive due process grounds because such an ordinance is a legislative act. *Kentner v. City of Sanibel,* 750 F.3d 1274, 1280 (11th Cir. 2014) ("Because plaintiffs are challenging the Ordinance on its face rather than contesting a specific zoning or permit decision made under the auspices of the Ordinance, we conclude that they are challenging a legislative act"). This kind of substantive due process challenge (which does not implicate a fundamental right) is reviewed under the 'rational basis' standard. *Id.*; *see also Leib v. Hillsborough Cnty. Public Trans. Comm'n*, 558 F.3d 1301, 1308

(11th Cir. 2009) ("[S]ubstantive due process claims are subject to rational basis review, so long as they do not infringe fundamental rights and are not discriminatory.").  This test is not a rigorous one, and only requires the court to consider whether the ordinance is "rationally related to a legitimate government purpose." *Ga. Mfgd. Hous. Ass'n. v. Spalding Cnty.*, 148 F.3d 1304, 1307 (11th Cir. 1998).  First, a court must identify a legitimate government purpose that the enacting government body could have been pursuing.  *See Restigouche, Inc. v. Town of Jupiter,* 59 F.3d 1208, 1214 (11th Cir. 1995).  Second, the court "asks whether a rational basis exists for the enacting government body to believe that the legislation would further [this] hypothesized purpose." *Id.* "As long as reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational, the legislation survives rational-basis scrutiny." *Spalding Cnty.*, 148 F.3d at 1307.

The party challenging the ordinance bears the burden of establishing a lack of a rational basis for that action. *Kentner v. City of Sanibel,* 750 F.3d at 1281.  That is, the party challenging the regulation bears the burden of proving that the regulation is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *New Port Largo, Inc. v. Monroe Cty.*, 873 F. Supp. 633, 644 (S.D. Fla. 1994) (quoting *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926); *see also Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989) (the state, when zoning land, must not act "for an improper motive and by means that were pretextual, arbitrary and capricious, and ... without any rational basis.");   As the Eleventh Circuit has explained, "[t]his standard is 'highly deferential' and we hold legislative acts unconstitutional under a rational basis standard in only the most exceptional of circumstances." *Kentner,* 750 F.3d. at 1281 (citations omitted).  "[T]he

ultimate issue of whether a zoning ordinance is arbitrary and capricious is a question of law to be determined by the court.  Although subsidiary facts are properly for the factfinder, the ultimate issue is one for the court."  *Greenbriar,* 881 F.2d at 1578.

Section 18-205 is rationally related to a legitimate government purpose. "It is well settled that the maintenance of community aesthetics is a legitimate government purpose."  *Restigouche,* 59 F.3d at 1214 (the town's regulation "reflect[ed] its concern with preserving and establishing an aesthetically-pleasing corridor . . . and its goal of creating an identifiable, traditional downtown" was a legitimate government goal); *see also Corn v. City of Lauderdale Lakes,,* 997 F.2d 1369, 1387 (11th Cir. 1993) ("[T]he Supreme Court and this court have repeatedly held ... noise, traffic, congestion, safety, aesthetics, valuation of adjoining land, and effect on city services ... are rational and permissible bases for land use restrictions."))  Here, the Town's goals are clearly set forth in Section 18-146, which states that the Town's community leadership is on a "deliberate search for beauty" which involves a certain "aesthetic quality" that will "preserve various elements of urban beauty and require that new projects enhance the existing elements."   Section 18-146 emphasizes the need for "harmony" as well as "comprehensive cohesiveness in [the] community," that will highlight the Town's "natural beauty" and maintain the community's "aesthetic tradition."   *See Kentner,* 750 F.3d at 1281 (rejecting facial substantive due process challenge because there were rational bases for the ordinance in question, including "aesthetic preservation.").  This Court finds that the Town has a rational basis for believing that Section 18-205 would further the Town's legitimate aesthetic goals.  *See Restigouche, Inc.*, 59 F.3d at 1214 ("we readily conclude that the prohibition of car dealerships could rationally further the Town's legitimate aesthetic purposes and its goal of creating a traditional downtown.").

In summary, Burns' substantive due process claims all fail.  His as-applied substantive due process claim fails because it constitutes an objection to an executive act – the denial of his 2015 Application.  Burns has not asserted that he was denied procedural due process.  As such, his as-applied substantive due process claim fails under *McKinney.*[18]  Burns' facial substantive due process challenge also fails.  He has not sustained his burden of showing that in all possible cases there is no rational connection between the Ordinances and the legitimate governmental goal of aesthetic preservation.

### 4.  Equal Protection

When a person challenges a state created classification under the equal protection clause and the classification does not affect "fundamental rights" or use a "suspect classification," a federal court must presume that the classification is valid, and uphold the classification if it is rationally related to a legitimate state interest.  *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440 (1985).  Here, because the Ordinances do not involve a suspect classification or fundamental right, rational basis scrutiny applies to Burns' equal protection challenge.  *Haves v. City of Miami,* 52 F.3d 918, 921-22 (11th Cir. 1995) (rational basis scrutiny applies in the absence of suspect classifications such as "race, alienage, national origin, gender, or illegitimacy . . . [or] 'fundamental rights' such as privacy and travel") (citation omitted).  The same two-step rational basis inquiry applies to an equal protection claim as applies to a substantive due process claim.  *Restigouche,* 59 F.3d at 1214 n.6 ("[T]he rational basis inquiry is the same for equal protection and substantive due process challenges to zoning.").  That inquiry turns on hypothetical goals and justifications, so the actual motivations of the governmental body

---

[18] Even if the Burns could assert an as-applied challenge, it would be limited to the portions of 18-205 that were the bases for the ARCOM decision.  He lacks standing to assert an as-applied challenge to the entirety of 18-205.

(including contemporaneous statements by government actors) are irrelevant. *Haves,* 52 F.3d at 921; s*ee Campbell v. Rainbow City, Ala.,* 434 F.3d 1306, 1313 (11th Cir. 2006). As long as there is "plausible, arguably legitimate purpose" for the application of the regulations, summary judgment is appropriate unless the party challenging the regulations can demonstrate that the governmental body could not possibly have relied on that purpose. *Haves,* 52 F.3d at 923.

A party asserting that a zoning ordinance has been applied in a manner that violates the equal protection clause "must show (1) that they were treated differently from other similarly situated individuals, and (2) that Defendant unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiffs." *Campbell,* 434 F.3d at 1314 (citing *Strickland v. Alderman*, 74 F.3d 260, 264–65 (11th Cir. 1996)). "A showing that two projects are similarly situated requires some specificity." *Id.* (citing *Racine Charter One, Inc. v. Racine Unified School Dist.,* 424 F.3d 677, 680 (7th Cir. 2005) (finding that "[t]o be considered 'similarly situated,' comparators must be *prima facie* identical in all relevant respects")). "The reason that there is a 'similarly situated' requirement in the first place is that at their heart, equal protection claims, even 'class of one' claims, are basically claims of discrimination." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1009 (7th Cir. 2004). "To maintain this focus on discrimination, and to avoid constitutionalizing every state regulatory dispute, we are obliged to apply the 'similarly situated' requirement with rigor. 'Different treatment of dissimilarly situated persons does not violate the equal protection clause.'" *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007) (quoting *E & T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987)). For this reason, the similarly situated entities presented by plaintiffs alleging class-of-one challenges "must be very similar indeed." *Griffin Industries, Inc.,* at 1205 (quoting *McDonald*, at 1002).

In his Complaint, Burns alleges that he was denied equal protection under the law

because "historical applications of the challenged sections [of the Ordinance] have had anomalous results *vis-à-vis* the issuance of building permits in the Town of Palm Beach." DE 1 at 6-7. Burns contends that the Town's unequal application of the Ordinance has "allowed dissimilar structures to be approved and constructed" while resulting in the ARCOM's denial of his proposed residence. *Id.* at 7. This argument has been largely undeveloped by Burns in any of his briefs. Instead he belatedly seeks "the opportunity to complete discovery" (DE 86 at 6) on this issue. For the reasons stated above, *see note* 1 *supra,* the Court declines this request.

Accordingly, the Court will consider whether, on the existing record of undisputed facts, Burns has presented sufficient evidence to show that he was treated differently than others who were similarly situated. At oral argument, Burns stated that the relevant comparators were the structures discussed by David Chase in his presentation to the ARCOM. *See* Hearing Transcript at 102:11-106:7. Burns has failed to establish that these comparators are "*prima facie* identical" to his proposed structure "in all relevant respects." *Campbell*, 434 F. 3d at 1314. The Town argues, and Burns does not dispute, that the comparators are located in neighborhoods other than where Burns proposed to build his structure. *See* DE 22 at 16. As such, they are not appropriate comparators for equal protection analysis. Especially given that Section 18-205 requires the ARCOM to consider the proposed structure's similarity and dissimilarity with the surrounding neighborhood, any asserted comparator from outside Burns' neighborhood that was approved by the ARCOM would not be *prima facie* identical for equal protection purposes. Moreover, the Town also correctly argues that the comparators used by Burns were "other Modern style homes approved at different times, by different ARCOM boards," which also makes them inapposite for equal protection purposes. *See* DE 81 at 29 (citing *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) (plaintiff's purported comparators were "not identically situated in

all relevant respects" because they "submitted their plats during different time periods; and had their plat requests granted by different and previous Boards").  Finally, the undisputed facts fail to show that the approved designs had similar massing, size, and design elements as proposed by Burns.  Burns has not show that the approved designs were similarly situated to his proposed structure in all relevant respects.  Therefore, Burns' as-applied equal protection challenge fails.

Because Burns has not shown that similarly situated property owners were treated more favorably, the Court need not consider the second part of the equal protection inquiry – whether the Town denied Burns' proposal for a discriminatory purpose because there was no rational basis for the difference in treatment.  *See Stephens v. Broward Sheriff's Office*, 84 F. Supp. 3d 1327, 1343–44 (S.D. Fla. 2014) (court rejected plaintiff's class-of-one theory where he failed to identify any similarly situated individual who was treated differently) (J. Rosenberg), *vacated in part on other grounds*, 852 F.3d 1298 (11th Cir. 2017).  Nevertheless, even assuming *arguendo* that Burns satisfied his burden to present similarly situated comparators, the Court would reject Burns' equal protection challenge for the same reasons that the Court rejected Burns' due process argument -- the Court finds that the Town's application of Section 18-205 to Burns' proposal was rationally related to a legitimate government purpose.  Burns' facial equal protection claim also fails as he has not shown that there is no possible case in which Section 18-205 could be applied in a non-discriminatory fashion.[19]

---

[19] Because the Court finds that Burns' equal protection claim fails on the merits, it declines to reach the Town's argument that *Engquist v. Oregon Dept. of Agriculture,* 553 U.S. 591 (2008) should be extended to the zoning regulation context.

## V.    RECOMMENDATION

For the reasons set forth above, this Court **RECOMMENDS** that the Town's Motion to Dismiss and/or for Summary Judgment (DE 21) be **GRANTED** and that judgment be entered in favor of the Town on Counts 1 and 2.

### NOTICE OF RIGHT TO OBJECT

A party shall serve and file written objections, if any, to this Report and Recommendation with the Honorable Beth Bloom, United States District Court Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016).

**DONE AND SUBMITTED** in Chambers this 13th day of July, 2018, at West Palm Beach in the Southern District of Florida.

_____
BRUCE REINHART
UNITED STATES MAGISTRATE JUDGE

# APPENDIX 1

**Sec. 18-205. - Criteria for building permit.**

(a)   The architectural commission may approve, approve with conditions, or disapprove the issuance of a building permit in any matter subject to its jurisdiction only after consideration of whether the following criteria are complied with:

(1)   The plan for the proposed building or structure is in conformity with good taste and design and in general contributes to the image of the town as a place of beauty, spaciousness, balance, taste, fitness, charm and high quality.

(2)   The plan for the proposed building or structure indicates the manner in which the structures are reasonably protected against external and internal noise, vibrations, and other factors that may tend to make the environment less desirable.

(3)   The proposed building or structure is not, in its exterior design and appearance, of inferior quality such as to cause the nature of the local environment to materially depreciate in appearance and value.

(4)   The proposed building or structure is in harmony with the proposed developments on land in the general area, with the comprehensive plan for the town, and with any precise plans adopted pursuant to the comprehensive plan.

(5)   The proposed building or structure is not excessively similar to any other structure existing or for which a permit has been issued or to any other structure included in the same permit application within 200 feet of the proposed site in respect to one or more of the following features of exterior design and appearance:

   a.   Apparently visibly identical front or side elevations;

   b.   Substantially identical size and arrangement of either doors, windows, porticos or other openings or breaks in the elevation facing the street, including reverse arrangement; or

   c.   Other significant identical features of design such as, but not limited to, material, roof line and height of other design elements.

(6)   The proposed building or structure is not excessively dissimilar in relation to any other structure existing or for which a permit has been issued or to any other structure included in the same permit application within 200 feet of the proposed site in respect to one or more of the following features:

   a.   Height of building or height of roof.

    b.  Other significant design features including, but not limited to, materials or quality of architectural design.

    c.  Architectural compatibility.

    d.  Arrangement of the components of the structure.

    e.  Appearance of mass from the street or from any perspective visible to the public or adjoining property owners.

    f.  Diversity of design that is complimentary with size and massing of adjacent properties.

    g.  Design features that will avoid the appearance of mass through improper proportions

    h.  Design elements that protect the privacy of neighboring property.

(7)  The proposed addition or accessory structure is subservient in style and massing to the principal or main structure.

(8)  The proposed building or structure is appropriate in relation to the established character of other structures in the immediate area or neighboring areas in respect to significant design features such as material or quality or architectural design as viewed from any public or private way (except alleys).

(9)  The proposed development is in conformity with the standards of this Code and other applicable ordinances insofar as the location and appearance of the buildings and structures are involved.

(10) The project's location and design adequately protects unique site characteristics such as those related to scenic views, rock outcroppings, natural vistas, waterways, and similar features.

(b)  If the above criteria are met, the application shall be approved. Conditions may be applied when the proposed building or structure does not comply with the above criteria and shall be such as to bring such building or structure into conformity. If an application is disapproved, the architectural commission shall detail in its findings the criterion or criteria that are not met. The action taken by the architectural commission shall be reduced to writing, and a copy thereof shall be made available to the applicant upon request.

(c)  A decision or order of the commission or the planning, zoning and building department director or his/her designee shall not become effective until the expiration of ten working days after the date upon which a ruling of the commission or the planning, zoning and building department director or his/her designee has been made.

**APPENDIX 2**



Location Map

ZONING & SITE CALCULATIONS



Proposed Site Plan

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW



COMM NO.
1409

REVISIONS

A New Residence at

1021 North Ocean Boulevard   Palm Beach, Florida, 33480



MP DESIGN &
ARCHITECTURE, INC

SHEET NO.

A000

TPB000295



Sitescape
Scale          1" = 40'

Streetscape (West Side North Ocean Boulevard)
Scale                                    1" = 40'

Streetscape (East Side North Ocean Boulevard)
Scale                                                  1" = 40'

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW

A New Residence at
1021 North Ocean Boulevard
Palm Beach, Florida, 33480
1021 North Ocean Boulevard

MP DESIGN &
ARCHITECTURE, INC
217 PENSWAH AVENUE, SUITE 4
PALM BEACH, FLORIDA 33480
561.863.7276
AA26001607

COMM. NO.
1409

REVISIONS

SHEET NO.
A001



Legend

+ Elevation Points on 25' Grid @ Development Site          Average Grade Level 13.81' NGVD Calculated Allowance

8.5' Ceiling Height @ %50 = 4.25'          7.4' Top of Slab @ Basement + 4.25' = 11.65'

Proposed Basement Level Floor Plan Ceiling Height Diagram

361.0'

365.0'

100.0'

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW

COMM. NO.
1409

REVISIONS

A New Residence
1021 North Ocean Boulevard          Palm Beach, Florida, 33480

MP DESIGN &
ARCHITECTURE, INC

SHEET NO.
A100.0

TPB000297



Proposed Basement Level Floor Plan

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW

MP DESIGN &
ARCHITECTURE, INC
217 PINYAN PARKWE, SUITE 4
PALM BEACH, FLORIDA 33480
561.833.7575

A New Residence at
1021 North Ocean Boulevard
Palm Beach, Florida 33480

A100

1409

TPB000298

NORTH OCEAN BOULEVARD

Proposed First Level Floor Plan

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW

TPB000299

| A101 | MP DESIGN & ARCHITECTURE, INC | | A New Residence at | | 1409 |
| SHEET NO. | 217 PERUVIAN AVENUE, SUITE 4 PALM BEACH, FLORIDA 33480 561.893.7675 AA26001667 | | 1021 North Ocean Boulevard | | |
| | | | 1021 North Ocean Boulevard    Palm Beach, Florida, 33480 | | |



TPB000300

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW

MP DESIGN &
ARCHITECTURE, INC
217 PERUVIAN AVENUE, SUITE 4
PALM BEACH, FLORIDA 33480
561.833.7575
AA26001667

A.102

A New Residence at

1021 North Ocean Boulevard

Palm Beach, Florida 33480

COMM NO.
1409

Proposed Second Level Floor Plan

TPB000301



Proposed Tower Plan

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW

MP DESIGN & ARCHITECTURE, INC
217 PINNIPAH AVENUE, SUITE 4
PALM BEACH, FLORIDA 33480
561.833.7575
AA26001667

1021 North Ocean Boulevard

A New Residence at
1021 North Ocean Boulevard
Palm Beach, Florida 33480

A103

TPB000302

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW

MP DESIGN &
ARCHITECTURE, INC
217 PIRVAN AVENUE, SUITE C
PALM BEACH, FLORIDA, 33480
561.833.7575
AA26001667

A New Residence at

1021 North Ocean Boulevard

1021 North Ocean Boulevard
Palm Beach, Florida, 33480

COMM. NO. 1409

A.104

Proposed Roof Plan

TPB000303



MP DESIGN &
ARCHITECTURE, INC

217 FERMAN AVENUE, SUITE 4
PALM BEACH, FLORIDA 33480
561.803.7575

AA26001697

A New Residence at

1021 North Ocean Boulevard

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW

South Elevation

North Elevation

East Elevation

West Elevation

A200

West Courtyard Section/Elevation

East Courtyard Section/Elevation

TPB000304

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW

MP DESIGN &
ARCHITECTURE, INC
217 PREMIUM AVENUE, SUITE 4
PALM BEACH, FLORIDA 33480
561.833.7575
AA26031607

A New Residence at

1021 North Ocean Boulevard
Palm Beach, Florida, 33480

1409

A201



South Driveway Street Perspective

TPB000305



North Driveway Street Perspective

TPB000306



East Oceanside Perspective

TPB000307



TPB000308



TPB000309



TPB000310



TPB000311



TPB000312



TPB000313



TPB000314



NORTH NEIGHBOR VIEW LOOKING SOUTHEAST

TPB000315



NORTH NEIGHBOR VIEW LOOKING SOUTH AT ENTRY

TPB000316



NORTH NEIGHBOR VIEW LOOKING EAST AT STREET

TPB000317

TPB000318



SOUTH NEIGHBOR VIEW LOOKING NORTH



Proposed Multi Story Residence
Main F.F. Elev. = 17.50 NGVD

Proposed Garage

Proposed Pool

North Ocean Boulevard

Burns Residence
1021 North Ocean Boulevard

STORMWATER RETENTION CALCULATIONS

Legend

Location Map
N.T.S.

Scale: 1" = 10'



North Ocean Boulevard

Existing Site Plan

SPECIAL EXCEPTION # 2-2016 w/ SITE PLAN REVIEW

Atlantic Ocean

TPB000320



| A000.0 | MP DESIGN & ARCHITECTURE, INC | | A New Residence at | | | IA |
|---|---|---|---|---|---|---|
| SHEET NO. | 217 PERUVIAN AVENUE, SUITE 4 PALM BEACH, FLORIDA 33480 561.833.7878 | | 1021 North Ocean Boulevard | | 1409 | |
| | AA26001667 | | 1021 North Ocean Boulevard   Palm Beach, Florida, 33480 | | | |