**FILED BY** *HH*

**Aug 13, 2021**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES COURT OF APPEAL
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

August 13, 2021

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  18-14515-AA
Case Style: Donald Burns v. Town of Palm Beach
District Court Docket No: 9:17-cv-81152-BB

Enclosed is the Bill of Costs.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

## UNITED STATES COURT OF APPEALS
### For the Eleventh Circuit

_____

No. 18-14515

_____

District Court Docket No.
9:17-cv-81152-BB

DONALD BURNS,

Plaintiff - Appellant,

versus

TOWN OF PALM BEACH,
a Florida municipal corporation,

Defendant - Appellee.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is
entered as the judgment of this Court.

Entered: June 08, 2021
For the Court: DAVID J. SMITH, Clerk of Court
By: Djuanna H. Clark

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 18-14515

————————————————

D.C. Docket No. 9:17-cv-81152-BB

DONALD BURNS,

Plaintiff-Appellant,

versus

TOWN OF PALM BEACH,
a Florida municipal corporation,

Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(June 8, 2021)

Before LUCK, ED CARNES, and MARCUS, Circuit Judges.

LUCK, Circuit Judge:

Donald Burns wants to knock down his "traditional" beachfront mansion and

build a new one, almost twice its size, in the midcentury modern style. The new

mansion, Burns says, will reflect his evolved philosophy of simplicity in lifestyle and living with an emphasis on fewer personal possessions.  The new two-story mansion will have a basement garage, outdoor pool and spa, cabana, and exercise room.

To build his new mansion, Burns had to get the approval of the Town of Palm Beach's architectural review commission.  Palm Beach created the commission to review building permit applications to make sure new structures were "in harmony with the proposed developments on land in the general area" and "not excessively dissimilar in relation to any other structure existing . . . within 200 feet of the proposed site in respect to . . . [a]rchitectural compatibility[,] . . . [a]rrangement of the components of the structure[,] . . . [a]ppearance of mass from the street," and "[d]iversity of design that is complimentary with the size and massing of adjacent properties."  In other words, the town doesn't want elephants next to poodles.  Or, as the town explained in its findings creating the commission, Palm Beach "has become a worldwide synonym for beauty, quality and value" and the "essential foundation of beauty in communities is harmony."  "The task of the architectural commission is . . . to preserve various elements of urban beauty and require that new projects enhance the existing elements" in order "to achieve a pleasant and comprehensive cohesiveness in community development."

Applying its criteria, the architectural review commission denied Burns's building permit. The commission found that his new mansion was not in harmony with the proposed developments on land in the general area and was excessively dissimilar to other homes within 200 feet in terms of its architecture, arrangement, mass, and size.

Burns sued the town, claiming that the criteria the commission used to deny his building permit violated his First Amendment free speech rights and his Fourteenth Amendment rights to due process and equal protection. The district court granted summary judgment for the town. We conclude that summary judgment was not granted too early and affirm on the First Amendment claim because there was no great likelihood that some sort of message would be understood by those who viewed Burns's new beachfront mansion. We also affirm the summary judgment on the Fourteenth Amendment claims because the commission's criteria were not unconstitutionally vague and Burns has not presented evidence that the commission applied its criteria differently for him than for other similarly situated mansion-builders.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### *Palm Beach's Architectural Review Commission*

Palm Beach created its architectural review commission because the town is "internationally known . . . for beauty, quality and value" and "beautiful

communities can be created only through a deliberate search for beauty on the part of the community leadership, architects, planners, realtors and the building industry." Town of Palm Beach, Fla., Code § 18-146(a)–(b).[1] The "essential foundation of beauty in communities," the town found, "is harmony." Id. § 18-146(e). "The plan for achieving beauty must grow out of special local characteristics of site, aesthetic tradition and development potential." Id. The commission was directed to "preserve various elements of urban beauty and require that new projects enhance the existing elements." Id. § 18-146(d). Palm Beach's "intent," it made clear, was "to achieve a pleasant and comprehensive cohesiveness in community development." Id. § 18-146(e).

There are seven commissioners on the architectural review commission. Id. § 18-166(a). The commissioners must be "specially qualified" by "training or experience in art, architecture, community planning, land development, real estate, landscape architecture, or other relevant business or profession, or by reason of civic interest and sound judgment to judge the effects of a proposed building upon the desirability, property values and development of surrounding areas." Id. § 18-167(a). No less than two, but no more than three, commissioners must be Florida-

_____

[1] The dissenting opinion uses the name "ARCOM" for the architectural review commission and then calls the name it uses "Orwellian." Dissenting Op. at 72. If by Orwellian the dissenting opinion means any government agency that administers regulations impacting our lives, then the architectural review commission is as Orwellian as the state board of therapeutic massage, the local dog catcher, and every one of the alphabet soup of departments and agencies and bureaus in Washington, D.C.

registered architects.  Id. § 18-166(a).  And one commissioner must be a landscape architect or a "master gardener."  Id.

Except for minor changes and changes to historic buildings, all applications for demolition and construction in the town must be approved by the commission.  Id. § 18-175(a).  The commission reviews an application for a building permit based on the criteria in section 18-205(a) of the town's code.  Id.  If an applicant meets the criteria, the commission "shall" approve the application.  Id. § 18-205(b).  Section 18-205(a) identifies ten criteria for the commission to consider:

> (1) The plan for the proposed building or structure is in conformity with good taste and design and in general contributes to the image of the town as a place of beauty, spaciousness, balance, taste, fitness, charm and high quality.
>
> (2) The plan for the proposed building or structure indicates the manner in which the structures are reasonably protected against external and internal noise, vibrations, and other factors that may tend to make the environment less desirable.
>
> (3) The proposed building or structure is not, in its exterior design and appearance, of inferior quality such as to cause the nature of the local environment to materially depreciate in appearance and value.
>
> (4) The proposed building or structure is in harmony with the proposed developments on land in the general area, with the comprehensive plan for the town, and with any precise plans adopted pursuant to the comprehensive plan.
>
> (5) The proposed building or structure is not excessively similar to any other structure existing or for which a permit has been issued or to any other structure included in the same permit application within 200 feet of the proposed site in respect to one or more of the following features of exterior design and appearance:

a. Apparently visibly identical front or side elevations;

b. Substantially identical size and arrangement of either doors, windows, porticos or other openings or breaks in the elevation facing the street, including reverse arrangement; or

c. Other significant identical features of design such as, but not limited to, material, roof line and height of other design elements.

(6) The proposed building or structure is not excessively dissimilar in relation to any other structure existing or for which a permit has been issued or to any other structure included in the same permit application within 200 feet of the proposed site in respect to one or more of the following features:

a. Height of building or height of roof.

b. Other significant design features including, but not limited to, materials or quality of architectural design.

c. Architectural compatibility.

d. Arrangement of the components of the structure.

e. Appearance of mass from the street or from any perspective visible to the public or adjoining property owners.

f. Diversity of design that is complimentary with size and massing of adjacent properties.

g. Design features that will avoid the appearance of mass through improper proportions.

h. Design elements that protect the privacy of neighboring property.

(7) The proposed addition or accessory structure is subservient in style and massing to the principal or main structure.

(8) The proposed building or structure is appropriate in relation to the established character of other structures in the immediate area or neighboring areas in respect to significant design features such as material or quality or architectural design as viewed from any public or private way (except alleys).

(9) The proposed development is in conformity with the standards of this Code and other applicable ordinances insofar as the location and appearance of the buildings and structures are involved.

6

(10) The project's location and design adequately protects unique site characteristics such as those related to scenic views, rock outcroppings, natural vistas, waterways, and similar features.

Id. § 18-205(a).

*Burns's New Mansion*

For the last eighteen years, Burns has been living in his 10,063 square foot mansion—which he describes as a "traditional home"—on the Atlantic Ocean in Palm Beach.



But in 2013, Burns decided he wanted to knock down the "traditional home" so he could build a new mansion in the midcentury modern style to convey the evolution of his personal philosophy.  He wanted his new mansion "to be a means of communication and expression of the person inside: Me."  He picked a design of international or midcentury modern architecture because it emphasized simple lines,

minimal decorative elements, and open spaces built of solid, quality materials. According to Burns, the midcentury modern design communicated that the new home was clean, fresh, independent, and modern—a reflection of his evolved philosophy of simplicity in lifestyle and living with an emphasis on fewer personal possessions. It also communicated Burns's message that he was unique and different from his neighbors.

Burns initially submitted a plan to the town council that proposed demolishing his existing 10,063 square foot mansion and building in its place a 25,198 square foot mansion in the midcentury modern design. His emphasis on fewer personal possessions included two stories and a basement containing a five-car garage, wine storage area, and steam room. The first floor would have an open-air entry, guest rooms, dining room, kitchen, family room, powder rooms, and living room. The open-air entry would lead to the pool, spa, and cabana. The second floor would have more guest rooms, an exercise room, and the master bedroom.

At the council's meeting on the application, Burns's landscape architect testified that the "most important design criteri[on]," as directed by Burns, was "to screen th[e] house properly, and more than adequate." The landscaper proposed curtaining the house from the public road with heavy landscaping, including a sixteen-to-eighteen-foot-tall hedge and a large specimen of trees. The design also called for landscaping to buffer the new mansion from Burns's northern and southern

neighbors.  After some of Burns's neighbors opposed the plan, the town council deferred action until the architectural review commission considered the building permit.

At the commission's May 25, 2016 meeting, Burns presented the testimony of his landscaper, attorney, architects, and expert architectural witness, David Chase. The landscaper told the commission about the "much more dense" landscaping that the new design would implement compared with Burns's current mansion.  Facing the street, Burns proposed planting a "tall, green callifolium wall or hedge" to "separate" the "street from the house and provide screening and a buffer."  The design would also stagger coconut palms in between the house and the street.  To "block views from the neighbors to the north," Burns would plant a fourteen-to-sixteen-foot-tall hedge, coconut palms at least thirty-two feet tall, and eighteen-to-twenty-two-foot-tall grey wood trees.  The design called for similar landscaping on the south side.

Burns's architectural expert, Chase, submitted a report and testified about the architectural styles in Palm Beach and previous applications that the commission had approved.  The report identified fifteen midcentury modern design applications, other than Burns's, that the commission considered from 1979 to 2016.  Chase documented the commission's deliberations on each application and some of the individual commissioners' statements about the designs.   He compared the

9

commissioners' observations to the eight design features in section 18-205(a)(6) and categorized the commission's reception as good, bad, or no comment for each criterion.  He also identified where a commissioner found a design feature "excessively dissimilar" in relation to nearby structures.  The commission had approved fourteen applications and denied one.  Chase gave his professional opinion that Burns's design met the commission's criteria in section 18-205(a)(6).

At the meeting, Burns's neighbors told the commission that the new mansion was too large for the lot, too dissimilar with the neighborhood, had inappropriate glass-to-mass ratios, and invaded their privacy.  The commission approved the demolition but voted to defer its decision on the building permit.

At the commission's August 24, 2016 meeting, Burns presented a revised design.  Burns reduced the square footage of his new mansion by twenty-two percent—to 19,594 square feet—but kept similar plans for the landscaping.  His neighbors again testified in opposition to the plan.  And the commission again deferred its decision.

At the commission's next meeting, on September 28, 2016, Burns presented another revised plan.





(behind the wall)

Among other changes, and to alleviate some of the concerns, he added a limestone

wall between the front of the mansion and Ocean Boulevard (the residential street in

front of the home) with a louvered gate.  The gate had angled vertical slats (the

louvers) spaced at regular intervals across its length to allow for air and light to come

through.    The angle of the louvers prevented anyone driving north on Ocean Boulevard from seeing the house.  Drivers headed south would not see the house because of the heavy landscaping on the other side of the gate.  Even with the changes, the commission voted five-to-two to deny his application.  The commission explained why it denied the building permit based on the section 18-205(a) criteria:

> (4) The proposed building or structure is not in harmony with the proposed developments on land in the general area, with the comprehensive plan for the town, and with any precise plans adopted pursuant to the Comprehensive Plan.
>         . . .
> (6) The proposed building or structure is excessively dissimilar in relation to any other structure . . . within 200 feet of the proposed site in respect to . . .
> (c) Architectural compatibility.
> (d) Arrangement of the components of the structure.
> (e) Appearance of mass from the street or from any perspective visible to the public or adjoining property owners.
> (f) Diversity of design that is complimentary with size and massing of adjacent properties.
>         . . . [and]
> (8) The proposed development is not in conformity with the standards of this Code and other applicable ordinances insofar as the location and appearance of the buildings and structures are involved.

### Burns Sues Palm Beach in Federal District Court

Burns could have appealed the commission's decision to the town council and then the state circuit court.  <u>See</u> Town of Palm Beach, Fla., Code §§ 18-177, 134-173.  Instead, Burns sued Palm Beach in federal district court under 42 U.S.C. section 1983.  In his two-count complaint, Burns brought a Fourteenth Amendment due process void-for-vagueness challenge and an equal protection challenge to

section 18-146 (the section explaining the town's findings and purpose for creating the architectural review commission) and section 18-205(a) (the section with the commission's criteria for approving building permits) of the town's ordinances. Burns also alleged that the two ordinances violated his First Amendment right to speak through the midcentury modern design of his new mansion. Burns claimed that the ordinances violated his constitutional rights both on their face and as applied to him.

Before discovery, Palm Beach moved to dismiss Burns's complaint for failure to state a claim and for summary judgment. Burns responded on the merits and, consistent with Federal Rule of Civil Procedure 56 and the local rules, filed affidavits in opposition to the motion and a statement of material facts. Burns also submitted a declaration under rule 56(d)[2] that identified several areas of discovery he needed so he could respond to the town's summary judgment motion. Burns told the district court that he wanted discovery on the records of the commission's hearings to show its lack of discernable standards, to get the legislative history of the relevant ordinances and the commission's rules and regulations, to hire an expert, and, "[d]epending on the documents obtained," to take depositions.

---

[2] Federal Rule of Civil Procedure 56(d) provides, "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

While the summary judgment motion was pending, discovery continued. Burns filed supplemental documents and exhibits opposing summary judgment. And the district court, at the parties' request, extended the discovery deadline three times.

Palm Beach's summary judgment motion was referred to the magistrate judge. The magistrate judge held a hearing on the motion about six months after it was filed but before the close of discovery. The magistrate judge asked Burns whether he was ready on the summary judgment motion, and Burns said he was "ready to proceed . . . on the facial claim[s]," but "want[ed] to be able to complete discovery" before a decision on the as-applied claims. Burns said he wanted to submit expert testimony on architecture as an art form, but he noted that he had already submitted other evidence showing that architecture was art and there was no dispute that it was. Burns also told the magistrate judge that he wanted transcripts of the commission meetings because Palm Beach had objected that Burns's summaries were hearsay.

Two months later, the magistrate judge recommended granting Palm Beach's summary judgment motion. The magistrate judge first said that Burns had waived any objection that summary judgment was premature because he opposed Palm Beach's motion on the merits. And Burns did not have standing to challenge section 18-146 (the findings and purpose section) because he was not injured by that ordinance.

14

As to Burns's First Amendment claim against the commission's criteria in section 18-205(a), the magistrate judge adopted the three-part predominant-purpose test from Mastrovincenzo v. City of New York, 435 F.3d 78 (2d Cir. 2006) for determining whether the new mansion was constitutionally protected speech. The predominant-purpose test asks whether: (1) the owner of the structure subjectively intended to communicate a message; (2) the predominant purpose of the structure was to communicate a message; and (3) a reasonable observer viewing the structure in its surrounding context had a great likelihood of understanding it to be predominantly communicating some message.

The town conceded that Burns intended to communicate a message, so that wasn't an issue. After reviewing the summary judgment evidence, the magistrate judge found that the predominant purpose of Burns's mansion was nonexpressive because the design—with its two stories, basement garage, numerous bedrooms and bathrooms, pool, oceanfront views, privacy wall, and heavy landscaping— demonstrated that the "structure [was] to serve as a residence, not as a piece of visual art." And any message from the mansion would be ambiguous, according to the magistrate judge, because of its residential features and because, even though the mansion was a custom design, a reasonable viewer would not infer that the design sent a message. Rather, a viewer might think that the owner liked the architecture, wanted a different style from his neighbors, or believed the house would be more

hurricane resistant.  Because the design was nonexpressive, the magistrate judge found that the First Amendment did not apply.

As to Burns's vagueness claim, the magistrate judge applied "less exacting scrutiny" because section 18-205(a) did not implicate any fundamental rights.  The magistrate judge explained that the commission's criteria were not vague because the ordinance listed specific design elements to compare a proposed structure to others in the area and identified "architectural compatibility" and "harmony" with nearby structures as guidelines for a design.  As to Burns's equal protection claim, the magistrate judge said that Burns had failed to present evidence of similarly situated building permit applications that Palm Beach treated differently than his, so his class-of-one claim failed.

Burns objected to the magistrate judge's report and recommendation, but only as to his claims challenging the constitutionality of the architectural review commission's criteria for issuing a building permit in section 18-205(a).  Burns argued that the magistrate judge: erred in recommending summary judgment before the close of discovery; analyzed his free speech claim using the wrong test; and erred in recommending that his vagueness and equal protection claims should be denied.  Burns also filed two expert reports opining on the communicative aspects of architecture.

The district court overruled Burns's objections and adopted the magistrate judge's report.  The district court agreed that Burns had waived any objection to an early summary judgment because he fully briefed a response to Palm Beach's motion and participated in oral argument.  And even if he didn't waive the objection, the district court concluded that Burns did not meet rule 56(d)'s standard because he did not specifically identify what facts he would discover to oppose the motion.  Rather, his declaration only identified "general categories of discovery that would be sought."  The district court also explained that Burns gave no reason why he could not obtain the discovery in the months between the filing of his declaration and the hearing.

As to Burns's First Amendment claim, the district court agreed that the three-part predominant-purpose test applied and that the primary purpose of Burns's new mansion was to be his residence.  Because Burns designed the residence to be concealed from the public by a privacy wall and heavy landscaping, the district court also concluded that a reasonable observer would not have a great likelihood of understanding that the mansion communicated a message.  As to Burns's vagueness claim, the district court agreed that section 18-205(a)'s criteria and reference to design elements were understandable to an ordinary person and prevented arbitrary and discriminatory enforcement.  Finally, as to Burns's equal protection claim, the district court agreed with the magistrate judge that Burns had not presented evidence

of comparator mansions, "identical in all relevant respects" to his design, that were

approved by the commission.

Burns appeals the summary judgment for Palm Beach.

## STANDARDS OF REVIEW

"We review the district court's denial of a [r]ule 56[(d)] motion under the

abuse of discretion standard." Fla. Power & Light Co. v. Allis Chalmers Corp., 893

F.2d 1313, 1315 (11th Cir. 1990).[3] "We review the district court's grant of summary

judgment de novo." Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale,

901 F.3d 1235, 1239 (11th Cir. 2018) (emphasis omitted). And we review questions

of constitutional law de novo. Id. Because "the reaches of the First Amendment are

ultimately defined by the facts it is held to embrace," we must "decide for ourselves

whether a given course of conduct falls on the near or far side of the line of

constitutional protection." Flanigan's Enters., Inc. of Ga. v. Fulton Cnty., Ga., 596

F.3d 1265, 1275 (11th Cir. 2010) (internal quotation marks omitted). To do that in

First Amendment free speech cases, "the Supreme Court has instructed us to make

an independent examination of the whole record, and has recognized our ultimate

---

[3] "When [r]ule 56 was rewritten in 2010, [the rule 56(f)] provisions were moved to a new subdivision (d), without any substantial change. Thus, precedent prior to 2010 citing [r]ule 56(f) is fully applicable to current [r]ule 56(d)." 10B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2740 (4th ed. 2020); see also City of Miami Gardens v. Wells Fargo & Co., 931 F.3d 1274, 1287 (11th Cir. 2019) (applying old rule 56(f) precedent to a rule 56(d) challenge).

power . . . to conduct an independent review of constitutional claims when necessary." Id. (quotation omitted; omission in original).

While the dissenting opinion agrees that we have done as instructed by independently examining the whole record before us in this appeal, it questions our conclusion because "[t]raditionally, this power is used to protect rights from government encroachment" and not, as it claims we have done, "to curtail the freedom of expression." Dissenting Op. at 73. Our narrow and fact-specific conclusion does not curtail the freedom of expression. And the standard of review in First Amendment free speech cases isn't a one-way rachet. It is result-neutral. We reject the dissenting opinion's suggestion that an independent examination of the whole record can only, and will always, reach the conclusion that the challenged expression is protected and never that it's not.

Our First Amendment free speech decisions do not support the dissenting opinion's view that under the independent "whole record" standard of review, we "traditionally" find protected expression and a First Amendment violation. For example, in ACLU of Florida, Inc. v. Miami-Dade County School Board, 557 F.3d 1177 (11th Cir. 2009), after independently examining the whole record to find the facts, we rejected the plaintiffs' First Amendment challenge to the school board's decision to remove a book from its libraries. We did so after finding for ourselves the motivation of the board's decision. Id. at 1207 ("Our review of the record leads

19

us to the conclusion that under the <u>Pico</u> standard we are assuming applies, the Board members did not remove books from school library shelves simply because they dislike[d] the ideas contained in those books and [sought] by their removal to prescribe what shall be orthodox in politics . . . or other matters of opinion." (internal quotation marks omitted; alterations and omissions in original)).  In <u>Flanigan's</u>, we independently examined the whole record before rejecting the plaintiffs' claim that the county's nude dancing ordinance violated their free speech rights.  We rejected it because we found that "it was reasonable for the [c]ounty to rely on the voluminous evidence before it—including the many findings of the July 2001 report, the numerous foreign studies appended to it, and the live testimony of the chief of police and the chief judge of the juvenile court."  596 F.3d at 1279–80.  And in <u>Don's Porta Signs, Inc. v. City of Clearwater</u>, 829 F.2d 1051 (11th Cir. 1987), we independently examined the whole record before rejecting the plaintiffs' claim that the city's sign ordinance violated their free speech rights.  We rejected it because we found that "the record sufficiently supports the [c]ity's judgment that the regulation of portable signs will help to eliminate visual clutter and thereby further the [c]ity's interest in improving the visual character of the [c]ity."  <u>Id.</u> at 1053 (footnote omitted).

In all of those cases the plaintiffs claimed that their First Amendment free speech rights were being violated by "government encroachment."  In all of those cases we, as the reviewing court, made an independent examination of the whole

record.  And in all of these cases, based on our review of the whole record, we held

that the alleged "government encroachment" did not violate the First Amendment.

Here, we do no more and no less than what we have "[t]raditionally" done in Don's

Porta, ACLU of Florida, and Flanigan's.

The "irony today" is not, as the dissenting opinion says, that we have done as

the Supreme Court has instructed and conducted an independent examination of the

whole record relating to Burns's constitutional claims.  Dissenting Op. at 73.  The

"irony today" is that it is the dissenting opinion that goes beyond the "whole record"

in this case, the record developed by the parties and put before the district court.  The

dissenting opinion consults extra-record sources and draws from them the "facts"

that it determines support its conclusion.  Throughout the dissenting opinion, it

laments the "incomplete record" and the "limited record" that's before us.  Id. at 74,

123 n.5.  So, the dissenting opinion escapes the confines of the record to look for

evidence that the parties never put forward and the district court never considered.

It discusses:

- Walter Gropius's home in Massachusetts, Frank Lloyd Wright's
  Fallingwater in Pennsylvania, John Yeon's Watzek home in Oregon,
  Philip Johnson's Glass House in Connecticut, Charles and Ray Eames'
  home in California, John Lautner's Schaffer home in California, and Eero
  Saarinen's Miller home in Indiana, id. at 90–91;

- Richard Wagner, id. at 85;

- The ruins of the Roman Forum, id.;

- Hitler's relationship with Albert Speer and Napoleon III's relationship with Baron Georges-Eugène Haussmann, id. at 86;

- Thomas Jefferson's views on architecture, id. at 86–87, 89;

- The U.S. Capitol, id. at 87;

- Versailles, the Winter Palace, and Schönbrunn Palace, id. at 88; and

- The history of the International Style, id. at 89–90.[4]

The dissenting opinion doesn't stop there.  It also relies on trade journals, articles, and websites that were not, and are not, part of the actual record in this case:

- Burford Pickens, Mr. Jefferson as Revolutionary Architect, 34 J. of the Soc'y of Architectural Historians 257 (1975), id. at 87, 89;

- Monticello and the University of Virginia in Charlottesville: World Heritage Site, National Park Service, https://www.nps.gov/articles/000/monticello-and-the-university-of-virginia-world-heritage-site.htm, id. at 89;

---

[4] Much of the dissenting opinion's extra-record facts have nothing to do with residential architecture.  Wagner designed a theater.  Dissenting Op. at 85.  Jefferson, in his letter to Madison, was discussing "public buildings."  Id. at 86.  And the U.S. Capitol is the seat of our federal government.  Id. at 87.

- Jess R. Phelps, <u>Preserving National Historic Landmarks?</u>, 24 N.Y.U. Envtl. L.J. 137 (2016), <u>id.</u> at 91 n.1;

- Susan L. Buck, <u>A Material Evaluation of the Gropius House: Planning to Preserve a Modern Masterpiece</u>, 28 APT Bulletin: The J. of Preservation Tech. (1997), <u>id.</u> at 120, 135; and

- Daisy Alioto, <u>Elizabeth Gordon's International Style</u>, Curbed (May 10, 2017), https://archive.curbed.com/2017/5/10/15592658/elizabeth-gordon-house-beautiful-frank-lloyd-wright, <u>id.</u> at 135.

None of these extra-record facts and sources the dissenting opinion relies on are part of the actual record in this case.  They were not part of the actual record before the magistrate judge and the district court; they were not part of the discovery materials; and they were not part of Burns's expert reports.  Not coincidentally, the dissenting opinion's extra-record facts and sources all seem to favor its legal position.

The dissenting opinion says not to worry because its extra-record materials are "common knowledge."  <u>Id.</u> at 92.  But we're not talking about Washington crossing the Delaware or the Beatles' greatest hits.  The history of residential architecture in the United States and the midcentury modern style is anything but common.  Burns needed three architectural experts to explain why his beachfront mansion met the commission's criteria and was protected by the First Amendment, and we only use experts where their "scientific, technical, or other specialized

knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  If the deep dive into the founding of the midcentury modern style was common knowledge, there would be no need for the "scientific, technical, or other specialized knowledge" of three experts.

More importantly, what the dissenting opinion does is not what the Supreme Court instructed us to do.  It did not instruct us to look outside the actual record in the case to whatever sources we could find to support the proposition that there had been (because there must be) a First Amendment violation.   Dissenting Op. at 72–73.  Instead, the Supreme Court instructed us to independently examine the actual record in the case, not go outside it, to find the facts to decide the First Amendment issue.  We are to do that even if we think that the record developed by the attorneys during discovery and reviewed by the district court is frustratingly "incomplete" and "limited."  And that is what we, unlike the dissenting opinion, have done.

As a final way to shore up the "incomplete" record and get to the result it wants to reach, the dissenting opinion says it may take judicial notice of the registry of national historic landmarks.  Id. at 91 n.1.  But the limited power of an appellate court to judicially notice historical facts on its own—that were not in the summary judgment record and that the parties have not asked us to judicially notice—does not extend to creating summary judgment evidence for our preferred litigant and then using the newly created evidence to find facts in his favor.  That's not the way

24

appellate review works.  See Selman v. Cobb Cnty. Sch. Dist., 449 F.3d 1320, 1332

(11th Cir. 2006) ("In deciding issues on appeal we consider only evidence that was

part of the record before the district court."); Callahan v. U.S. Dep't of Health &

Human Servs., 939 F.3d 1251, 1266 (11th Cir. 2019) ("We are, after all, a court of

review, not a court of first view.").  And even if appellate review did work that way,

and we took judicial notice of the national historic landmark registry, the notice

would only include the regulatory criteria, the homes on the list, and the date they

became national historic landmarks.  The historical details and the architectural

descriptions that the dissenting opinion relies on in its summary judgment analysis

are not on the registry and would not be judicially noticed.

## DISCUSSION

Burns makes the same arguments on appeal that he made before the district

court.  He contends that the district court abused its discretion by granting summary

judgment prematurely, erred in applying the predominant-purpose test to his First

Amendment free speech claim (which led it to reach the wrong result), and erred in

denying his vagueness and equal protection claims.

### Rule 56(d)

Burns argues that he diligently pursued discovery, but that the district court

did not give him enough time before granting summary judgment.  He contends that

he properly objected to the early summary judgment by filing his rule 56(d)

declaration identifying his need for additional discovery and the categories of discovery he still needed.

Under rule 56(d), a court may "defer" or "deny" a motion for summary judgment, allow additional time for discovery, or issue an appropriate order "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). "Failure to satisfy [the rule 56(d)] burden is fatal to an argument that the district court granted summary judgment prematurely by failing to order or await the results of further discovery." City of Miami Gardens, 931 F.3d at 1286. To invoke rule 56(d), "a party 'may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts,' but 'must specifically demonstrate how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" Id. at 1287 (quoting Reflectone, Inc. v. Farrand Optical Co., 862 F.2d 841, 843 (11th Cir. 1989)).

Burns's rule 56(d) declaration failed to "specifically demonstrate" how discovery would show a genuine issue of fact. See id. As the district court explained, Burns only listed general categories of discovery without pointing to the specific facts that discovery would reveal and how those facts would create a genuine issue of material fact. He didn't explain why he needed legislative history materials,

expert testimony, and potential depositions.  The closest Burns got was his request

for commission records, which, he said, would show the lack of discernable

standards used by the commission in making its decisions.  But "vagueness is a

question of law for the judge, and not the jury, to determine," Konikov v. Orange

Cnty., 410 F.3d 1317, 1330 (11th Cir. 2005), and Burns gave no indication how

commission records would aid his as-applied challenge.  He had already filed the

transcripts of the commission's meetings related to his application, and he conceded

that he did not need further discovery on his facial claims.  "[T]he district court had

all the information necessary to rule on the legal issues, and [Burns] raised no

genuine question of material fact that would have precluded summary judgment."

See Artistic Ent., Inc. v. City of Warner Robins, 331 F.3d 1196, 1202 (11th Cir.

2003).

    The district court also did not abuse its discretion because Burns had ample

time after his rule 56(d) declaration to obtain the discovery he needed, and he did

not renew his request for further discovery.  After Burns filed his declaration, the

district court gave him five months of discovery before the magistrate judge held a

hearing on the summary judgment motion.  The district court, at the parties' request,

continued the discovery deadline three times.  Burns used the extra time to

supplement his response and file new exhibits.  After the magistrate judge's hearing,

Burns was invited to supplement his response again, which he did.

Burns never renewed his rule 56(d) objection.  Not after the district court granted three extensions of the discovery deadline.  Not after Burns supplemented his summary judgment response.  Not before the magistrate judge's hearing.  And not after the hearing when he again supplemented his response.  At the hearing, when the magistrate judge brought up discovery, Burns mentioned he wanted an expert on whether architecture was art and transcripts of the commission's hearings.  Burns also said, in his post-hearing filings, that he sought more discovery and transcripts of the commission's hearings.  But Burns conceded that there was no factual dispute about whether architecture was art.  And Burns never told the magistrate judge what disputed facts the commission's transcripts would show.  Burns did not tell the magistrate judge, as he was required to do under rule 56(d), how the transcripts would "rebut the movant's showing of the absence of a genuine issue of fact."  See City of Miami Gardens, 931 F.3d at 1287 (citation and internal quotation marks omitted).

Burns argues that "the [r]ule 56(d) analysis should be measured based upon the amount of time for discovery prior to the summary judgment motion being filed, not the amount of time that had transpired at the time the trial court took up the motion."  But this is wrong for two reasons.  First, the text of the rule directly contradicts that argument, as it allows for additional "time . . . to take discovery" in "opposition" to what must be an already-filed motion.  Fed. R. Civ. P. 56(d)(2).

Second, <u>Florida Power & Light Co.</u> (the case Burns cites) makes clear that the rule 56(d) time is measured from when summary judgment is entered, not, as he contends, from when the summary judgment motion is filed.  <u>See</u> 893 F.2d at 1316 ("Before <u>entering</u> summary judgment the district court must ensure that the parties have an adequate opportunity for discovery." (emphasis added)).  The district court here allowed ten months (with extensions of discovery deadlines in between) from the filing of the motion until it adopted the magistrate judge's report and recommendation and granted summary judgment.  It allowed Burns an adequate opportunity for discovery.

*First Amendment Claim*

The parties raise three issues with Burns's First Amendment claim:  (1) Can residential architecture ever be expressive conduct protected by the First Amendment? (2) If so, what First Amendment test do we use to analyze whether a home is expressive conduct? And (3) applying the proper test, is Burns's new mansion expressive conduct protected by the First Amendment?  Burns contends that custom-designed residential architecture communicates a form of expressive conduct unique to the homeowner, like his lifestyle choices, political stances, and individuality.  Because the commission's criteria in section 18-205(a) restricted his expressive conduct, Burns argues that they had to meet the Supreme Court's two-part test in <u>Texas v. Johnson</u>, 491 U.S. 397 (1989).  Applying the <u>Johnson</u> test, Burns

contends that building his new mansion was expressive conduct entitled to First Amendment protection.

Palm Beach, on the other hand, argues that residential architecture is not expressive conduct because, whatever its artistic elements, those elements can't be separated from the home's predominant and primary purpose as a place to sleep, eat, and live.  To the extent that it can be expressive conduct, Palm Beach asks us to apply the district court's three-part predominant purpose test adopted from Mastrovincenzo.  Under that test, Burns's mansion was not expressive because its predominant purpose, as shown by its location, design, and use, was to serve as a residence.

Because we conclude that, even under the easier-to-meet Johnson test, Burns's new mansion was not expressive conduct protected by the First Amendment, we do not decide, and save for another day, the harder issues of whether residential architecture can ever be expressive conduct and, if so, what is the proper First Amendment test.  We assume that Johnson controls and apply it here to Burns's new mansion.

Despite saying that we are not deciding whether residential architecture can be expressive conduct protected by the First Amendment, the dissenting opinion accuses us of deciding the exact opposite:  that residential architecture can never be expressive conduct.  Dissenting Op. at 74 (the majority "virtually ensures that no

piece of residential architecture will ever garner First Amendment protection"); id. at 116 ("Burns's house does not present the same circumstances, nor is it likely that any piece of residential architecture would ever do so."). The dissenting opinion is wrong about what we have—and haven't—decided today.

To dispel any lingering confusion, we emphasize again that we are not deciding whether residential architecture can ever be expressive conduct protected by the First Amendment. We have not decided, as the dissenting opinion says, that Philip Johnson's Glass House isn't expressive conduct but tattooing is; we have not decided that Jefferson's Monticello isn't protected under the First Amendment but nude dancing is; and we have not decided that the Empire State Building doesn't meet the Johnson test but elevator music does. Id. at 93. Not at all.

Burns's First Amendment claim challenges the criteria the architectural review commission used to deny the building permit for his new beachfront mansion. As part of our independent examination of the actual record in this case, we will dig deeply into Burns's plans for his new mansion and his dealings with the commission to see whether the new mansion meets the Johnson test for expressive conduct (it doesn't). Because our review is limited to the actual record in this case, which is about Burns's proposed mansion, this opinion says nothing about the expressive conduct of national historical landmarks, the homes of our founding fathers and mothers, and the world's most iconic skyscrapers.

\*   \*   \*

"In determining whether the government has violated free speech rights, the initial inquiry is whether the speech or conduct affected by the government action comes within the ambit of the First Amendment." <u>One World One Fam. Now v. City of Miami Beach</u>, 175 F.3d 1282, 1285 (11th Cir. 1999).  "Constitutional protection for freedom of speech 'does not end at the spoken or written word.'" <u>Fort Lauderdale</u>, 901 F.3d at 1240 (quoting <u>Johnson</u>, 491 U.S. at 404).  Rather, the First Amendment offers safeguards for "expressive conduct, as well." <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1270 (11th Cir. 2004) (internal quotation marks omitted).

To determine "whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play," the two-part <u>Johnson</u> test asks: (1) "whether '[a]n intent to convey a particularized message was present,'" and (2) whether "the likelihood was great that the message would be understood by those who viewed it." <u>Johnson</u>, 491 U.S. at 404 (quoting <u>Spence v. Washington</u>, 418 U.S. 405, 410–11 (1974)); <u>see also</u> <u>Fort Lauderdale</u>, 901 F.3d at 1240.  "[A] 'narrow, succinctly articulable message is not a condition of constitutional protection' because 'if confined to expressions conveying a "particularized message" the First Amendment would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll.'"

Fort Lauderdale, 901 F.3d at 1240 (cleaned up) (quoting Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp., 515 U.S. 557, 569 (1995)).  So, in applying the second factor, "we ask whether the reasonable person would interpret [the conduct] as some sort of message, not whether an observer would necessarily infer a specific message."  Holloman, 370 F.3d at 1270.

Palm Beach conceded to the magistrate judge, and does not dispute on appeal, that Burns had the intent to convey a message.[5]  But Burns cannot meet Johnson's second element.  A reasonable viewer would not infer some sort of message from Burns's new mansion because, quite simply, a viewer can't see it.

As the second factor of the Johnson test indicates, the Supreme Court's cases (and ours) have focused on the perspective of those who "view[]" the expressive conduct.  See Johnson, 491 U.S. at 404.  There has to be a viewer for there to be a great likelihood that the expressive conduct will be understood by those who view it.  Expressive conduct has a "communicative" element, but only insofar as it, "in

---

[5] While the dissenting opinion acknowledges our agreement "that, at least for purposes of summary judgment, Burns intended to convey a message through the design of his home," Dissenting Op. at 99, it later says that "[p]erhaps" we "intend[ed] to suggest that Burns's First Amendment claim [was] disingenuous" because, when describing the facts, we "pair[ed]" his "'philosophy of simplicity in lifestyle' with a recitation of the house's features, including that it will have a 'basement garage, outdoor pool and spa, cabana, and exercise room,'" id. at 123 n.5. We have no such intent.  All we have done is recite the undisputed facts that the message Burns sought to communicate with his new mansion—simplicity in lifestyle and living with an emphasis on fewer personal possessions—included adding 15,000 square feet and a second story to his mansion, a basement with a five-car garage, wine storage, a steam room, a spa, a cabana, and an exercise room.

context, would reasonably be understood by the viewer to be communicative." <u>Clark v. Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 294 (1984).  After all, expressive conduct deserves First Amendment protection because it serves as an "effective way of communicating ideas"—a "short cut from mind to mind."  <u>See</u> <u>W. Va. State Bd. of Educ. v. Barnette</u>, 319 U.S. 624, 632 (1943).  But to get from mind to mind, a viewer must be able to see the idea being communicated.  All of the Supreme Court's expressive conduct cases have dealt with conduct that was and could be seen by viewers.

In the case that laid the foundation for the <u>Johnson</u> test, <u>Spence</u>, the Supreme Court examined a First Amendment challenge to a college student's conviction for hanging an American flag upside down with a peace symbol taped over it.  418 U.S. at 406.  The student displayed his altered "three by five feet" flag from a window "above the ground floor" of his private apartment, so it was "plainly visible to passersby."  <u>Id.</u>  In fact, the student got into trouble because police officers observed the flag from outside the apartment.  <u>Id.</u>  The state conceded that the student engaged in expressive conduct, <u>id.</u> at 409, and the Court thought such a concession "inevitable on this record," given the undisputed message the student sought to communicate and the likelihood that "that the message would be understood by those who viewed it," <u>id.</u> at 409–11.

In <u>Johnson</u> itself, the Supreme Court upheld another First Amendment challenge to a flag desecration conviction.  491 U.S. at 399.  There, the defendant, after a demonstration against the ongoing Republican national convention, "unfurled the American flag, doused it with kerosene, and set it on fire" in front of the Dallas city hall.  <u>Id.</u>  As in <u>Spence</u>, the state conceded (the Court thought "prudent[ly]") that the defendant engaged in expressive conduct.  <u>Id.</u> at 405–06.  The Court summarized that, given the political context, the communicative nature of conduct relating to flags, and the demonstration, "[t]he expressive, overtly political nature of this conduct was both intentional and overwhelmingly apparent."  <u>Id.</u> at 405.

The Court has also concluded that parades comfortably fit within expressive conduct, noting the "inherent expressiveness of marching to make a point."  <u>Hurley</u>, 515 U.S. at 568.  Parades consist of "marchers who are making some sort of collective point, not just to each other but to bystanders along the way."  <u>Id.</u>  They require a public display of their message: "a parade's dependence on watchers is so extreme that nowadays, as with Bishop Berkeley's celebrated tree, if a parade or demonstration receives no media coverage, it may as well not have happened."  <u>Id.</u> (internal quotation marks omitted).  The Supreme Court had no trouble concluding that the parade at issue was expressive conduct, given that "[s]pectators line[d] the streets; people march[ed] in costumes and uniforms, carrying flags and banners with all sorts of messages (<u>e.g.</u>, 'England get out of Ireland,' 'Say no to drugs'); marching

bands and pipers play[ed]; floats [were] pulled along; and the whole show [was] broadcast over Boston television." Id. at 569.

The many other cases in which the Supreme Court and this Court have identified protected expressive conduct all share a common element: the expressive conduct in each of those cases was or could be viewed. The conduct was not like the proverbial tree, which was out of view because it was deep in the forest. See Walker v. Tex. Div., Sons of Confederate Veterans, Inc., 576 U.S. 200, 203, 207 (2015) (issuing "specialty license plate designs" for "display on vehicles registered in Texas"); Pleasant Grove City v. Summum, 555 U.S. 460, 476 (2009) ("By accepting a privately donated monument and placing it on city property, a city engages in expressive conduct . . . ."); Virginia v. Black, 538 U.S. 343, 348, 350 (2003) (burning a cross on the property of another or observable from a public road); City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) (plurality opinion) (nude dancing at an establishment open to the public); United States v. Grace, 461 U.S. 171, 176 (1983) (peaceful picketing and leafletting on the sidewalks surrounding the Supreme Court); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 504 (1969) (wearing a black armband to school); Barnette, 319 U.S. at 642 (refusing to salute the flag and recite the pledge of allegiance in school); Stromberg v. California, 283 U.S. 359, 362 (1931) (display of a red flag at a summer camp); Fort Lauderdale, 901 F.3d at 1237–38 (outdoor food sharing open to the public at a city park); Buehrle

v. City of Key West, 813 F.3d 973, 975 (11th Cir. 2015) (tattooing at a "tattoo establishment in the City's historic district"); Holloman, 370 F.3d at 1259, 1270 (silently raising fist during the pledge of allegiance at school).

Here, Burns sought to express a message through his new mansion's simple lines, minimal decorative elements, and open spaces built of solid, quality materials, but his design calls for carefully shielding those purportedly expressive elements from any viewer. A limestone wall and louvered gate prevent a person driving or walking north along Ocean Boulevard from seeing the design at all. While a person driving or walking south may be able to see through the gaps in the louvred gate, the viewer's gaze would be met not by a midcentury modern design, but by heavy landscaping. Private properties close off the north and south view of the new mansion, further reducing the opportunity for an observer to see the design. Even Burns's neighbors could not see his house because he purposely blocked it from their view with a fourteen-to-sixteen-foot-tall hedge and trees at least eighteen feet tall. Burns is not burning a flag in front of city hall, parading through Boston, or even displaying a sign from his viewable window. The landscaping he proposes obstructs those elements that he says communicate a message. A viewer cannot infer a message from something the viewer cannot view.

But, the dissenting opinion says, a reasonable viewer would be able see Burns's new mansion from the backside facing the beach. Dissenting Op. at 100–

01.  We know this, the dissenting opinion explains, because the record is "abundant with examples of neighbors" and commission members "concerned with Burns's proposed design precisely because the home can be seen from the vantage point of the beach." Id. at 107.

The dissenting opinion misreads the comments from the commission meetings.  They are not largely about Burns's design.  Instead, the comments were about the height and mass of Burns's new mansion and how dissimilar it would be to the neighboring homes.  As part of its criteria, the commission was required to determine whether the "[h]eight" and "[a]ppearance of mass" of the proposed building was "excessively dissimilar in relation to any other structure existing . . . within 200 feet of the proposed site."  Town of Palm Beach, Fla., Code § 18-205(a)(6).  The neighbors and commission members spoke to these factors.  To them, Burns's new mansion looked like an elephant next to his neighbors' poodles.

- "This long massing is, along one property line, is dissimilar to the adjacent properties . . . It's as much or more house than houses that have double the lot size. . . .  I want to make it abundantly clear that our objection is not on the basis to the fact that it is international style architecture.  That is not our objections."

- "The mass of the proposed home will overwhelm both North Ocean Boulevard and the view from this popular beach . . . .  [Burns] does not have

the land to provide [this] kind of mass without eliminating the privacy of his neighbors.  Making the house a little less tall is no solution."

- "[T]his house is far too massive for the size of the lot . . . .  It's just too—too large."

- "[W]e're not picking on the style . . . it's been reduced, [but] still it's 165 feet of building . . . .  So you can see that the proposed property is still significantly bigger than the adjacent properties . . . we're still contending it's too much house."

- "[T]he new house still towers at the same height and mass over our building and the neighborhood."

The neighbors and commission members were concerned about their view being disrupted by a new mansion that was taller and larger than any of the surrounding homes.

The dissenting opinion muses that it's "hard to understand why Burns's design created so much controversy . . . if the house would not be visible to the public at all."  Dissenting Op. at 110.  But the dissenting opinion confuses visibility with the design.  The new mansion disrupted the view because its height and mass were so dissimilar from the rest of the homes in the neighborhood.  That disruption is what caused the controversy.  But no reasonable viewer could see the actual design because it was blocked by landscaping and fences.

This doesn't matter, the dissenting opinion explains, because height and mass are "hallmark features" of the midcentury modern style so the neighbors must be seeing some of the design elements. Id. at 109. But large trash heaps also have height and mass, and no one would say they are midcentury modern masterpieces. If, as the neighbors explained, all they could see of the back of the new mansion was height and mass, then there was no great likelihood that a reasonable viewer could distinguish a Frank Lloyd Wright masterpiece from a pile of garbage.

Some neighbors and commission members commented on the design of the new mansion, but those who did were talking about the model Burns presented at the commission's meetings. As the dissenting opinion explains, the commission's "evaluation . . . looked at the house design without taking landscaping into account." Id. at 111. But we must take the landscaping into account as part of our review of the actual record in this case.

The dissenting opinion next points to Burns's experts. Their testimony, the dissenting opinion explains, showed "that the majority of the landscaping work would be focused on the north, west, and south sides of the home," but the east side of the new mansion would remain "undisturbed." Id. at 105. But Burns's expert testified that Burns's main landscaping goal was screening the property "more than adequate." Another architectural expert told the commission that there was "substantial vegetation"—a combination of "topography, grass, and vegetation"—

creating, "from the ocean looking west," a "visual barrier" between the new mansion and the beach.  And, George Ranalli—the same expert the dissenting opinion quotes ten times—swore in his summary judgment affidavit that "Burns has proposed a house in the context of landscape design to protect the neighbors from unwelcome and unavoidable intrusions.  The house . . . is surrounded <u>on all four side[s]</u> by a dense perimeter of trees, shrubbery, and other plantings."  <u>All four sides.</u>

The dissenting opinion also contends that Burns shielded his new mansion with landscaping "in order to satisfy [the commission] and Burns's neighbors," and "it would make no sense to offer less First Amendment protection to speech when the person making it takes steps to minimize any offense caused."  <u>Id.</u> at 111 n.3.  But the original plan Burns submitted to the town, before he made any changes, called for "heavy landscaping."  That original plan would have placed a sixteen-to-eighteen-foot-tall hedge and numerous trees between the mansion and the road.  It also would have added more landscaping to serve as a buffer between Burns's mansion and his neighbors' homes to the north and south.  And Burns's landscape architect told the town council exactly why there was heavy landscaping.  He testified that Burns directed him that his "most important design criteri[on]" was screening the property properly and "more than adequate."  From day one, Burns wanted to conceal from his neighbors what he now says is his message.

The dissenting opinion finally points to five pictures of the mansion to show that its backside would be visible from the beach.  Id. at 101–05.  But the five pictures are more than a little misleading about what a viewer standing on the beach facing west would actually see.  The first picture is an aerial photo of Burns's "current house," not his new one.  Id. at 101.  It tells us nothing about what the new mansion with its heavy landscaping would look like.  And this photo is from so high up that the Goodyear Blimp could have taken it.  It would be impossible to make out the dunes, grass, trees, and the substantial vegetation from 1,000 feet in the air.

The second picture is the architect's two-dimensional schematic of the new mansion.  This top-down drawing of the inside doesn't show all of the outside visual barriers surrounding the new mansion.

The third picture is a computer-generated mockup of the new mansion with an unobstructed view of its backside.  The third picture shows only a sliver of land between the water and the backdoors, creating the illusion that Burns could jump from his living room right into the Atlantic Ocean.  But, of course, he can't.  Behind the new mansion is a backyard, dunes, sea grass, trees, vegetation, and a large beach.  The dissenting opinion's other pictures contradict the third picture.  The first, second, fourth, and fifth pictures show the large beach and backyard; the dissenting opinion's third picture inexplicably—and misleadingly—doesn't.  The dissenting opinion's third picture is like a picture of a castle without the moat and gate.  It's a

nice closeup of the building but it's not what a reasonable viewer would actually see if she were looking at the castle.

The fourth and fifth pictures are hobby-store models of Burns's new mansion. The dissenting opinion claims that they show the "lack of landscaping on the east side" of the new mansion, in contrast to the "dense foliage screen" on the other three sides.  Id. at 104–05.  But these models—because they are models of the new mansion and not the landscaping—purposely left out the screening on the backside. When presenting the models to the architectural review commission, Burns's landscape architect told the commission that "on the rear" of the new mansion there would be "more screening . . . than what the model shows"—"[a] lot more."  Burns's architect explained that the company which made the models didn't even "have sea grape," one of the plants that was a part of the visual barrier surrounding the new mansion and which Burns planned to add more of from both the north and south property lines "towards the house" and "into [his] property."

None of the dissenting opinion's five pictures show what a viewer would actually see if she were standing on the beach facing the back of Burns's new mansion.  None of them.  They don't show what a viewer would see because they're purposely incomplete.  For what a viewer would actually see, the summary judgment evidence is clear.  There would be "substantial vegetation" creating a "visual barrier" between the new mansion and the beach.  The new mansion, Burns's summary

judgment expert swore, would be "surrounded on all four side[s] by a dense perimeter of trees, shrubbery, and other plantings."  We take Burns's expert at his word; the dissenting opinion doesn't and instead relies on old or misleading pictures and incomplete plastic models to get around the testimony of Burns's own expert.

The dissenting opinion ends this part wondering "why Burns would create a home with floor-to-ceiling windows only to block the view of the ocean." Id. at 110.  But we don't have to wonder; the answer is in the actual record.  Burns's landscape architect told the town council that "the most important design criteria for this project for me, and a directive from my client [Burns], was to screen this house properly and more than adequate."

Shifting gears, the dissenting opinion says that, "even if it were true that Burns's house was not visible at all to those driving and walking by[,] . . . his home would still warrant First Amendment protection" because a guest may be a reasonable viewer.  Id. at 111-12.  The dissenting opinion relies on the new mansion's four or five bedrooms and a letter to neighbors about an expanded driveway. Id. at 112-13.  But the letter said nothing about Burns inviting guests to his new mansion—Burns (through his attorney) told the commission that the driveway would create parking for "staff" so they wouldn't have to park on the street—and he presented no evidence that he intended to invite guests.  The dissenting opinion finds it "hard to imagine that Burns intended to rebuild his home

and never invite a single soul to see it," id. at 112, but the dissenting opinion's imagination is not evidence and does not create a genuine issue of material fact for summary judgment purposes.  See Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (quotation omitted)).  Besides, we don't have to imagine why Burns wanted to build a new mansion.  He told us why:  "I wished to renovate my existing house to better reflect my current tastes and long-term needs.  It was my intention that the design of the new house to be a means of communication and expression of the person inside:  Me."  Burns told us his purpose in building his new mansion and it was not to invite guests.

After going on-and-on for ten pages about whether a reasonable viewer can see Burns's home, Dissenting Op. at 100–10, the dissenting opinion tells us that it doesn't even matter if a passerby or Burns's neighbors can't see his house because "the courts have given extensive protection, in many ways and in many different contexts, to the home," id. at 112 n.4, citing City of Ladue v. Gilleo, 512 U.S. 43 (1994) and Stanley v. Georgia, 394 U.S. 557 (1969).[6]  But Gilleo and Stanley are

---

[6] The dissenting opinion also cites Lawrence v. Texas, 539 U.S. 558 (2003); Kyllo v. United States, 533 U.S. 27 (2001); Payton v. New York, 445 U.S. 573 (1980); and Griswold v. Connecticut, 381 U.S. 479 (1965).  Dissenting Op. at 112 n.4.  But none of these are First Amendment cases.  Lawrence and Griswold were substantive due process cases, while Kyllo and

not expressive conduct cases.  They are First Amendment free speech cases that involved reading, writing, and watching films.  The plaintiff in <u>Gilleo</u> put up a sign in her yard in 1990, and later in the upstairs window of her home, protesting the Persian Gulf War.  512 U.S. at 45–46.  As the Supreme Court explained, "signs are a form of expression protected by the Free Speech Clause."  <u>Id.</u> at 48.  And the <u>Gilleo</u> plaintiff's sign was intended for viewers to see.  As the Court explained, "a person who puts up a sign at her residence often intends to reach <u>neighbors</u>, an audience that could not be reached nearly as well by other means."  <u>Id.</u> at 57.

The defendant in <u>Stanley</u> was arrested for possessing obscene films in his home.  394 U.S. at 558.  The Supreme Court reversed his conviction, holding that the First Amendment prohibited the state from prosecuting the defendant for the private possession of obscene films.  <u>Id.</u> at 558–59.  "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch."  <u>Id.</u> at 565.

---

<u>Payton</u> were Fourth Amendment cases.  None have anything to do with expressive conduct. <u>Lawrence</u> was about the constitutionality of Texas's sodomy ban.  539 U.S. at 562 ("The question before the Court is the validity of a Texas statute making it a crime for two persons of the same sex to engage in certain intimate sexual conduct.").  <u>Kyllo</u> was about whether law enforcement's use of thermal-imaging technology amounted to a warrantless search.  533 U.S. at 29 ("This case presents the question whether the use of a thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home constitutes a 'search' within the meaning of the Fourth Amendment.").  <u>Payton</u> was about the constitutionality of a warrantless seizure.  445 U.S. at 574 ("These appeals challenge the constitutionality of New York statutes that authorize police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest.").  And <u>Griswold</u> was about the constitutionality of Connecticut's birth control ban.  381 U.S. at 480 (holding unconstitutional state law that criminalized the use of "any drug, medicinal article or instrument for the purpose of preventing conception").

Neither <u>Gilleo</u> nor <u>Stanley</u> involved expressive conduct, much less expressive conduct and architecture.  In neither case did the Supreme Court have to grapple, as we do here, with First Amendment issues involving expressive conduct.  Political signs are pure speech.  <u>Gilleo</u>, 512 U.S. at 48; <u>Baldwin v. Redwood City</u>, 540 F.2d 1360, 1366 (9th Cir. 1976) ("Communication by signs and posters is virtually pure speech.").  So are books and films.  <u>See</u> <u>Kaplan v. California</u>, 413 U.S. 115, 119–20 (1973) (explaining that "films" and "the printed word" have First Amendment protection); <u>Metzger v. Peracy</u>, 393 F.2d 202, 203 (7th Cir. 1968) ("[M]otion pictures, like books, are protected by the constitutional guarantees of freedom of speech and press.").  As the dissenting opinion acknowledges, "when analyzing the scope of the First Amendment protection beyond 'pure speech,' courts should apply the expressive conduct test."  Dissenting Op. at 95.  And expressive conduct depends on an observer's ability to see it.  Unless it is seen, there is no likelihood that a viewer would infer a message from it.  <u>See</u> <u>Johnson</u>, 491 U.S. at 404.  That is true whether the expressive conduct occurs inside or outside the home.  Just as the fall of Bishop Berkeley's tree in the forest makes no sound unless someone is there to hear it, expressive conduct conveys no message unless someone sees it.  Burns's architectural design does not speak so long as his trees prevent viewers from seeing it.  <u>See</u> <u>Hurley</u>, 515 U.S. at 568.

*   *   *

But even if potential viewers could see through the trees, shrubbery, and other landscaping (put there at Burns's direction to block the view) and could catch a glimpse of some part of the backside of the proposed new mansion, there still would be no great likelihood they would understand that it conveyed some sort of message. See Fort Lauderdale, 901 F.3d at 1240.   In expressive conduct cases, "context matters." Id. at 1237.   Context separates "the physical activity of walking from the expressive conduct associated with a picket line or a parade"; the act of sitting down to read at a library from sit-ins protesting segregation; and nude dancing from private dressing. Id. at 1241.   The "circumstances surrounding an event" help a reasonable observer discern the dividing line between expressive conduct and everyday conduct.  See id.

In Fort Lauderdale, we examined five contextual factors to determine whether there was a great likelihood some sort of message would be understood by those who viewed a group sharing a meal with the homeless in a city park.  See 901 F.3d at 1242–43.   First, the group set up tables and its banner and distributed literature at its events, which distinguished its activity from simply sharing a meal with friends.  Id. at 1242.   Second, the meal was open to everyone and the group invited all present to share in the meal at the same time.  Id.   Third, the organization conducted its activities at a city park, a traditional public forum and a "place[] 'historically associated with the exercise of First Amendment rights.'"  Id. (quoting Carey v.

Brown, 447 U.S. 455, 460 (1980)).  Fourth, "the City's homeless population [was] an issue of concern in the community" that would increase "the likelihood that the reasonable observer would understand that [the organization's] food sharing sought to convey some message."  Id. at 1242–43.  The city had held a "public workshop" on "homeless issues, including public feedings" in city parks and the status of the city's homeless population had attracted local news coverage for years before that workshop.  Id. at 1242.  Fifth, the history of "sharing meals with others" that stretched back "millennia" indicated an observer would interpret some message.  Id. at 1243.

Here, the Fort Lauderdale factors show that a reasonable observer would view Burns's new mansion as a really big house, but not as an expression of some sort of message.  First, Burns has no plans to set up tables, distribute literature, or hang up a banner in front of his new mansion.  He is not giving tours or handing out informational brochures on its design elements.

Second, Burns has offered no evidence that his house will be open to everyone or that he has invited the public to view his architectural design.  In fact, he has carefully shielded it from public view with a limestone wall, louvered gate, heavy landscaping, and substantial vegetation.

Third, unlike a public park, a private residence is not a traditional public forum, nor has it been historically associated with the exercise of First Amendment

rights.  Certainly, First Amendment protections do not end at the home.  See, e.g., Spence, 418 U.S. at 406.  But a private home, unlike a public park, has not traditionally "been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  Fort Lauderdale, 901 F.3d at 1242. Unlike a group activity in a public park, the context of Burns's new mansion—a private oceanfront residence surrounded by lush greenery along a quiet residential street—does not transmit a message to the viewer.

Fourth, there is no evidence that residential midcentury modern architecture was a public concern of the town that was workshopped by the town council or reported by the local news in the years before Burns's building permit application. See id.  There was no local discussion or public concern about Burns's design that would provide background to help a reasonable observer understand that Burns sought to convey some message.  In fact, the midcentury modern style was so uncontroversial that it was listed in the architectural review commission's guidelines as one of Palm Beach's ten predominate styles.  Burns was not burning a flag after a demonstration amid the ongoing Republican national convention, see Johnson, 491 U.S. at 406, hanging an American flag upside down with a peace symbol taped over it after the shootings at Kent State, see Spence, 418 U.S. at 410, or wearing a black armband to school during the Vietnam War, see Tinker, 393 U.S. at 505.  See also

<u>Fort Lauderdale</u>, 901 F.3d at 1243.  He was merely building another house on a residential street.

Fifth, there is no evidence that <u>residential</u> architecture has been used over the millennia to convey a message.  Burns submitted expert reports discussing residential architecture as an expressive means for the homeowner.  One expert said that a custom design enhanced the expressive nature of a house because the architect and client can work together to express the client's "personal aesthetic."  And another expert chronicled the development of architecture as an art form starting with Plato, continuing with the ancient Romans and the Renaissance, and enduring today.  But there was no evidence that <u>residential</u> architecture, specifically, has a historical association with communicative elements that would put a reasonable observer on notice of a message from Burns's house.

The fifth <u>Fort Lauderdale</u> factor asks whether the conduct at issue has been understood to convey a message over the millennia.  901 F.3d at 1243.  While Burns's experts noted that architectural principles have been used to build homes since Roman times, they said nothing about the message <u>residential</u> architecture has conveyed going "back many hundreds of years."  As the dissenting opinion concedes, Burns's experts take a "mile-high view" of the history of residential architecture, Dissenting Op. at 121, but—other than some academic-sounding

generalities—they don't explain what residential architecture has communicated over the millennia.

The historical context in Fort Lauderdale showed that sharing meals was not merely a mode of dining, but also a form of expression. See 901 F.3d at 1243. Two millennia ago, Jesus ate with sinners and tax collectors to "demonstrate that they were not outcasts in his eyes." Id. In 1621, Native Americans and the pilgrims shared the first thanksgiving to celebrate the harvest. Id. Over two hundred years later, President Lincoln established thanksgiving as a national holiday to express gratitude for the country's blessings of "fruitful fields and healthful skies." Id. And Americans continue to celebrate the holiday with traditional foods and family and friends. Id. Both the long history of significant meal sharing and what those meals conveyed—messages of inclusion and gratitude—put an observer on notice of a message from a shared meal. Burns has offered no similar evidence. He has not established that residential architecture has a history stretching back millennia which shows an association between home design and communication.

The weight of the factors in Fort Lauderdale revealed that the plaintiff organization's "food sharing events [were] more than a picnic in the park." Id. at 1243. We cannot say the same about Burns's mansion. To the reasonable observer, it is nothing more than another big beachfront home.

The dissenting opinion concedes, as it must, that Burns's proposed mansion doesn't "present the same circumstances" that made meal sharing protected expressive conduct in Fort Lauderdale. Dissenting Op. at 116. But it complains that it's unlikely "that any piece of residential architecture would ever do so" under the Fort Lauderdale factors. Id. Wrong. Take one of the dissenting opinion's own examples, Monticello. (1) Monticello has its own website, brochures, and books that are published by the National Park Service and available to the public. (2) Monticello is open for tours. (3) Monticello is a national historic landmark. (4) And its builder, Jefferson, was the author of the Declaration of Independence, our first secretary of state, our second vice president, our third president, the leader of his political party for decades, and an inventor. Hundreds of years later, Jefferson, his ideas, and his ideals are still a part of our public debate.

The dissenting opinion criticizes us for looking at Monticello's historical context as part of the expressive conduct test, id. at 117-18, but all we've done is apply the same factors the Supreme Court does in its expressive conduct cases. In Johnson, for example, the Supreme Court considered the two-hundred-year history of the American flag as a national symbol to conclude that burning the flag was expressive conduct. See Johnson, 491 U.S. at 404–05 ("That we have had little difficulty identifying an expressive element in conduct relating to flags should not be surprising. The very purpose of a national flag is to serve as a symbol of our

country; it is, one might say, the one visible manifestation of two hundred years of nationhood." (quotation omitted)).

While there is no evidence in our record that residential architecture has communicated a message dating back millennia, we've never said that every contextual factor has to weigh in favor of the conduct being expressive.  The Fort Lauderdale factors are contextual guidelines that we weigh together to decide whether or not certain conduct is protected expression.  But Burns's proposed new mansion does not require us to weigh any competing contextual clues because none of the factors favor finding a great likelihood that a reasonable observer would receive some sort of message from a hidden beachfront mansion.

The dissenting opinion says that the Fort Lauderdale factors "were relevant to determining whether . . . food sharing in a public park was expressive" but aren't relevant in "all future cases" like hanging an American flag upside-down (Spence) or nude dancing (Schad).  Dissenting Op. at 116–17.  "[T]he circumstances that made the meals in Fort Lauderdale expressive," as the dissenting opinion understands it, "were not the same as those that made the flag burning expressive in Johnson."  Id. at 118.  That is also wrong.  The Fort Lauderdale court didn't make up the expressive conduct factors.  It got them from Supreme Court expressive conduct cases having nothing to do with sharing meals.  The first Fort Lauderdale factor—setting up tables and banners and distributing literature—came from the

Supreme Court's decision in Hurley, the parade case.  901 F.3d at 1242 (citing

Hurley, 515 U.S. at 570).  The third factor—the location of the expressive conduct—

came from the Supreme Court's decisions in Spence and Johnson, the flag cases (the

very cases that the dissenting opinion says are not contextually relevant to the Fort

Lauderdale factors).  Id. (citing Spence, 418 U.S. at 409–10 and Johnson, 491 U.S.

at 406).  The fourth factor—whether the conduct involves an issue of concern to the

community—also came from Spence and Johnson as well as Tinker, the black

armband in school case.  Id. at 1242–43 (citing Johnson, 491 U.S. at 406, Spence,

418 U.S. at 410, and Tinker, 393 U.S. at 505).  And the fifth Fort Lauderdale factor—

the history of the conduct—also came from Johnson.  Id. at 1243 (citing Johnson,

491 U.S. at 405–06).  While the dissenting opinion says that the factors "are ripped

from a markedly different context," Dissenting Op. at 117, we and the Supreme

Court have used the Fort Lauderdale factors in cases as different as flag burning,

armband wearing, parading, and meal sharing.  There's no reason—other than they

don't support the dissenting opinion's position—why the same factors cannot be

used to evaluate the expressiveness of residential architecture.

We do not hold and have not said, as the dissenting opinion implies we have,

that the Fort Lauderdale factors are "exclusive."  Id. at 116.  There may be other

factors that are relevant to whether Burns's new mansion is expressive conduct

protected by the First Amendment.  But it's incorrect to say, as the dissenting opinion

does, that the Fort Lauderdale factors are not the same as the factors the Supreme Court considered in flag-burning cases and in other non-sharing-meal cases. They are.

After all the pages of discussion spent arguing that the Fort Lauderdale factors don't apply to any cases but those involving meal-sharing, the dissenting opinion puts forward only two other factors to fill the void. One factor is whether a reasonable viewer would interpret the choice of architectural style as "a message about the philosophy of the house's owner," and the other factor is whether Burns's design is different from his neighbors. Id. at 118, 122. There are three problems with the dissent's reliance on these two additional factors.

First, the dissenting opinion concedes that the parties' "incomplete record . . . comes to us without a resolution by the district court of questions basic to the disposition of this case," including "whether there is a likelihood that some sort of message would be communicated to those who view Burns's new home." Id. at 74. That is fatal to his First Amendment expressive conduct claim, which requires a great likelihood that the particular conduct convey some message to those who view it. Johnson, 491 U.S. at 404.

The second problem with the dissenting opinion's reliance on its two new factors is that the dissenting opinion fills the gap in the record with journals and articles to support the proposition that a reasonable viewer would understand the

midcentury modern design as conveying some sort of message.  But none of these journals and articles are evidence; none of them are in the actual record before us. The dissenting opinion's extended discussion about the midcentury modern style going back to the 1930s relies on sources that were not turned over during discovery, were not put before the district court for its consideration on summary judgment, and are not part of the actual record in this case.  Our independent examination of the whole record of a case in First Amendment free speech cases gives us room to review the "whole record," Don's Porta, 829 F.2d at 1053 n.9, but only the actual record compiled in the district court.  Our adversarial judicial system requires that the parties develop the record, not that appellate courts do so.    See Turner v. Burnside, 541 F.3d 1077, 1086 (11th Cir. 2008) ("We do not consider facts outside the record.").

The third problem with the dissenting opinion's reasoning based on its two factors is that it does not fit the actual record in this case.  Even assuming a neighbor walking on the beach behind Burns's new mansion could see some sliver of the rear of the house, virtually all of the midcentury modern design elements would be blocked by trees and hedges and gates and vegetation and other visual barriers.  As we explained, Burns instructed his landscape architect to shield his proposed new mansion from his neighbors so the architectural design elements couldn't be seen. It's like hanging a Jackson Pollock painting backwards and with all but the top part

of it hidden.  To the extent there is any evidence in the actual record that any "elements" of midcentury modern design in the proposed house would be "discernable to a reasonable viewer," Dissenting Op. at 120, the viewer wouldn't be able to see enough of those elements for there to be a great likelihood of her getting some sort of message about the architectural style to know that Burns's new mansion was different from the other homes in the area.

* * *

Because the dissenting opinion finds that Burns's new mansion is expressive conduct protected under the First Amendment, it addresses the level of scrutiny that should be applied to the architectural review commission's criteria and whether the criteria survives that level of scrutiny.  It concludes that the criteria are content-based and subject to strict scrutiny, and that the justification for the criteria—aesthetics—does not survive strict scrutiny.

If we were to respond in full to this part of the dissenting opinion, we would build off of the following foundation:

- The inconsistency between two of the dissenting opinion's positions.  On the one hand, it states that because the "district court applied the wrong legal standard to Burns's First Amendment claim," it would "vacate and remand, directing the district court in the first instance to find facts and measure them against the appropriate standard of law."  On the other hand, the dissenting

opinion goes on to decide all of the legal issues it had earlier described as "com[ing] to us without a resolution by the district court" because of the "incomplete record."  Dissenting Op. at 74, 98.

- The section 18-205(a) criteria are not content-based because they do not distinguish favored from unfavored speech.  Section 18-205(a) requires the commission to consider whether the proposed building is excessively dissimilar to any other structure within 200 feet in respect to "significant design features" and "[a]rchitectural compatibility."  Town of Palm Beach, Fla., Code § 18-205(a).  On its face, section 18-205(a) applies to all designs.  It asks only whether the design features of the proposed building are excessively dissimilar from the surrounding homes.  If a grocery store rule requires that dissimilar-looking produce not be put next to each other on the same grocery shelf, a stock clerk doesn't have to know whether a fruit is a mango or a papaya to know that it doesn't look like a pineapple.  And the similar-produce rule is not personal to any of the three fruits; it is not content-based in the usual sense.

- Section 18-205(a) was not intended to discriminate against midcentury modern designs.  In the last forty years, the commission received fifteen applications for building permits based on a midcentury modern design.  Of those fifteen, the commission rejected only one.  Just one.  That's a

93.3 percent success rate for midcentury modern designs.   Some discrimination.   And the commission's own guidelines describe the midcentury modern style as one of the ten predominant styles in Palm Beach.

We could go on about this part of the dissenting opinion addressing the level of scrutiny that should be applied to the architectural review commission's criteria and whether the criteria survive that level of scrutiny, but there is no need.  Because we've concluded that, even under the Johnson test, Burns's proposed new mansion is not expressive conduct protected under the First Amendment free speech clause, we don't need to decide:  whether the commission's criteria are content-based or content-neutral; the level of scrutiny to be applied; and whether the town has given a sufficient justification for its ordinance.   Generally, we don't answer constitutional questions that don't need to be answered.   See Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

In the end, the dissenting opinion waxes poetically and passionately about architecture, art, and the First Amendment and criticizes us for shying away from the Constitution's commitment to free expression.   Dissenting Op. at 136.   But this Court has never shied away from protecting expressive conduct.   We have found outdoor meal-sharing in a public park (Fort Lauderdale), tattooing (Buehrle), and

silently raising a fist during the pledge of allegiance at school (<u>Holloman</u>) to be expressive conduct protected by the First Amendment.

One day, we may even find some residential architecture to be expressive conduct. But Burns's proposed new mansion is not Monticello or Versailles, no matter how much the dissenting opinion wants to compare it to those historic homes. It's just a really big beachfront house that can't be seen, located on a quiet residential street in Palm Beach, Florida.

*Fourteenth Amendment Vagueness Claim*

Burns next contends that section 18-205(a), the architectural review commission's criteria for reviewing building permits, is void for vagueness. He argues that section 18-205(a) fails to inform ordinary people what it prohibits and allows the commission unbridled discretion to deny applications and target modern architecture.

The Fourteenth Amendment prohibits "any state" from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "It is, by now, a 'basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.'" <u>Wollschlaeger v. Governor, State of Fla.</u>, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc) (quoting <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108 (1972)). A vague law can violate the due process clause if it (1) "fails to provide people of ordinary intelligence a

reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." Id. (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000)).  "[A] civil statute is unconstitutionally vague only if it is so indefinite as 'really to be no rule or standard at all.'"  Leib v. Hillsborough Cnty. Pub. Transp. Comm'n, 558 F.3d 1301, 1310 (11th Cir. 2009) (quoting Seniors C.L. Ass'n v. Kemp, 965 F.2d 1030, 1036 (11th Cir. 1992)).

The void-for-vagueness doctrine addresses "at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  F.C.C. v. Fox Television Stations, Inc., 567 U.S. 239, 253 (2012).  Standard economic regulations, including zoning ordinances, need only pass "a less strict vagueness test."  See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 498 (1982); see also CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 631 (3d Cir. 2013) (applying the "less strict vagueness test" to a zoning ordinance).  In First Amendment free speech cases, however, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."  Fox Television Stations, 567 U.S. at 253–54.  Because Burns's proposed new mansion does not raise First Amendment concerns, we apply the "less strict vagueness test."  See Hoffman Ests., 455 U.S. at 496–98 (rejecting a free speech

challenge and proceeding with the void-for-vagueness analysis); see also Leib, 558 F.3d at 1311 (holding that a civil statute regarding permitting met the less strict vagueness standard); Reserve, Ltd. v. Town of Longboat Key, 17 F.3d 1374, 1378–79 (11th Cir. 1994) (holding that an ordinance that allowed a town to revoke a building permit upon a determination that "substantial work" had not been accomplished in a thirty-day period was not unconstitutionally vague).

Like the district court, we conclude that section 18-205(a) is not unconstitutionally vague. In a similar case, Maher v. City of New Orleans, 516 F.2d 1051, 1054 (5th Cir. 1975), the former Fifth Circuit held that a New Orleans ordinance requiring an architectural commission to preserve the "architectural and historical value" of that city's French Quarter did not run afoul of the due process clause. There, the plaintiff wanted to demolish his Victorian cottage and build apartments in its place. Id. He sought approval from the city's architectural commission, as required for any demolition or construction project. Id. As with Burns's new mansion, "[a]lmost from the time of the original application, interested individual neighborhood owners . . . vigorously opposed the [plaintiff's] plan to tear down the cottage and to develop the property." Id. The plaintiff "undertook a succession of attempts to secure approval of his plans from the [c]ommission," which it eventually granted before the city council reversed it. Id. The plaintiff sued the city, arguing that the architectural commission ordinance violated due process

because "it provide[d] inadequate guidance to the [c]ommission for the exercise of its administrative judgment." Id. at 1061.

We rejected the vagueness challenge for several reasons. First, the state constitution, the architectural commission ordinance, and the state supreme court had fleshed out what the ordinance meant by "architectural and historical value"—that it, for example, sought protection of the "quaint and distinctive character of the area." Id. at 1060–63 & n.58. Second, the ordinance applied only to a specific geographic district, was limited to the appearance of the portions of buildings that faced public streets, and "regulat[ed] items of special interest, such as floodlights, overhanging balconies or signs." Id. at 1062. Third, the ordinance required the architectural commission to consist of "architects, historians and business persons offering complementary skills, experience and interests." Id. And fourth, the city council had the power to review the commission's decisions, preventing the "potential for arbitrariness." Id.

Like Maher, section 18-205(a) has the same protections that limit the commission's discretion and saved the review criteria from the shoals of vagueness. It has ten exhaustive criteria that the commission must consider before approving an application. Town of Palm Beach, Fla., Code § 18-205(a). The "excessively dissimilar" standard was geographically limited to comparing homes within 200 feet of Burns's mansion. Id. § 18-205(a)(6). The commission has a limited membership

64

made up of no less than two, but no more than three, registered architects and one landscape architect, and even the other members had to be "specially qualified" in art, architecture, community planning, land development, real estate, landscape architecture, or another relevant profession, or have "civic interest and sound judgment" that could be used to determine the effects of a proposed building on "the desirability, property values and development of surrounding areas." Id. §§ 18-166(a), 18-167(a). And the town council had the power to review arbitrary decisions by the commission. Id. § 18-177.

Faced with similar ordinances, our sister circuits have reached the same conclusion that we do. The Third Circuit concluded that the phrase "development appropriate in scale, density, character and use for the surrounding community" did "not provide 'no standard at all.'" CMR, 703 F.3d at 631–32. There, the Philadelphia ordinance defined the geographic reach of the provision, which informed the definition of "community." Id. at 632. And the other words could be unambiguously understood by reference to their dictionary definitions. Id.

The Fifth Circuit has also applied Maher to an ordinance that required a building's color to "harmonize with the structure's facade," its materials to be "architecturally and historically appropriate," and its walkways to be "compatible" with the walkways of "surrounding structures." Mayes v. City of Dallas, 747 F.2d 323, 325 (5th Cir. 1984). Those criteria, the Fifth Circuit concluded, "provide[d]

adequate legislative direction to the [c]ommission to enable it to perform its functions consonant with due process." Id.

And the Ninth Circuit has upheld an ordinance that gave a zoning commission "authority to determine whether the use 'would cause any damage, hazard, nuisance or other detriment to persons or property in the vicinity.'" Turning Point, Inc. v. City of Caldwell, 74 F.3d 941, 944 (9th Cir. 1996). The court determined that the ordinance used language "characteristic of zoning regulation" that was "not so general as to be unintelligible to any reasonable owner of property" and thus not unconstitutionally vague. Id. The Third, Fifth, and Ninth Circuits recognized that some of the exact words and phrases that Palm Beach used here, such as "harmony" and "compatible" and a comparison of architectural styles among nearby structures, were not vague and arbitrary. Given the detailed criteria and the procedural protections in section 18-205(a), we cannot say that it provided "no rule or standard at all."

*Fourteenth Amendment Equal Protection Claim*

Burns argues that the district court erred in granting summary judgment on his class-of-one equal protection claim because he offered evidence that the commission reviewed fifteen midcentury modern designs (before Burns's) and approved all of them except one. This evidence, Burns says, showed that he was treated differently than similar homeowners.

The Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Our equal protection cases generally involve "governmental classification and treatment that affects some discrete and identifiable group of citizens differently from other groups." Corey Airport Servs., Inc. v. Clear Channel Outdoor, Inc., 682 F.3d 1293, 1296 (11th Cir. 2012). But a select subset of decisions allow class-of-one equal protection claims where "the identifiable group that was discriminated against consisted solely of the plaintiff." Id. at 1297 n.2. Specifically, we and the Supreme Court have allowed class-of-one claims for "the government's regulation of property" because we have "a clear standard against which departures, even for a single plaintiff, c[an] be readily assessed." Engquist v. Or. Dep't of Agric., 553 U.S. 591, 602 (2008); see also Vill. of Willowbrook v. Olech, 528 U.S. 562, 565 (2000) (per curiam) (class-of-one challenge allowed to municipality's requirement of an abnormally long easement); Stardust, 3007 LLC v. City of Brookhaven, 899 F.3d 1164, 1176–77 (11th Cir. 2018) (discussing a class-of-one claim against a zoning ordinance); Campbell v. Rainbow City, 434 F.3d 1306, 1314 (11th Cir. 2006) (applying class-of-one analysis to a challenge of a zoning ordinance).

To succeed on a class-of-one claim in a zoning case, the plaintiff must show that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Campbell, 434 F.3d

at 1314 (quoting Olech, 528 U.S. at 564).   Because "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause," the plaintiff must show that those "others similarly situated" are "prima facie identical in all relevant respects." Id. (emphasis and internal quotation marks omitted).   In evaluating the similarly situated requirement, we look at the state action "in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision." Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1203 (11th Cir. 2007).

Palm Beach has given us "the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant" in the form of the statutory criteria it uses to review building permits—section 18-205(a). See id. The statutory criteria are mandatory and apply to every application the commission reviews.   Town of Palm Beach, Fla., Code § 18-205(b).   So, to show an equal protection violation, Burns must offer evidence of similar mansions that the commission approved based on the same criteria in section 18-205(a) that the commission cited in rejecting his application.

The only evidence Burns points to in order to meet this burden is the report his expert David Chase made for the commission.   But Chase's report does not show that the mansions the commission approved were similar to Burns's new mansion in all relevant respects.   Chase's report identifies homeowners who had midcentury

modern designs that were approved, but his report does not say that the other midcentury modern designs were "not in harmony with the proposed developments on land in the general area" but approved nonetheless.  And Chase's report did not compare the architectural compatibility, massing, and size of Burns's property to the mansions the commission approved.  Instead, the report provided summaries of the commissioners' thoughts on each application.  But those summaries do not establish that the fourteen midcentury modern designs the commission approved were excessively dissimilar to nearby homes in the same way that the commission found Burns's new mansion excessively dissimilar to his neighbors' homes.  Chase's report does not show comparators that are "prima facie identical in all relevant respects." See Campbell, 434 F.3d at 1314 (emphasis omitted).  Given the absence of evidence of other similarly situated designs, Burns has not shown any difference in treatment.  His class-of-one claim fails.

## CONCLUSION

We conclude that the district court did not grant summary judgment too early, Burns's proposed new mansion is not expressive conduct protected by the First Amendment, section 18-205(a) is not unconstitutionally vague, and Burns was not treated differently from other Palm Beach homeowners.  Because Burns's as-applied challenges to section 18-205(a) fail, we also must reject his facial challenges.  See William Jefferson & Co. v. Bd. of Assessment & Appeals No. 3 ex rel. Orange Cnty.,

695 F.3d 960, 963 (9th Cir. 2012) ("[A] facial challenge to a statute necessarily fails if an as-applied challenge has failed because the plaintiff must establish that no set of circumstances exists under which the [statute] would be valid." (internal quotation marks omitted)); <u>Diaz v. Patterson</u>, 547 F.3d 88, 101 (2d Cir. 2008) (same).  We affirm the district court's summary judgment for the town in all respects.

**AFFIRMED.**

MARCUS, Circuit Judge, dissenting:

Outside of Chicago there is a home called the Farnsworth House, nestled in the woods along the Fox River.  Or it was a home.  Now it is a museum, a National Historic Landmark, and a piece of our common cultural heritage.  Designed by the renowned architect Ludwig Mies van der Rohe, the Farnsworth House is a striking piece of art.  A single rectangular prism, two-thirds of which is enclosed by glass, the remainder an open-air porch, elevated five feet above the ground by the white steel beams that form its structure, the house blends seamlessly into its sylvan surroundings.  When the river floods, the water flows beneath the house; in the snow its white beams and glass panes are nearly invisible; from within it is as though one stands unsheltered in the forest.  The house expresses the view of Mies -- and of the home's first owner, Dr. Edith Farnsworth -- that the modern world has strayed too far from nature and lost the potential for individual fulfillment hidden therein.

Donald Burns has lived in Palm Beach for many years.  His current home is built in a traditional style that matches that of his immediate neighbors.  Seven years ago, Burns decided that his house no longer reflected his identity and he decided to build a house like the Farnsworth House, in the International Style.  He wants to do that because of the message he believes the International Style conveys -- minimalism, individuality, and the pursuit of fulfillment in harmony with nature.

He also might just find the style beautiful.  Many do.  The question in this case is whether a government commission created by the Town of Palm Beach with the Orwellian moniker "ARCOM" may prevent Burns from expressing his philosophy and taste through the architecture of his home and create a work of art on land he owns solely because a majority of the members of the Commission do not like the way it looks.

In my view, the First Amendment -- the most powerful commitment to think, speak, and express in the history of the world -- does not permit the government to impose its majoritarian aesthetic whims on Burns without a substantial reason.  The First Amendment's protection of the freedom of speech is not limited to the polite exchange of words or pamphlets.  It is not limited -- as the majority suggests -- to public displays clearly related to the narrow issues of the day.  It protects art, like architecture, and it protects artistic expression in a person's home as powerfully as in the public sphere, if not more so.

The district court disagreed, based on its application of an incorrect legal standard largely drawn from Second Circuit precedent concerned with the commercial sale of expressive merchandise.  Normally when a district court makes an error of law, we vacate and remand and the temptation to do so is particularly great here.  But First Amendment cases are unique.   When presented with a First Amendment case where "the ultimate conclusions of law are virtually inseparable

from findings of fact," the Supreme Court has instructed us that "we are obligated to independently review the factual record to ensure that the . . . court's judgment does not unlawfully intrude on free expression."  See Boy Scouts of Am. v. Dale, 530 U.S. 640, 648–49 (2000); see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 567 (1995) ("This obligation rests upon us simply because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection.").

Traditionally, this power is used to protect rights from government encroachment.  See Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 510–11 (1984) ("It reflects a deeply held conviction that judges—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution.").  The irony today is the willingness of my colleagues to resolve factual disputes and draw factual conclusions on their own, overlooking the obviously erroneous legal template against which the district court measured this First Amendment case, and to do so in order to curtail the freedom of expression, not to protect it.

 After the majority conducts an independent review of the record to find that the case before us falls on the "far side of the line of constitutional protection," see

Hurley, 515 U.S. at 567,  it claims to "save for another day" the resolution of issues critical to this case -- namely "whether residential architecture can ever be expressive conduct" and "if so, what is the proper First Amendment test" -- while effectively answering them through its review of the factual record and its application of factors it draws from our recent decision in Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 901 F.3d 1235 (11th Cir. 2018).  Majority Op. at 30.  It has done so in a way that virtually ensures that no piece of residential architecture will ever garner First Amendment protection -- an outcome that is, as I see it, at odds with the meaning of the First Amendment.

At the very least, whether the First Amendment precludes Palm Beach from denying Burns the right to rebuild his house on his own property is a much closer question than the majority acknowledges.  The case comes to us on an incomplete record.  It comes to us without a resolution by the district court of questions basic to the disposition of this case -- questions such as whether Burns's artistic and philosophical motivation is genuine, whether there is a likelihood that some sort of message would be communicated to those who view Burns's new home, whether ARCOM had some reason other than its distaste for the aesthetics of the proposal that motivated it to deny the permit, and whether the Town has reasons other than its aesthetic distaste to support ARCOM's determination.  And because the majority, like the magistrate judge and the district court before it, resolves this case

on the threshold question of whether the architectural design of Burns's home is even protected expression, it never conducts the heightened scrutiny applicable, or indeed any scrutiny at all, if it were protected.

On this record, I cannot reach the same outcome. As I see it, Burns's proposed home merits the protection of the First Amendment. I respectfully dissent.

## I.

Donald Burns has lived at 1021 N. Ocean Boulevard in a home on a popular public beach for almost 20 years. His home is built in the Bermuda Style, as shown in the photograph of the east facade below, similar to the traditional styles of his immediate neighbors' homes.



75

Previously, Burns was attracted to the house's style that communicated that he "wanted to be like [his] neighbors in all respects," but his views have evolved. He has come to "embrace simplicity in lifestyle and living" and has said that he intends to convey the message that he is "unique and different from [his] neighbors."   The traditional style of his home, which communicates "history, establishment, and stability," no longer reflects those views or his identity.

In 2013, Burns decided to rebuild his home in the International Style -- a style that better expresses his new perspective.  International Style architecture is a prominent style of modern architecture -- distinguished by simple lines, exposed glass, white structural elements and open spaces -- that developed in the first half of the twentieth century.  Its proponents saw the integration of nature into human living space as an antidote to the clutter and chaos of modernity.  Burns worked closely with a local architectural firm to design a new home in this style and submitted it to the relevant authorities, as shown in the computer-generated rendering of the west facade below.



Burns's proposal met every objective zoning requirement to be found in Palm Beach's Town Code.  That the proposal met all objective zoning requirements has never been disputed.  Indeed, the Zoning Administrator for Palm Beach asserted at a Town Council meeting that the house "me[]t code as it relates to setbacks, lot coverage, landscape [and] open space."  In most municipalities in the United States, this would have been the end of the story -- Burns had submitted a proposal that complied with safety, size, and environmental requirements prescribed by the Town, and it would permit him to build the home he wanted to on the lot he owns in fee simple.

Not so in Palm Beach.  In Palm Beach, in addition to meeting all objective zoning requirements, new construction must win the approval of an Architectural

Commission, established by the Town Council.  Nicknamed "ARCOM," the

Commission is a seven-member body of people "specially qualified by reason of

training or experience in art, architecture, community planning, land development,

real estate, landscape architecture, or other relevant business or profession, or by

reason of civic interest and sound judgment."  Code of Ordinances,  Town of Palm

Beach, Florida §§  18-166(a); 18-167(a).  Charged with "creat[ing] beauty,

aesthetic order [and] amenity" and "preserv[ing] various elements of urban

beauty," ARCOM reviews new projects for "harmony" in "beauty, spaciousness,

balance, taste, fitness, charm and high quality." Id. §§. 18-146; 18-205.  As

relevant here, ARCOM must disapprove proposals that are "excessively dissimilar

in relation to any other structure . . . within 200 feet," with respect to

"[a]rchitectural compatibility," "[a]rrangement of the components of the structure,"

"[a]ppearance of mass from the street . . . ," or "[d]iversity of design that is

complimentary with size and massing of adjacent properties." Id. § 18-

205(a)(6)(C)-(F).  Similarly, to approve a proposal, ARCOM must find it

"appropriate in relation to the established character of other structures in the

immediate area or neighboring areas in respect to significant design features such

as . . . architectural design." Id. § 18-205(a)(8).

Notably, there is no claim by the Town that this case involves historical

preservation, which is dealt with by a different committee in Palm Beach. See id.

§ 18-175(c)(2) ("Individual structures and/or properties that have been designated or are under consideration or in an historic district are subject to review by the landmark preservation commission and shall not be subject to review by the architectural commission.").  Nor for that matter does the Town argue, let alone even suggest, that the construction of an International Style home, or even the construction of Burns's design, would diminish in any way the fair market value of the property in the neighborhood.

Instead, this case arises because ARCOM -- or at least the majority of its members -- hated Burns's proposed design.  They thought it was ugly.  They thought it was not in harmony, thought it was not appropriate.  They thought it lacked "beauty, spaciousness, balance, taste, fitness, charm and high quality."  "It's very hard to sit here and say, no, you shouldn't build this house," one ARCOM member said.  "[I]t fits on the lot, there are no variances required. . . . But this house is so dissimilar in style, . . . and we are charged also with making sure that we don't let the character of Palm Beach go.  And the character of Palm Beach has not made it to the modern style yet."  Another expressed less reluctance to vote against the proposal, baldly proclaiming "[t]here's not a person in Christendom who can convince me that this house is charming."  Still another said that "[w]e can't afford to make another mistake" by forcing "everybody who drives by . . . to see this contemporary home which is not in harmony with the established character

of th[e] neighborhood."  And another member noted that although "[i]f I were to see this architecture in a different location, I might find it attractive," there was "just the problem of where it's located."

Burns made a series of revisions to the proposal in an effort to mitigate their concerns.  He and his design team first appeared before ARCOM in May 2016. The Commission heard testimony from David Chase, an architect hired by Burns who presented a report on the International Style in Palm Beach, and specifically on fifteen International or Modern architectural designs that had been reviewed by ARCOM and all but one approved.  The Commission also heard from neighbors and Palm Beach residents who were opposed to the project.  The Commission voted to approve Burns's demolition application, but voted to defer their review of the new house design.  Burns revised the design, reducing the footprint, the length, the mass of the roof, and the amount of glass on the exterior.  He also moved the house back from the seawall and increased the amount of landscaped open space.

In August 2016, Burns presented a revised application to ARCOM.  The Commission again heard from neighbors and residents who were opposed to the project.  Although one member introduced a motion to deny Burns's application based on the criteria in Section 18-205(a), it was rejected by the Commission 4 to 3.  The Commission then voted to defer their review to allow a "restudy of the west elevation, including the landscaping, the approach to the home and the possibility

of installing gates." Burns made still another series of revisions, including

modifications of the west facade, narrowing the entryway, adding more

landscaping and removing more glass from the facade.

But it appears there was little he could do short of abandoning the

International Style that was the purpose of his application. In the end, then,

notwithstanding Burns's efforts to incorporate the Commission's feedback,

ARCOM voted 5 to 2 to prevent him from building his new home.

## II.

### A.

The First Amendment protects art in its myriad forms. See Nat'l

Endowment for the Arts v. Finley, 524 U.S. 569, 580–82 (1998) (subjecting

regulations governing the National Endowment for the Arts to First Amendment

scrutiny); Hurley, 515 U.S. at 569 (noting that the "painting of Jackson Pollock,

music of Arnold Schöenberg, [and] Jabberwocky verse of Lewis Carroll" are

"unquestionably shielded" by the First Amendment); Ward v. Rock Against

Racism, 491 U.S. 781, 790 (1989) ("Music, as a form of expression and

communication, is protected under the First Amendment."); Schad v. Borough of

Mt. Ephraim, 452 U.S. 61, 65–66 (1981) ("Entertainment, as well as political and

ideological speech, is protected; motion pictures, programs broadcast by radio and

television, and live entertainment, such as musical and dramatic works fall within

the First Amendment guarantee."); Southeastern Promotions, Ltd. v. Conrad, 420

U.S. 546, 557–58 (1975) ("By its nature, theater usually is the acting out—or

singing out—of the written word, and frequently mixes speech with live action or

conduct.  But that is no reason to hold theater subject to a drastically different

standard."); Kaplan v. California, 413 U.S. 115, 119–120 (1973) (noting that

"pictures, films, paintings, drawings, [] engravings, . . . oral utterance and the

printed word" are protected by the First Amendment); Joseph Burstyn, Inc. v.

Wilson, 343 U.S. 495, 501 (1952) ("It cannot be doubted that motion pictures are a

significant medium for the communication of ideas.").  This includes art involving

words -- undoubtedly speech -- and art devoid of words alike.

Some of our sister circuits have followed the Supreme Court's lead and

announced categorical protection for artistic mediums.  See, e.g. White v. City of

Sparks, 500 F.3d 953, 956 (9th Cir. 2007) ("So long as it is an artist's self-

expression, a painting will be protected under the First Amendment, because it

expresses the artist's perspective.."); Bery v. City of New York, 97 F.3d 689, 695

(2d Cir. 1996) ("Visual art is as wide ranging in its depiction of ideas, concepts and

emotions as any book, treatise, pamphlet or other writing, and is similarly entitled

to full First Amendment protection."); Piarowski v. Ill. Cmty. Coll. Dist. 515, 759

F.2d 625, 628 (7th Cir. 1985) ("The [stained-glass] windows were art for art's

sake.  But the freedom of speech and of the press protected by the First

Amendment has been interpreted to embrace purely artistic as well as political

expression (and entertainment that falls far short of anyone's idea of 'art' . . .) . . .

.").

The great challenge of this case is that the Supreme Court has never clearly

told us why art is protected.  See Buehrle v. City of Key West, 813 F.3d 973,  976

(11th Cir. 2015) (observing that "the Supreme Court has never explicitly defined

the entire universe of artistic expression safeguarded by the First Amendment").  It

is often suggested that art is protected because it can convey political ideas.  See,

e.g., Joseph Burstyn, 343 U.S. at 501 (describing "motion pictures as an organ of

public opinion").  But while some art does comment on politics, that role does not

delimit its First Amendment protection.  See Finley, 524 U.S. at 602–03 (Souter,

J., dissenting) ("The constitutional protection of artistic works turns not on the

political significance that may be attributable to such productions . . . .").  Other

courts have suggested that the First Amendment encodes the theory that self-

expression is a good in itself.  See, e.g., White, 500 F.3d at 956 ("So long as [a

painting] is an artist's self-expression, [it] will be protected under the First

Amendment . . . .").

In the end, the First Amendment's protection of art could not be otherwise.

The guarantee of "freedom of speech" would be a mirage without the concomitant

recognition of the way in which we communicate with each other about the things that matter in life and politics -- things about human identity and aspiration, virtue and vice, "courage and honor and hope and pride and compassion and pity and sacrifice which have been the glory of [man's] past,"  William Faulkner, Banquet Speech, The Nobel Prize (Dec. 10, 1950), https://www.nobelprize.org/prizes/literature/1949/faulkner/speech/ -- in the stories we tell, the paintings we view, and the homes in which we live.

Architecture is a form of art, and an expressive one of that.  This is a proposition already recognized by copyright law, which defines "architectural work" as "the design of a building as embodied in any tangible medium of expression."  17 U.S.C. § 101 (emphasis added);  see also H.R. Rep. No. 101-735 (1990), as reprinted in 1990 U.S.C.C.A.N. 6935, 6936 ("Architecture is a form of artistic expression that performs a significant societal purpose, domestically and internationally."); Imperial Homes Corp. v. Lamont, 458 F.2d 895, 897 (5th Cir. 1972) ("[T]he architect who originates a set of blueprints for a dwelling is as much an author for copyright purposes as the writer who creates an original novel or the dramatist who pens a new play.").

Like other forms of art, architecture can inspire, humble, awe, reflect on continuity with the past, offer a radical departure therefrom, or adapt old themes to modernity.  Architecture, like other art, can seek to reflect nature, transcend it, or

subdue it.  Like other forms of art, architecture can push what we expect from and explore the limits of human imagination.

Architecture's relationship with other arts has always been symbiotic. Leonardo Da Vinci, for example, was celebrated as a painter, sculptor, inventor, and architect.  Richard Wagner, the virtuoso composer, also designed the Beyreuth Festspielhaus, or Festival Theater, to showcase his operas and his worldview -- he saw the architecture of the music hall to be one and the same as the music that would be performed there.  The great architect Le Corbusier was a painter and a writer as well as an icon of the Modernist movement of the Twentieth Century.

That architecture is an expressive art is a proposition that has stood unchallenged for millennia.  The Greek philosophers and the Romans knew this, as did the Renaissance humanists.  We continue to visit places such as the Parthenon at the Athenian Acropolis and the ruins of the Forum of Rome because the architecture communicates something about the people who built it.  The legacies of these political systems are now often synonymous with their architectural remains.

Although it is no prerequisite to First Amendment protection, architecture can be a profoundly political form of art.  See, e.g., John Ruskin, The Seven Lamps of Architecture 2  (Smith, Elder, and Company 1849) (describing "the distinctively political art of Architecture").  As George Ranalli, an architect and author who

provided an expert report on architectural history in this litigation, notes, Mies van der Rohe once described architecture as "the will of an epoch translated into space."  Buildings make a statement about how we want to live, a statement that can have plainly political impulses and implications.  A brick colonial speaks of stability, the importance of continuity and the nuclear family; a log-cabin on the prairie of independence and self-reliance.  Indeed, architecture can make a more powerful political statement in some ways than direct political speech.  Just as "the totalitarian state . . . ha[s] censored musical compositions to serve [its] needs," Ward, 491 U.S. at 790, tyrants have always been aware of the political power of architecture.  Hitler kept the architect Albert Speer in his inner circle, trusting him to design the buildings of his new Reich.  The Emperor Napoleon III deputized Baron Georges-Eugène Haussmann to design a new Paris that would impress upon the world the civility and grandeur of his Second Empire -- and be easier to subdue in the event of insurrection.

Governments have recognized the value of architecture in more benign ways as well.  Writing to James Madison in 1785, Thomas Jefferson explained that architecture could be used to educate his fledgling country:

> But how is a taste in this beautiful art to be formed in our countrymen, unless we avail ourselves of every occasion when public buildings are to be erected, of presenting to them models for their study and imitation? . . . You see I am an enthusiast on the subjects of the arts. But it is an enthusiasm of which I am not ashamed, as its object is to

improve the taste of my countrymen, to increase their reputation, to reconcile to them the respect of the world and procure them its praise.

Burford Pickens, Mr. Jefferson as Revolutionary Architect, 34 J. of the Soc'y of Architectural Historians 257, 260 (1975).  We need only turn to our nation's civic buildings for an example of this enacted.  The architecture of the National Mall in Washington, D.C. proudly evokes the architecture of democracy.  As Ranalli explains, the Lincoln Memorial, for one, "loosely represent[s] a temple of classical antiquity, the Parthenon, with additional Roman elements."  He characterizes the building as a "marriage of unlike Classical and Modern styles" meant to evoke "American conviction in the rule of law and its impartiality, and the consent of the governed to the wisdom and justice of the laws that make their liberty possible, memorably articulated through these various avenues of associational meanings."  The Memorial sits alongside other neoclassical marvels like the United States Capitol, which together announce to the nation, and to the world, America's enduring commitment to self-governance.

Similarly, there can be no doubt that architecture is an act of self-expression -- always of the architect, and often too of the person who commissioned the building.  We have previously held that tattooing is protected as an expressive collaboration between an artist and a patron.  See Buehrle, 813 F.3d at 977–78 (observing that "[p]rotected artistic expression frequently encompasses a sequence of acts by different parties, often in relation to the same piece of work").

In part, it is the meeting of the aesthetic with the utilitarian in architecture that sets it apart from other arts and creates the expressive value of architecture. Architecture, Paul Goldberger, an architectural critic and another of Burns's experts, reminds us, "is both a practical matter and an art, and it is in the interdependence, and the tension, between these two characteristics that its unique nature lies."

Residential architecture does not lose its expressive qualities because it is also practical.  The great palaces of Europe -- Versailles, the Winter Palace, Schönbrunn -- all housed their country's royal families and their accompanying staff, but are still recognized as architectural marvels.  There is nothing in the theory either of artistic expression or architectural aesthetics that changes merely because a person spends the night in a building.

Nor does it change when the building is owned for purely private use. Instead, the expressive nature of architecture is connected to that individual, rather than to a collective identity.  "Like music, dance, and visual art, residential architecture can be a highly expressive way to communicate lifestyle choices, political stances, and individuality."  Janet Elizabeth Haws, Architecture As Art? Not in My Neocolonial Neighborhood: A Case for Providing First Amendment Protection to Expressive Residential Architecture, 2005 BYU L. Rev. 1625, 1644

(2005).  The home, and especially its facade, may act as a stand-in for the individual's own face.

Just like public buildings, there is a long history of the use of private residential architecture to convey symbolic messages.  Perhaps the first architectural treatise ever written, De Architectura by the Roman architect Vitruvius, contains an entire volume on domestic buildings.  So too is there an American tradition of communicative residential architecture.  Thomas Jefferson designed his home at Monticello, using "an architectural vocabulary based upon classical antiquity [that] symbolizes both the aspirations of the new American republic as the inheritor of European tradition and the cultural experimentation that could be expected as the country matured."   Monticello and the University of Virginia in Charlottesville: World Heritage Site, National Park Service, https://www.nps.gov/articles/000/monticello-and-the-university-of-virginia-world-heritage-site.htm (last updated July 15, 2020); see also Pickens, supra, at 257.  Today, Monticello is a National Historic Landmark as well as a World Heritage Site, and understood to be "an outstanding example of a neoclassical work of art."  Monticello and the University of Virginia in Charlottesville: World Heritage Site, supra.

Of course, the Founding is not the only period in American history with notable examples of the symbolic value of residential architecture.  Ranalli

explains that "[p]erhaps[] no American architect has made a stronger contribution to the symbolic meaning of the" home than Frank Lloyd Wright.  Born in the years following the Civil War, Wright began his career as an architect at the turn of the twentieth century and is credited with the reinvention of American residential architecture.  Wright's designs, most notably his Prairie style homes, represented a stark departure from the traditional homes that dominated American architecture at the time, and as Ranalli explains, helped "realign the aristocratic art of residential architecture more closely to modern democratic ideals."  A forefather of modernism, Wright's homes are an exemplary combination of aesthetic and functional concerns.  To commission a Prairie house in the early twentieth century, then, was to communicate a desire to be new, to be modern, and to be uniquely American.

Nor are Wright's houses the last examples of expressive modern residential architecture that readily come to mind.  Instead, this country is filled with notable examples, including Walter Gropius's House in Massachusetts, Frank Lloyd Wright's Fallingwater in Pennsylvania, John Yeon's Watzek House in Oregon, Mies van der Rohe's Farnsworth House in Illinois, Philip Johnson's Glass House in Connecticut, Charles and Ray Eames's House in California, John Lautner's Schaffer House in California, and Eero Saarinen's Miller House in Indiana.  Each of these homes has been designated a National Historic Landmark or are on the

National Register of Historic Places and they are all widely recognized to be important parts of our American cultural heritage.[1]

The majority suggests that these references to architectural marvels and famous architects -- as well as International Style and modern architectural theory cited later on -- are "extra-record" fact-finding, and therefore, inappropriate for inclusion or discussion.  The majority would have us feign ignorance to centuries of world history, well-known and not subject to dispute, in order to resolve this case in a vacuum.  It is nothing new for the federal courts to turn to historical facts that may exist outside the record.  See, e.g., Allison Orr Larsen, Confronting Supreme Court Fact Finding, 98 Va. L. Rev. 1255, 1276 (2012) ("Several of the sources Justice Scalia uses in [District of Columbia v. Heller] to set forth the history of the language of the Second Amendment were drawn from outside of the party briefs or the hundreds of amicus briefs filed in that case.").

---

[1] The origin of the National Historic Landmark program can be traced back to the New Deal era Historic Sites Act, 49 Stat. 666 (current version at 54 U.S.C. § 320101), as well as to the National Register of Historic Places.  See Jess R. Phelps, Preserving National Historic Landmarks?, 24 N.Y.U. Envtl. L.J. 137, 147–61 (2016) (describing the history of federal preservation law).  Some of the criteria for becoming a National Historic Landmark focus primarily on the aesthetics of architecture, such as that the buildings "embody the distinguishing characteristics of an architectural type specimen exceptionally valuable for a study of a period, style or method of construction," while others recognize architecture's expressive potential, such as that the buildings "collectively compose an entity of exceptional historical or artistic significance, or outstandingly commemorate or illustrate a way of life or culture," or even just "represent some great idea or ideal of the American people."  36 C.F.R. § 65.4(a)(4)–(6).  These buildings, and the regulatory regime designating them as important, may be judicially noticed.  See, e.g., 44 U.S.C. § 1507; see also N.L.R.B. v. Goya Foods of Fla., 525 F.3d 1117, 1139 n.30 (11th Cir. 2008).

And today we need not go outside the realm of indisputable facts in order to recognize the historical examples referenced herein.  These examples are matters of historical fact and, in most cases, are surely part of the "common knowledge" this Court has cited so many times before.    My colleagues take issue with this, arguing that by looking beyond the record I consider more architecture than this case requires.  Majority Op. at 21–24.  But these constitutional questions do not exist in a vacuum.  Indeed, the oft-cited quotation from Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston -- that a particularized message is not a precondition for constitutional protection otherwise it "would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll" -- would not exist if the Supreme Court had only passed comment on St. Patrick's Day parades.  See 515 U.S. at 569.

Moreover, the current record is limited on these points because, as the majority admits, the Town did not dispute the fact that architecture is art.  Burns's counsel explained it succinctly in a hearing on the summary judgment motion: "it's one of those things that's obvious on its face that architecture is a form of art.  It permeates our society."  Similarly, no one has challenged Burns's claim that his proposed home was built in the International Style or argued that International Style architecture is lacking in distinctive meaning.  By considering the larger history of residential architecture it seems to me indisputable that it may have a

communicative element worthy of First Amendment protection, either through the application of the expressive conduct test or as analogous to other forms of protected artistic expression.

As I see it, the majority's resolution of this case cannot easily be squared with well-settled law recognizing the First Amendment's protection of artistic expression in all of its forms. An analysis of this kind would yield the odd conclusion that a tourist's drunkenly obtained tattoo is art protected by the First Amendment, see Buehrle, 813 F.3d at 980, n.2, while Philip Johnson's Glass House is not; "coin-operated devices by virtue of which a customer could sit in a booth, insert a coin and . . . watch a live dancer, usually nude," are protected, Schad, 452 U.S. at 62, Monticello is not; anodyne elevator music is protected, see Ward, 491 U.S. at 790, the Empire State Building is not. These distinctions seem to me to be indefensible. I do not see how we can declare in one breath that tattooing is protected by the First Amendment because it is "virtually indistinguishable from other protected forms of artistic expression," Buehrle, 813 F.3d at 976, but that architecture is so different as to be excluded from protection in another. At least, we cannot without undermining our aspiration to an intelligible jurisprudence.

Holding that architecture is a form of art (as it obviously is) would not, as the Town of Palm Beach seems to suggest, subject all construction in the United

States to the rigors of First Amendment scrutiny.  That architecture is a <u>form</u> of art does not mean all buildings are art.  Holding that architecture is a form of art would mean precisely what it says -- that <u>some</u> architectural construction can be artistic and may be protected by the First Amendment.

B.

To determine which architectural construction is artistic and worthy of protection, we look to the First Amendment.  "Congress shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. Amend. I.  However, the constitutional protection for freedom of speech "does not end at the spoken or written word." <u>Texas v. Johnson</u>, 491 U.S. 397, 404 (1989).  The First Amendment guarantees "all people [ ] the right to engage not only in 'pure speech,' but 'expressive conduct,' as well." <u>Holloman ex rel. Holloman v. Harland</u>, 370 F.3d 1252, 1270 (11th Cir. 2004) (citing <u>United States v. O'Brien</u>, 391 U.S. 367, 376–77, (1968)).  As our Court recently noted, "[a] sharp line between 'words' and 'expressive acts' cannot . . . be justified in Madisonian terms.  The constitutional protection is afforded to 'speech,' and acts that qualify as signs with expressive meaning qualify as speech within the meaning of the Constitution." <u>Fort Lauderdale Food Not Bombs</u>, 901 F.3d at 1240 (quoting Cass R. Sunstein, <u>Democracy and the Problem of Free Speech</u> 181 (1993)).

The Supreme Court has instructed us that when analyzing the scope of First Amendment protection beyond "pure speech," courts should apply the expressive conduct test drawn from Spence v. Washington, 418 U.S. 405, 409 (1974). In Spence, the Court asked whether the challenged activity "was sufficiently imbued with elements of communication to fall within the scope of the First" Amendment. Id. A court must examine whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." Johnson, 491 U.S. at 404 (quoting Spence, 418 U.S. at 410–11).

Though it may seem odd to analyze art, and especially concrete, tangible art, through a test articulated for conduct, ultimately the Spence/Johnson test asks courts to look for indicia of expression. Thus, when confronted with a claim that a particular instance of art is protected, the courts must decide on which side of the expressive line it falls. While I have little doubt that architecture is artistic expression deserving of First Amendment protection, answering whether this house is architecture deserving protection requires us to dig deeper into our precedent.

This type of line-drawing is commonplace for the First Amendment. Photography, like architecture, has expressive as well as utilitarian value. And while its expressive forms -- such as in the works of Ansel Adams and Alfred

95

Stieglitz -- are clearly deserving of protection, courts have been willing to draw a line when expression is lacking.  See, e.g., Porat v. Lincoln Towers Cmty. Ass'n, No. 04 Civ. 3199 (LAP), 2005 WL 646093, at *4–*5 (S.D.N.Y. Mar. 21, 2005) (holding that "purely private recreational, non-communicative photography" is not protected expression while acknowledging that "communicative photography is well-protected by the First Amendment"); Larsen v. Fort Wayne Police Dep't, 825 F. Supp. 2d 965, 979 (N.D. Ind. 2010) (holding that the "First Amendment is not implicated because a person uses a camera"); State v. Chepilko, 965 A.2d 190, 199, 202 (N.J. Super. Ct. App. Div. 2009) (observing that "the fact that some photography qualifies as expressive conduct entitled to First Amendment protection" does not mean the defendant's sale of photographs on a boardwalk is protected).

Similarly, "[n]ot all dancing is entitled to First Amendment protection as expressive activity."  Barnes v. Glen Theatre, Inc., 501 U.S. 560, 581 (1991) (Souter, J., concurring in the judgment).  Some forms of nude dancing are protected under the First Amendment, see Schad, 452 U.S. at 66 ("[N]ude dancing is not without its First Amendment protections from official regulation."), but "recreational dancing" is not, City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989).  Since the inquiry turns on expressiveness, the Spence/Johnson test may be the best analytical tool we have.

96

As I see it, the district court erred by departing from the expressive conduct test, attempting instead to glue together elements drawn from the Second Circuit's "dominant purpose" test found in a case involving the sale of expressive merchandise with the Spence/Johnson test.  As the Second Circuit explained in Mastrovincenzo v. City of New York, decorated commercial goods that "clearly ha[ve] a[n] alternative, non-expressive purpose" are "more likely to possess only marginally expressive content."  435 F.3d 78, 95 (2d Cir. 2006).  The court must consider whether the expressive elements of such items "may fairly be characterized as dominant" before extending First Amendment protection.  Id. at 96.  The court also must "take into account other factors that shed light on how and why an object is being sold or disseminated."  Id.

The magistrate judge found, and the district court agreed, that "the predominant purpose of Burns' structure was non-expressive" and therefore was not entitled to First Amendment protection.  But the "dominant purpose" test has not been adopted by this Circuit nor should it be applied to architecture, which does not involve the same concerns as those associated with the sale of baseball caps or other "objects adorned with only minor artistic adjustments."  Mastrovincenzo, 435 F.3d at 96.  The application of the "dominant purpose" test to residential architecture would virtually ensure that no home would ever qualify for First Amendment protection.  Further, even when separately considering the

second prong of <u>Spence</u>/<u>Johnson</u>, the district court was clearly influenced by the "dominant purpose" test and its emphasis on an item's function.

The district court applied the wrong legal standard to Burns's First Amendment claim.  The thrust of its analysis is pegged to the wrong template.  For this reason alone, I would vacate and remand, directing the district court in the first instance to find facts and measure them against the appropriate standard of law.  My colleagues undertake that task themselves, and while they are surely free to do that, I think that it would be wiser to give the district court the first crack at the fact-bound questions.  This seems to me to be especially so because by applying the wrong standard, yielding the wrong conclusion, the district court never got around to struggling with the additional difficult questions surrounding whether ARCOM barred Burns from building his home simply on account of content and whether the Town had any other sound interests that might otherwise justify so blatant an attempt to stamp out a long accepted architectural form simply because it found it to be distasteful.  Nor do we have the benefit of factual findings on critical issues such as whether the home was visible from the beach or credibility determinations because the Town, the magistrate judge, and the district court found this to be an open-and-shut case.  Instead, Burns's house presents a novel First Amendment claim and an important one for the freedom of artistic expression.

III.

A.

While the majority properly selects the Spence/Johnson framework, in my view its application of that test is deeply flawed.  The first question we must answer is whether "[a]n intent to convey a particularized message was present." Johnson, 491 U.S. at 404 (citing Spence, 418 U.S. at 410–11).  On this point, the parties do not dispute that Burns had an intent to convey a particularized message through his house and the majority admits as much.  Majority Op. at 33.  As Burns declared, it was his "intention that the design of the new house [] be a means of communication and expression of the person inside: Me."  Burns explained that the International Style "communicates that it is not old-fashioned; it is clean, fresh, independent, modern, and different from what I, and my prior home, were in the past."  He hired professional architects to help him with that act of expression.  But that entitles him no less to the protection of the First Amendment.  The majority agrees that, at least for purposes of summary judgment, Burns intended to convey a message through the design of his home.  It resolves the case on the second prong.

The second prong asks whether "the likelihood was great that the message would be understood by those who viewed it."  Johnson, 491 U.S. at 404 (quoting Spence, 418 U.S. at 410–11).  The Supreme Court has cautioned that there cannot be "an apparently limitless variety of conduct [that] can be labeled 'speech'"; thus,

"the factual context and environment in which [the activity] was undertaken" serve as a limiting principle to separate generic activities from expressive ones.  Spence, 418 U.S. at 409–10 (internal quotation marks omitted).  In this Circuit, "we ask whether the reasonable person would interpret it as some sort of message, not whether an observer would necessarily infer a specific message."  Holloman, 370 F.3d at 1270 (emphases omitted).

My colleagues brush off Burns's First Amendment claim with the easy conclusion that "[a] reasonable viewer would not infer some sort of message from Burns's new mansion because, quite simply, a viewer can't see it."  Majority Op. at 33.  They say that Burns's "design calls for carefully shielding those purportedly expressive elements from any viewer."  Majority Op. at 37.  But, as I read this record, it seems clear that Burns's proposed home would be visible to the Palm Beach community.

The east side of Burns's home faces a well-trafficked public beach and the Atlantic Ocean.  Burns's final presentation to ARCOM included photographs of the current house and several depictions of the proposed one -- through architectural drawings, renderings, and a three-dimensional model -- showing the house in relation to that beach.[2]  For starters, the following aerial photograph of the

---

[2] These are the kinds of materials one would look to in order to discern what a new home might look like.  And, indeed, these are the kinds of materials that ARCOM considers

current house shows it in the neighborhood context and reveals a dark, dense

perimeter of landscaping along three sides of the home, but a lighter, open lawn

facing the ocean.



Each representation of the proposed home presented to ARCOM included a

view of the house with the proposed landscaping.  The images below clearly show

that the landscaping plan would provide a dense shield from the neighboring

properties to the north, west, and south, but notably an almost unobstructed view to

the east and the water.  For example, the following is Burns's landscape architect's

plan for the landscaping, which shows precise drawings for the perimeter

---

when reviewing a new home.   For example, the Town of Palm Beach Zoning
Application Checklist requires the submission of signed plans, including streetscapes and
elevations.

landscaping and dots for the existing palm trees, but no raised landscaping through the center of the lawn toward the beach.



Similarly, the following computer-generated rendering of what the home would look like from the beach shows the home flanked by trees and with small shrubs in front, but completely visible from the beach and the water. This rendering shows the lawn, beach, and ocean. And the record establishes that the house is 74.83 feet from the existing sea wall demarcating the beach. This is a shorter distance than it is from home plate to first base.



Finally, the following photograph of the three-dimensional model facing eastward and toward the ocean shows the palm trees on the corners of the lawn and an open expanse in between.



The lack of landscaping on the east side is even more notable when compared with the west side of the property, which shows a dense foliage screen between the home and the neighbors to the north and south, and between the home and the street to the west.



The majority suggests that these images are somehow misleading, as if Burns and his team purposefully skewed the representation of the east side but not the other three.  For example, the majority notes that the physical model should have "[a] lot more" foliage on the backside.  Majority Op. at 43.  But it is worth turning to what Burns's landscape architect, Keith Williams, actually said to ARCOM.  Over the course of several ARCOM hearings, Williams explained to the Commission that the majority of the landscaping work would be focused on the north, west, and south sides of the home -- i.e., to shield the house from the street and from the two neighboring properties.  The east side, however, would remain mostly "undisturbed."  Speaking to one ARCOM member at the second hearing, Williams explained that he would add more sea grape on the east side, focused

along the northern and southern property lines, not on the central lawn facing the

Atlantic Ocean.  The transcribed dialog between Williams and this ARCOM

member from the second ARCOM hearing makes this clear:

> [ARCOM]: . . . When I'm looking at the model and I'm looking at your elevations and plan views of your landscaping, there's a lot more landscaping on the north and south of that east elevation than you see in the model is that because that's in the neighbor's yard?
>
> Mr. Williams: No it's just the model person --
>
> [ARCOM]: Because if I'm looking at the north side there on your plans there's a lot more sea grape it looks like.
>
> Mr. Williams: The sea grape is on the neighbor's property.
>
> [ARCOM]: That's what I'm asking you.  That's a lot thicker there.
>
> Mr. Williams: Exactly.  Much thicker and our idea -- what we're proposing to do, which we didn't do originally is to pick up on that and actually bring that back in towards the house.  So when you come to the side of the property you actually walk through those sea grape.
>
> [ARCOM]: So on the rear -- from the land, that's a lot more screening there than what the model shows?
>
> Mr. Williams: A lot more. Unfortunately the model company doesn't have sea grape.

(Emphases added).  Furthermore, Williams made it abundantly clear at the third

and final ARCOM hearing what the final plan for landscaping would look like on

the east side.  He said, "[t]here is a continuation of lawn, just as it is today.  There

are existing sea grapes on the north neighbors' property and on the south

neighbors' property.  We're kind of adding to those.  <u>Not towards the ocean</u>, but adding towards the house, into our property."  (Emphases added).

Ultimately, then, these images are clear and consistent in their representation of the landscaping on the east (ocean) side of the proposed home.  Each one presents the same depiction of the home and of the landscaping and reflects landscape architect Williams's testimony before ARCOM.  The majority inexplicably refers to these images as "old," but these were the very images Burns presented to ARCOM at the final hearing when the Commission rendered its decision.  Majority Op. at 44.

Moreover, the perspective offered by the architectural drawings, renderings, and the three-dimensional model is corroborated by a record abundant with examples of neighbors concerned with Burns's proposed design precisely because the home can be seen from the vantage point of the beach.  One neighbor wrote to the Town, "[w]e suggest that you look at the homes from the beach.  The proposed home for 1021 N. Ocean is not compatible with the existing homes."  Or as another put it, "[t]here is no way to hide this home from viewers on the beach."  Many objectors lamented that Burns's design would ruin the quality of the beach.  As one put it, "[m]y family and I have long enjoyed the picturesque flowing [lawns] currently existing on the ocean in this unique neighborhood.  The proposed house plan would unquestionably disrupt that idyllic view as well."  Another objector

asked ARCOM to "[i]magine walking the beach, as so many people do, and enjoying the many traditional homes and then coming upon a very large contemporary home." And another argued that "[w]ith regard to the view from the ocean, and the popular public beach accessed by Eden Road, the house will still mar the ambience and view." Still another explained that "[i]f this house were to be approved, beachgoers currently enjoying an expanse of lawns and traditional-design homes will be forced to look at a higher house with a mass and design incompatible and disharmonious with its neighbors and neighborhood, marring the current scenic view." And another, "[t]his house will be directly viewed from a popular public beach . . . . This excessively dissimilar house negatively affects the views of the public from the public beach." Similar comments were made during the ARCOM hearings, including by an attorney for one neighbor who explained that "[o]ne of my concerns is that you are supposed to look at natural vistas. If you still want to walk on that beach, you're supposed to preserve and enhance those."

That the house would be visible to the public from the beach was understood by ARCOM as well. As one ARCOM member explained, while the house would be hidden from the street, the "exception for that is if you're walking on the beach, then of course you're going to see this house." (Emphasis added). Another commented that "[t]his is a particular area of the north end where I really like to walk on the beach. So I appreciate that when I look at this site now . . . [i]t makes

me look on the other side."  And a third explained that if "I were walking on the

beach or sailing by here, I would be kind of -- you're turning something which had

a little bit of a harmonious stretch there into a -- you've got something that clearly

doesn't match the others."

The majority attempts to bolster its conclusion by drawing a distinction

between seeing the house's design and its "height" and "mass."  Majority Op. at

38–39.  But the majority does not explain how "height" and "mass" are different

than design.  Design is "the arrangement of elements or details in a . . . work of

art."  See "Design," Merriam-Webster Dictionary, https://www.merriam-

webster.com/dictionary/design (last visited Jan. 20, 2021).  The elements that make

up the design undeniably include height and mass.

Indeed, the treatment of height and mass incorporated here are hallmark

features of International Style design, which as David Chase put it in his written

presentation to ARCOM, is "[c]haracterized by 'white' rectilinear forms,

cantilevered construction, interior/exterior openness, steel, glass, concrete wall

planes, flat roofs, horizontal linear elements and asymmetrical composition, which

is absent of ornamentation."  The majority concedes that Burns sought to express a

message through these International Style features in the house's "simple lines,

minimal decorative elements, and open spaces built of solid, quality materials,"

Majority Op. at 37, but does not explain how those elements are somehow hidden

while the height and mass are not.  As can be seen from the renderings already cited, more than a "sliver" of the home's design -- including its height, mass, materials, minimal adornment, flat roof, and simple lines -- is visible.

The majority's conclusion also leaves one to wonder why Burns would create a home with floor-to-ceiling windows only to block the view of the ocean. It would be hard to imagine an International Style design that failed to integrate the home with its natural setting, including the backdrop of the Atlantic.  And in this case, we know the design of Burns's home intended to do just that.  As Ranalli put it, the design of Burns's home sought to incorporate the home's natural setting, working with "vistas of sea and sky . . . visible through the large grey tinted-glass" in order to "turn[] rooms inside out, to transform views into landscape art."

It also would be hard to understand why Burns's design created so much controversy -- controversy that made it all the way to the United States Court of Appeals -- if the house would not be visible to the public at all.  Instead the record makes clear that it was the house's visibility -- especially the visibility of the International Style elements -- that generated heated opposition.  As another objector wrote, "[t]his excessively dissimilar structure will be a monolithic presence on this formerly tranquil beach."

If there be any doubt about whether Burns's design was intended to block his view of the beach and the ocean, this provides still further reason why the case

should be remanded to the district court for basic fact-finding.  Even when we

adjudicate constitutional issues, we are still obliged to "draw all inferences and

review all evidence in the light most favorable to the non-moving party."  Fort

Lauderdale Food Not Bombs, 901 F.3d at 1239–40.  In this case, that's Burns.

Further, concluding that Burns's house is visible, or not, from the road or the

beach does not end our analysis.  It certainly was not part of ARCOM's evaluation,

which looked at the house design without taking landscaping into account.[3]

According to one member, although Burns's final proposal greatly improved the

landscaping, it was not to his benefit because ARCOM looks "at the house without

landscaping."  A second member of the Commission explained, the house must be

evaluated as it was designed because he did not "think it's fair to lean on the

landscaping to hide this house from the street."

Even if it were true that Burns's house was not visible at all to those driving

or walking by -- and on this record that is not the case -- his home would still

---

[3] But even if ARCOM had considered the landscaping, much of the landscaping was added or increased in order to satisfy ARCOM and Burns's neighbors.  As one ARCOM member and supporter of Burns's project pointed out, Burns, unlike other applicants who faced resistance from ARCOM, engaged in a "democratic dialogue" with the Commission and incorporated its comments into his design.  There is no doubt that despite these changes, Burns's message continues to be conveyed.  The irony is powerful: it would make no sense to offer less First Amendment protection to speech when the person making it takes steps to minimize any offense caused, while still unmistakably communicating a distinct message.  Such changes should not be seen as changing the content of the speech so much as the way in which it is conveyed -- a difference recognized in First Amendment jurisprudence.  See Ward, 491 U.S. at 791–92.

warrant First Amendment protection.[4]  The Spence/Johnson test does not require the "reasonable viewer" to be a passerby or a neighbor.  A social guest or an invitee is more than enough.  The majority offers that it would require "speculation" to say that Burns was expecting social guests or invitees to view his home because "he presented no evidence that he intended to invite guests." Majority Op. at 44.  But it is hard to imagine that Burns intended to rebuild his home and never invite a single soul to see it.  Nor does the record support this assumption.  For one thing, the plans for Burns's new home included at least two guest bedrooms.  We also know from this record that Burns employed a staff to care for his property.  Further, Burns specifically referenced having guests at his new home in a 2014 letter to his neighbors made part of this record.  He explained

---

[4] As a general matter, the courts have given extensive protection, in many ways and in many different contexts, to the home.  See, e.g., Lawrence v. Texas, 539 U.S. 558, 562 (2003) ("In our tradition the State is not omnipresent in the home."); Kyllo v. United States, 533 U.S. 27, 31 (2001) (describing "the right of man to retreat into his own home and there be free from unreasonable governmental intrusion"); Payton v. New York, 445 U.S. 573, 597 n.45 (1980) (noting "the common law's special regard for the home"); Griswold v. Connecticut, 381 U.S. 479, 484 (1965) (citing "the sanctity of a man's home" (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)).  In fact, the First Amendment protects speech from governmental censorship in the home just as it does in the streets.  See, e.g., City of Ladue v. Gilleo, 512 U.S. 43, 58 (1994) ("A special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to speak there.") (citations and emphasis omitted); Stanley v. Georgia, 394 U.S. 557, 565 (1969) ("Whatever may be the justifications for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home.  If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch.").  These cases suggest the uniqueness of the setting and the sensitivity with which our courts have addressed previous claims of governmental intrusion onto private residential property.

that part of his design process would include "improving Motor Court design to improve guest drop off." This letter suggests that Burns hosted people at his current home, and strongly suggests that he intended to host people at his new home, which was also a point of concern to his neighbors. Indeed, at one ARCOM meeting, the representative of several neighbors explained that noise could travel from people gathering at the new residence as designed: "On cool days, you might have a dinner party or something else, sound will just promulgate in both directions."

The long and the short of it is that <u>Spence</u>/<u>Johnson</u> directs us to a "reasonable viewer" and whether he may interpret some message from the expressive conduct. A reasonable viewer exists here.

### B.

The majority continues with the second prong of <u>Spence</u>/<u>Johnson,</u> finding that even if the house were visible, "a reasonable observer would view Burns's new mansion as a really big house," not as one communicating some message. Majority Op. at 49. It reaches that result by rigorously applying a set of contextual "factors" it draws from this Circuit's recent decision in <u>Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale</u>, 901 F.3d 1235 (11th Cir. 2018). But these

factors do not provide all of the guidance we need in this case to determine whether residential architecture is expressive, nor could they.

Context is the touchstone of the expressive conduct test. Both <u>Spence</u> and <u>Johnson</u> involved claims of expressive conduct related to the American flag -- in <u>Spence</u>, the defendant was convicted of improperly using the American flag for exhibition or display when he taped a peace sign on the flag, 418 U.S. at 405, and in <u>Johnson</u>, the defendant burned the flag during a political protest, 491 U.S. at 399. In both cases, the Court looked to the context in which the allegedly expressive activity occurred. <u>See Spence</u>, 418 U.S. at 410 ("Moreover, the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol."); <u>Johnson</u>, 491 U.S. at 405 ("Instead, in characterizing such action for First Amendment purposes, we have considered the context in which it occurred."); <u>see also Clark v. Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 294 (1984) ("It is also true that a message may be delivered by conduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative."). Our Circuit similarly emphasizes the importance of examining the context surrounding a particular activity when deciding whether it merits protection. <u>See Fort Lauderdale</u>, 901 F.3d at 1237 ("In understanding what is going on around us, <u>context matters</u>.") (emphasis added).

In Fort Lauderdale, a nonprofit engaging in "peaceful political direct action" argued that its weekly events at a public park in Fort Lauderdale, which involved sharing food at no cost with those who gathered there, were expressive conduct protected by the First Amendment.  Id. at 1237–38.  We found the organization's food sharing events to be "an act of political solidarity meant to convey the organization's message" and a form of expressive conduct protected by the First Amendment.  Id. at 1238, 1245.

In reaching that result, we explained that it "should be no surprise . . . that the circumstances surrounding an event often help set the dividing line between activity that is sufficiently expressive and similar activity that is not."  Id. at 1241.  We outlined five "circumstances" that placed the challenged activity "on the expressive side of the ledger": first, that the organization "sets up tables and banners (including one with its logo) and distributes literature at its events," id. at 1242; second, that "the food sharing events are open to everyone," id.; third, that the organization "holds its food sharing in . . . a public park near city government buildings," id.; fourth, that "the record demonstrates without dispute that the treatment of the City's homeless population is an issue of concern in the community," id.; fifth, and finally, that "the significance of sharing meals with others dates back millennia," id. at 1243.

Of course, Burns's house does not present the same circumstances, nor is it likely that any piece of residential architecture would ever do so.  Burns has not set up a table to distribute literature about his home's design and that design could not be said to relate to an issue of concern in the community, even though at the end of the day it did create an issue of obvious concern.  Nor is his home open to everyone or located on or near a public forum or any official building -- both of these factors are incompatible with the idea of expression on private property.  The circumstances in Fort Lauderdale -- which my colleagues read as factors -- were relevant to determining whether a political nonprofit's food sharing in a public park was expressive conduct -- nothing more and nothing less.  "Each medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems."  Conrad, 420 U.S. at 557.  A test so concerned with context and unique circumstances could not presume to dictate the application of five exclusive axes on which all future cases must rest.

Nor could there ever be a definitive test for context.  If the five Fort Lauderdale factors were read as exclusive requirements for finding First Amendment protection, the seminal expressive conduct cases would surely have come out the other way.  The student who hung the American flag in Spence did not set up tables, distribute literature, or hang up a banner to explain what he was doing.  418 U.S. at 409 ("There is no evidence that any crowd gathered or that

appellant made any effort to attract attention beyond hanging the flag out of his own window."). Nor did he open his apartment to everyone or place his flag in a traditional public forum. Id. ("[T]here is no evidence that anyone other than the three police officers observed the flag."). Similarly, nude dancing performed for entertainment may be expressive conduct, see Schad, 452 U.S. at 66, but it is unclear that it is ever in dialogue with "an issue of concern in the community." Fort Lauderdale, 901 F.3d at 1242. My colleagues point out that the Fort Lauderdale court found support for four of the five circumstances in case precedent, including Spence and Johnson. Majority Op. at 54–55. But while this is true, the Court did not "weigh [these factors] together to decide whether" flag burning or marching in a parade was expressive conduct, as the majority does here for residential architecture. Majority Op. at 54. Instead, the Court started with the activity and then looked at the unique circumstances surrounding it. Just because some circumstances may be sufficient in some cases does not mean they are necessary -- or even appropriate -- in all cases.

Ultimately, the majority embraces the letter of the expressive conduct test, but not its spirit. The majority insists on evaluating residential architecture through the prism of the Fort Lauderdale factors, which are ripped from a markedly different context. The majority maintains that these factors can protect residential architecture at least some of the time by applying them to Monticello. But the

majority analyzes Monticello as it exists <u>today</u> -- as a public museum rather than a private residence.  Majority Op. at 53.  If a piece of residential architecture must publish a website and brochures, hold public tours, and maintain designation as a national historic landmark in order to merit First Amendment protection, then the range of residential architecture that may qualify is not only exceedingly narrow, but would likely be unknown until maybe centuries later.  Moreover, the majority's focus on the poorly fitting <u>Fort Lauderdale</u> factors causes it to miss the fundamental point -- Monticello was expressive residential architecture, and so deserving of protection, on the day it was built, long before it became a museum, conducted tours, published brochures, or received historic landmark status.

The circumstances that make Burns's house expressive will not be the same as those found in <u>Fort Lauderdale,</u> just as the circumstances that made the meals in <u>Fort Lauderdale</u> expressive were not the same as those that made flag burning expressive in <u>Johnson</u>.  But because the majority considers nothing other than the factors articulated in <u>Fort Lauderdale</u> it leaves the impression that they represent the entire analytical framework -- the alpha and omega -- for expressive conduct.

Looking at the context surrounding Burns's proposed home, a reasonable observer would interpret a distinct message from the home.  For starters, a reasonable viewer would interpret the International Style design as a message about the philosophy of the house's owner.  Ranalli explains that the International

Style is a coherent and self-consciously artistic architectural movement of the inter-war period, the parameters of which were codified in a 1932 exhibition in New York's Museum of Modern Art (the museum's first architectural exhibition), and a subsequent manifesto by architects Henry-Russell Hitchcock and Philip Johnson.  See Henry-Russell Hitchcock & Philip Johnson, The International Style (W.W. Norton ed. 1996).

The International Style had two guiding justifications: that a radical departure from previous forms of architecture was required and that a return to nature could offer that departure.  The architecture, as explained by Burns's expert David Chase before ARCOM, is "[c]haracterized by 'white' rectilinear forms, cantilevered construction, interior/exterior openness, steel, glass, concrete wall planes, flat roofs, horizontal linear elements and asymmetrical composition which is absent of ornamentation."  Through these elements, Ranalli observes, modern architects explored "the interplay of interior and exterior space."  Chase also noted that the style was "championed by Architects such as Walter Gropius, Le Corbusier, Frank Lloyd Wright and Ludwig Mies van der Rohe."  Gropius explained his guiding motivation in a 1931 edition of Architectural Forum magazine this way:

> The dwelling house should no longer resemble something like a fortress, like a monument with walls of medieval thickness and an expensive front intended for showy representation.  Instead it is to be of light construction, full of bright daylight and sunshine, alterable,

time-saving, economical and useful in the last degree to its occupants whose life functions it is intended to serve.

Susan L. Buck, <u>A Material Evaluation of the Gropius House: Planning to Preserve a Modern Masterpiece</u>, 28 APT Bulletin: The J. of Preservation Tech., 1997, at 29, (1997).

These elements are easily discernable to a reasonable viewer.  The viewer need not be familiar with any of the works cited to perceive a message of modernity from the clean walls and stark lines of Burns's proposed home.  Nor is it hard to discern a return to nature from the emphasis on open space, glass, simple materials, and integration with the surrounding beach and ocean.  A viewer, invited to the property or standing on the beach, likely would interpret that message.

Finally, the historical context weighs in Burns's favor.  The majority disagrees, finding that Burns "has not established that residential architecture has a history stretching back millennia which shows an association between home design and communication."  Majority Op. at 52.  My colleagues criticize Burns's expert reports, claiming they "said nothing about the message <u>residential</u> architecture has conveyed going 'back many hundreds of years.'"  Majority Op. at 51.  But I think they make two mistakes.  In the first place, unlike the singular meaning associated with sharing a meal, the meaning of residential architecture undoubtedly changes over time and place.  It seems indisputable that the meaning derived from seeing

Jefferson's late eighteenth century Monticello is profoundly different than the meaning derived from seeing Mies's mid-twentieth century Farnsworth House.

In the second place, the expert reports describe the evolution of meaning that has been communicated through residential architecture over hundreds of years. Ranalli devotes an entire section of his report to residential architecture, though he opines on the topic throughout. In that section, he describes the "symbolic meaning" of residential architecture from the 1450s through today. As he explains, "every built structure helps to shape an environment," and "our houses have much more to say than any distant architectural masterwork." He then traces notable examples of residential architecture, starting with the Italian Renaissance through Frank Lloyd Wright and modern architecture. His report is brief, providing only a high level summary, but it provides a starting point for considering the long history of expressive residential architecture.

The other report, written by Paul Goldberger, similarly takes a mile-high view of the subject, but still examines the evolving meaning of residential architecture, from the townhouses of Georgian England to the coastal houses of Nantucket, from the modernism of Frank Gehry to the traditionalism of McKim, Mead & White. Goldberger notes that it is "in the construction of private houses that the American spirit of architecture as a form of personal expression has always had its greatest manifestation." His analysis begins with the individual home, but

goes on to examine the larger assortment of homes that make up a street, town, or city.  In that way, he identifies the uniqueness of <u>American</u> architecture: it is an architecture that "reflect[s] the pluralism that is fundamental to the American character.  Architecture at its best has always shown us the virtues of pluralism, and the way in which diversity of expression is not something to be feared, but a quality to be welcomed as a building block of community."

Burns's choice of the International Style communicates his message of modernity and individuality, especially when viewed in the larger context of his neighborhood.  ARCOM heard testimony that all of the houses within two-hundred feet of Burns's property were in the "Georgian, Regency [or] Bermuda" styles.  Were every home in the neighborhood an example of the International Style, my colleagues might be right that Burns's house would communicate that it is "nothing more than another big beachfront home."  Majority Op. at 52.  But again, context matters.  The International Style may be modern, but part of its communicative power is found in its dialogue with the residential styles that came before.  Like a raised fist during the Pledge of Allegiance, seeing Burns's home among the other, more traditional homes on Ocean Boulevard communicates a generalized message of difference, of individuality, and of modernity.  <u>See</u> <u>Holloman</u>, 370 F.3d at 1270.

The district court also took issue with the house's "bedrooms, bathrooms, []
garage, laundry room, wine storage, and [] steam room, as these features highlight
the non-expressive functions of the home" and demonstrate that "the structure is to
serve as a residence, not as a piece of visual art."[5]  But it looked at Burns's home
too narrowly, missing the forest for the trees.  It is <u>because</u> Burns will live in this
house that it communicates something for him and about him.  The house is not a
sculpture, placed in a museum, divorced from any functionality.  Nor is it merely
an architectural plan, meant to be kept in the archives.  It is the very fact that the
house is a shelter, a residence, and a place of refuge for its owner that enables it to
speak on his behalf.  <u>Cf.</u> <u>Gilleo</u>, 512 U.S. at 56 ("Displaying a sign from one's own
residence often carries a message quite distinct from placing the same sign
someplace else, or conveying the same text or picture by other means.  Precisely
because of their location, such signs provide information about the identity of the
'speaker.'").  Taking issue with the functional aspects of the design is like saying
that the <u>Fort Lauderdale</u> plaintiffs could not take sustenance from their food or else
forfeit their First Amendment protection.

---

[5] Even the majority pairs Burns's "philosophy of simplicity in lifestyle" with a recitation of the
house's features, including that it will have a "basement garage, outdoor pool and spa, cabana,
and exercise room."  Majority Op. at 1–2.  Perhaps my colleagues intend to suggest that Burns's
First Amendment claim is disingenuous.  But on the limited record before us, which did not
include credibility determinations by the trial court, there is no evidence supporting that
inference.  Nor should we indulge that inference instead of construing the facts in Burns's favor
as is required on summary judgment.

Burns already owns a home that includes bedrooms, bathrooms, and other functional areas.  He is not seeking to tear that one down and build a new one because of a need for functionality.  Instead, Burns thought that his traditional home communicated one message and now he wants to communicate a sharply different one.  On this record, I would find that Burns satisfies the expressive conduct test and that his proposed home is protected by the First Amendment.

C.

Concluding that Burns's home is protected by the First Amendment does not end the analysis.  The government can regulate protected expression -- and does so all the time -- in certain ways and under certain conditions.  Because the district court disposed of this case on the threshold question, it did not undertake the difficult analysis that would, and should, follow.

i.

The level of scrutiny applicable to a regulation of protected expression turns in no small way on whether the regulation is "content-based" or "content-neutral."  See Reed v. Town of Gilbert, 576 U.S. 155, 163–64 (2015).  As the Supreme Court has explained, "the First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals.  Our precedents thus apply the most

124

exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content."  Turner Broadcasting Sys., Inc. v. F.C.C., 512 U.S. 622, 641–42 (1994) (citations omitted).  On the other hand, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue."  Id. at 642 (citation omitted).

Content-based laws "target speech based on its communicative content." Reed, 576 U.S. at 163; Turner, 512 U.S. at 643 ("[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.").  On the other hand, a regulation is content-neutral if it can be "justified without reference to the content of the regulated speech." Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976).  Thus, the "principal inquiry in determining content neutrality" is "whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." Ward, 491 U.S. at 791.  And "the mere assertion of a content-neutral purpose [will not] be enough to save a law which, on its face, discriminates based on content." Turner, 512 U.S. at 642–43.  But a facially content-neutral regulation can be considered content-based when enforced in a content-based way.  See Turner, 512 U.S. at 645–46 ("Our

cases have recognized that even a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys."); accord Ward, 491 U.S. at 791–93.

Content-based regulations of protected expression are "presumptively," though not conclusively, "unconstitutional." Reed, 576 U.S. at 163. A court will uphold a content-based regulation if the government can show that it is "narrowly tailored to service compelling state interests." Id. "Narrow tailoring" in this context requires "the least restrictive means," United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000) (internal quotation marks omitted), but not that the regulation be "perfectly" tailored, Williams-Yulee v. Fla. Bar, 575 U.S. 433, 454 (2015) (internal quotation marks omitted). Though this is a rigorous standard, it is not necessarily "fatal in fact." Adarand Constructors., Inc. v. Pena, 515 U.S. 200, 237 (1995) (internal quotation marks omitted).

ii.

The ARCOM ordinances as applied to Burns are content-based. Section 18-205(a)(4) prohibits construction that is not "in harmony with . . . the general area." Section 18-205(a)(6) prohibits construction that is "excessively dissimilar in relation to any other structure . . . within 200 feet" with respect to, among other things, "[a]rchitectural compatibility," "[a]rrangement of the components of the

structure" and "[d]iversity of design."  And Section 18-205(a)(8) requires proposed

buildings to be "appropriate in relation to the established character of other

structures in the immediate area or neighboring areas in respect to significant

design features such as . . . architectural design."  Under these provisions (each of

which was cited in denying Burns's application), the permissibility of construction

turns entirely on the content of its design and its architectural style.  If Burns had

submitted a plan for a Georgian, Regency, or Bermuda Style home -- the only

styles currently found in his immediate neighborhood -- construction would have

proceeded.  In Palm Beach, an owner's right to make full, enjoyable use of his own

property turns on the extent to which his aesthetic views conform to those of the

majority.  This is the essence of content-based regulation.

Under the Town Code, new construction must comply with a variety of

objective, non-aesthetic zoning requirements, designed to ensure that it is of high

quality and broadly of the same size and location on the lot.  Burns's proposal

indisputably met these requirements.  But the purposes of the ARCOM ordinances

state that although "[t]he comprehensive plan and zoning codes are the most

powerful legal enforcement of an overall urban concept," "alone they do not create

beauty, aesthetic order, or amenity."  Code of Ordinances,  Town of Palm Beach,

Florida § 18-146(d).  In other words, ARCOM exists to impose its views of

"beauty" and "aesthetic order" on a population whose own views of beauty -- as they seek to express it through their own homes -- might not be up to par.

Were there any lingering doubt that the ARCOM ordinances as applied are content-based, the record reveals that ARCOM denied Burns's permit because the majority of its members did not like the architectural style. Over the course of three hearings, as I've noted, ARCOM members made many disparaging comments about the style of the house including, that there is no "charm" in the house, that the taste "is questionable," that "[t]here's not a person in Christendom who can convince me that this house is charming," and that "[t]his house is 'in your face' and has no charm that I can see," because "the overall impression of this house is institutional."

One recurring theme of ARCOM's criticism was that modern architecture does not belong in Palm Beach. A Commission member conceded that it would be "very hard to sit here and say no, you shouldn't build this house" since "it fits on the lot" and "there are no variances required," but that she would not approve the design because ARCOM is "charged also with making sure that we don't let the character of Palm Beach go. And the character of Palm Beach has not made it to the modern style yet." Another member commented that if she "were to see this architecture in a different location, [she] might find it attractive. It's just the problem of where it's located." Still another explained that "[t]he style that is

proposed here is a very modern and new style that's inserted into the fabric."  And although Burns presented information on fourteen "Contemporary Modern" homes, including International Style homes, that were previously approved by ARCOM, the Commission made clear that it was not bound by this precedent and especially not by any past "mistakes."  In fact, one Commission member expressed regret over the approval of an earlier, unrelated project, explaining that "[w]e can't afford to make another mistake."  According to ARCOM, then, excessive dissimilarity is a moving target because existing homes might still be found to be incompatible with the area.  These comments are troubling evidence of how the ARCOM ordinances are applied to discriminate against certain content.

ARCOM'S displeasure with Burns's choice of design is made even clearer by the Commission's stated preference for Burns's current home.  When voting on his demolition application, one member said that though he would approve it, the Commission could "voice [its] displeasure" with the fact that the existing home would be demolished because "it's certainly a nice [house]."  He continued: "And it's a shame . . . it's a horrible, you know, waste of resources."  Another offered that he would vote yes "by law; [but] philosophically, emphatically no."

It is indisputable that modern architecture faces a heavier burden before the Commission than traditional architecture.  ARCOM's published guidelines euphemistically note that the International Style "can appear quite diverse from

other styles prominent in Palm Beach."  ARCOM members themselves have

openly acknowledged a bias against modern designs.  Airing her objections to a

different International Style home, one Commission member stated that ARCOM

has not "allowed  . . . in many years a modern, an international house unless it was

[a] superior design."  She framed her remarks in almost apocalyptic terms,

explaining that Palm Beach "has survived" because of its appreciation for beauty

and charm and that she "resent[s] people coming in trying to change Palm Beach

for whatever reason."  Modern architecture, she concluded, "is not Palm Beach."

Another member voted to deny a permit for a proposed contemporary home in

2014 on the ground that "[w]e have not been as strict as we should be; questioning

the charm of the proposed structure."

The record also shows that ARCOM members were inundated with

complaints by Palm Beach residents who did not like the design of Burns's home -

- complaints that the Commission could consider when deciding whether to

approve the project.  One resident complained that "anyone passing by on this

most important road in the north end of the Island will have to see this glass

rectangle designed like a motel and more appropriate to . . . Malibu than Palm

Beach ISLAND."  And another extolled his "very pure" motive to "keep the

character of Palm Beach" before explaining that there were no "changes on this

style of home [to make it] come into conformity with the ARCOM ordinance."

After hearing many heated objections, an ARCOM member explained that "it may be that some people resent the neighbors [for] saying, look, we don't want this here, this is not consistent with our neighborhood.  But they are the established character of the neighborhood. They speak for the character of the neighborhood and, therefore, they are persuasive in this instance."  So long as these Commission members sit on ARCOM, they can effectively dictate what the accepted taste of the neighborhood will be, and no one will build a modern house in Palm Beach again.

On the record before us, the Town cannot meet the weighty burden required to sustain the ARCOM ordinances, at least as applied to the Burns design.  The only interest it has asserted is its interest in aesthetic uniformity.  But, notably, the record reveals that aesthetic uniformity may not even exist in Palm Beach.  The ARCOM 1995 Guidelines (as revised in May 2015) describe ten "predominant styles found in Palm Beach," which are markedly different from one another: Mediterranean Revival, Bermuda, Regency, Ranch, International, Spanish Colonial, Shingle, Bungalow, Art Deco, and Tudor.[6]  And as I've noted, there are

---

[6] Chase's expert report, which was submitted to ARCOM, describes how diverse many of these styles actually are.  Thus, for example, he points out that Mediterranean Revival style homes have low-pitched clay barrel tile roofs, semicircular or pointed arches, cast and carved stone ornamentation and asymmetrical facades.  Bermuda style homes, by contrast, have steeply pitched roofs with flat cement tiles and symmetrical facades with classical detailing.  Regency style homes are "one-story, symmetrical, flat roofed structure[s] with classical ornamentation, including stucco banding," arched windows, pediments, and columns.  Still different are Ranch style homes, which "are represented by asymmetrical, irregularly shaped and sometimes undistinguished one-story structures with low-pitched cement tile roofs and awning windows."

at least fourteen other International, Mid-Century Modern and Contemporary style homes in Palm Beach.

We have long recognized in this Circuit "a government's substantial interest in aesthetics and the right to maintain its aesthetics through zoning regulations." Fla. Pub. Telecomms. Ass'n, Inc. v. City of Miami Beach, 321 F.3d 1046, 1055 (11th Cir. 2003). But we have also explained that "aesthetics . . . are not sufficiently 'compelling' to sustain content-based restrictions." Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1268 (11th Cir. 2005); see also Ward, 491 U.S. at 793 ("Any governmental attempt to serve purely esthetic goals by imposing subjective standards of acceptable sound mix . . . would raise serious First Amendment concerns . . . .").

Since the Town believes that there is no First Amendment protection for architecture, it only offers a cursory attempt at justifying the ARCOM ordinances and wholly misses the correct test and standard of review. It argues that its aesthetic interests are especially acute in the context of architecture because of how long it lasts and because of its impact on those who will see it. The Town may have a substantial interest in creating a community that is "beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." Berman v. Parker, 348 U.S. 26, 33 (1954).

The vast majority of traditional zoning regulations are aimed at similar ends and could easily be enforced.  Unlike content-based zoning regulations, most zoning regulations in the country are content-neutral; that is, they can be "justified without reference to the content of the regulated speech." Va. State Bd. of Pharm., 425 U.S. at 771.  In this context, it is the artistic, architectural style of residential construction that may raise First Amendment concerns, not the act of building itself.  Thus, routine regulations of features such as height, lot coverage, setback, construction materials, quality and emergency preparedness standards among countless others -- the kinds of regulations people ordinarily think of when they think about zoning -- are entirely agnostic to the artistic style of architecture and can be justified by reference to other important state interests such as health, safety, environmental preservation, privacy, preservation of property values and a robust tax base, and the segregation of residential and commercial uses.  Just as the regulation of the volume of music is content-neutral because it is unconcerned with the artistic content of the music, see Ward, 491 U.S. at 792, zoning regulations that set the rules under which architectural expression can be performed are not content-based.

Moreover, the places most in need of stylistic zoning ordinances would be unlikely to cite to their aesthetic interest alone.   In Taos, Colonial Williamsburg, or the French Quarter, for example, the economic life of the community depends

on the architectural style and on its uniformity.  Cf. Metromedia, Inc. v. City of

San Diego, 453 U.S. 490, 534 (1981) (Brennan, J., concurring) ("[T]he parties

acknowledge that a historical community such as Williamsburg, Va. should be able

to prove its interest in aesthetics and historical authenticity are sufficiently

important that the First Amendment value attached to billboards must yield."); City

of New Orleans v. Dukes, 427 U.S. 297, 304–05 (1976) (upholding limitations on

street peddlers and hawkers in the French Quarter because "disturb[ing] tourists

and disrupt[ing] their enjoyment of th[e] charm and beauty [of the area] . . . might .

. . have a deleterious effect on the economy of the city").  This powerful interest in

economic vitality -- which, in some cases, may amount to an interest in the

continued existence of a place -- is much stronger than an aesthetic interest

standing alone.

But to conclude from the long history of affirming zoning regulations that a

naked interest in stylistic orthodoxy will always overcome the guarantees of the

First Amendment misapprehends the Amendment's applicability to art and

architecture.  "If there is any fixed star in our constitutional constellation, it is that

no official, high or petty, can prescribe what shall be orthodox in . . . matters of

opinion." W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943); see

Terminiello v. City of Chicago, 337 U.S. 1, 4–5 (1949) (observing that the First

Amendment prohibits government pursuit of "standardization of ideas"); see also

Turner, 512 U.S. at 641 ("At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence.").

In Palm Beach, ARCOM is attempting to prescribe what is orthodox in architecture.  This is not the first time modern architecture has come under attack.  Ranalli describes an "escalating series of criticism" leveled at modern architecture in the postwar years.  Walter Gropius's neighbors thought his flat-roofed house looked like a "chicken coop[]."  Buck, supra, at 29.  Nor was criticism of International Style homes limited to disgruntled neighbors.  "The Threat to the Next America," a 1953 House Beautiful article, specifically attacked the Farnsworth House and accused the International Style, and especially its European architects, of containing "the threat of cultural dictatorship."  Daisy Alioto, Elizabeth Gordon's International Style, Curbed (May 10, 2017), https://archive.curbed.com/2017/5/10/15592658/elizabeth-gordon-house-beautiful-frank-lloyd-wright.  ARCOM's attacks on Burns's home are nothing new, but that does not make them any less dangerous to free expression.

Art contains ideas -- ideas that can inspire us, but also challenge us.  And it is why the bargain struck by our First Amendment is a bargain and a trade-off.  The First Amendment asks each of us to endure the sacrifices of living in a society with art that we hate so that each of us can also create and consume art that we

love.  In some ways it is an unfair bargain because it is undoubtedly an easier

sacrifice for some than others.  And there is nothing inevitable about this bargain.

But this bargain "at any rate is the theory of our Constitution."  Abrams v. United

States, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

It is no rejoinder, then, for the Town to argue that its interest in aesthetic

uniformity is more acute in this case than ordinarily because of the endurance and

public effects of architecture.  This seems particularly so in a town where aesthetic

uniformity in architecture may not even exist.  Art affects all of us.  But the

Constitution prohibits us from censoring it solely because we do not like it.

Today's case is not an easy case, but it is an important one.  Although we are

one of the first courts to address the issue of First Amendment protection for

residential architecture, this should not dissuade us from our task.  Cf. Masterpiece

Cakeshop, Ltd. v. Colorado Civil Rights Comm'n, 138 S. Ct. 1719, 1723 (2018)

("[T]he application of constitutional freedoms in new contexts can deepen our

understanding of their meaning.").  The First Amendment represents a powerful

commitment to free expression, a commitment that does not stop at the edge of the

printed page or the painted canvas.  When that freedom is in jeopardy, the courts

must step in to preserve it.  Because the majority shies away from this task, I

respectfully dissent.

**COVID-19 Response**

Consistent with CDC recommendations, people who are not fully vaccinated must continue to wear masks indoors and in crowded outdoor spaces. Masks are required for everyone on all forms of public transportation. Additional details are available at **www.nps.gov/coronavirus**. Before visiting, please check the **park website** to determine its operating status. Please **recreate responsibly**.

National Park Service

ARTICLE

# Monticello and the University of Virginia in Charlottesville: World Heritage Site



*Monticello. Public Domain.*

Thomas Jefferson (1743–1826) was the author of the American Declaration of Independence, third president of the United States, and a talented architect of neoclassical buildings. It is for this architectural distinction that Jefferson's plantation home, Monticello, and his ideal "academical village" -- the heart of the University of Virginia -- are included on the World Heritage List. Jefferson's use of an architectural vocabulary based upon classical antiquity symbolizes both the aspirations of the new American republic as the inheritor of European tradition and the cultural experimentation that could be expected as the country matured.

In 1809, Jefferson finished the rebuilding of Monticello begun in 1796. He transformed the original eight room Palladian villa, with its tall two-story portico, into a 21-room house designed in the fashionable Neoclassical style he saw in France. The front elevation was a deceptively low horizontal composition centered on a pavilion dominated by a columned portico and a low dome. The renovation kept most of the rooms of the original house,

Page: 1 of 2        Date Filed: 06/08/2021        USCA11 Case: 18-14515

but more than doubled its depth. The integration of the buildings into the natural landscape, the originality of the plan and design, and the refined proportions and decor make Monticello an outstanding example of a neoclassical work of art. Jefferson, an avid horticulturist, also created the gardens at Monticello, which were a botanic showpiece, a source of food, and an experimental laboratory of ornamental and useful plants from around the world.

The University of Virginia was Jefferson's most ambitious and last architectural undertaking. This project departs from preexisting British or American college planning schemes. Jefferson intended that the university design express educational ideals both encyclopedic and democratic, a fitting legacy for his beloved Virginia and the new United States of America.

Jefferson founded the University of Virginia in 1819 as the first nonsectarian university in the United States. He intended the institution to produce leaders well-versed in public service and practical affairs. The University of Virginia is considered one of Jefferson's greatest achievements, both for its architecture and innovative nature. The first university to use an elective course system, its most recognizable physical symbol is the Rotunda, which Jefferson designed to contain the library and be the heart of the campus. Standing at the north end of the University's Lawn with its flanking faculty pavilions and student rooms, the Rotunda is based on the Pantheon in Rome. Its Lawn continues to serve as a model for centralized green areas on university campuses. Reconstructed in 1899, after being severely damaged in a fire, the Rotunda retains many of its original Jeffersonian design elements and remains a physical embodiment of his illustrious legacy.

Visitors to Thomas Jefferson's Monticello can explore both the house and extensive grounds. A day pass to the site allows visitors to choose from a selection of guided tours ranging in topic from a standard house tour to a themed "Slavery at Monticello" or "Garden and Grounds" tour. At Monticello's grounds, guests may visit the estate's historic gardens, walk along Mulberry Row – once the hub of plantation activity – or hike the scenic Saunders-Monticello Trail. The visitor center features a series of museum-style exhibits, a hands-on activity area geared towards younger visitors, and a café whose menu includes seasonally-grown vegetables from the Monticello Vegetable Garden.

A short driving distance from Monticello, the University of Virginia is an active college campus. Guided tours of the university's famous Rotunda, Academical Village, and Lawns are typically available free for visitors.

**Thomas Jefferson's Monticello**, a **World Heritage Site**, and a National Historic Landmark, is located at 931 Thomas Jefferson Parkway, Charlottesville, VA. Monticello is also a National Historic Landmark. Click here for the National Historic Landmark registration file: **text** and **photos**.

**The University of Virginia**, a **World Heritage Site** and a National Historic Landmark, is located in downtown Charlottesville, VA. Click here for the National Register of Historic Places file: **text** and **photos**.

YOU MIGHT ALSO LIKE

Case 9:17-cv-81152-BB    Document 125    Entered on FLSD Docket 08/13/2021    Page 141 of 153



Page: 1 of 8    Date Filed: 06/08/2021    USCA11 Case: 18-14515

# Merriam-Webster

SINCE 1828

🔍

GAMES THESAURUS WORD OF THE DAY BLOG SHOP

- LOG IN
- REGISTER
-
  settings
- 📋 SAVED WORDS

6/7/2021                                                Design | Definition of Design by Merriam-Webster

design

✕

🔍

dictionary
thesaurus

view recents

Login or Register
Hello,
GAMES THESAURUS WORD OF THE DAY BLOG SHOP SETTINGS

- SAVED WORDS    view recents

# design

verb

Save Word

To save this word, you'll need to log in.

Log In

de·sign | \ di-ˈzīn 🔊 \
designed; designing; designs

## Definition of *design*

(Entry 1 of 2)

transitive verb

1 : to create, fashion, execute, or construct according to plan : devise, contrive design a system for tracking inventory
2a : to conceive and plan out in the mind he designed the perfect crime
b : to have as a purpose : intend she designed to excel in her studies
c : to devise for a specific function or end a book designed primarily as a college textbook a suitcase designed to hold a laptop computer
3 archaic : to indicate with a distinctive mark, sign, or name
4a : to make a drawing, pattern, or sketch of … a curious woman whose dresses always looked as if they had been designed in a rage …— Oscar Wilde
b : to draw the plans for design a building designing a new bike

intransitive verb

1 : to conceive or execute a plan
2 : to draw, lay out, or prepare a design was trained to design for homes and offices

design

noun

Definition of *design* (Entry 2 of 2)

Page: 2 of 8
Date Filed: 06/08/2021
USCA11 Case: 18-14515

Design | Definition of Design by Merriam-Webster

1a : a particular purpose or intention held in view by an individual or group He has ambitious designs for his son.
b : deliberate purposive planning more by accident than design
2 : a mental project or scheme in which means to an end are laid down was never part of my design
3a : a deliberate undercover project or scheme : plot a declaration of a design upon his life— John Locke
b designs plural : aggressive or evil intent —used with *on* or *against* he has designs on the money
4 : a preliminary sketch or outline showing the main features of something to be executed the design for the new stadium
5a : an underlying scheme that governs functioning, developing, or unfolding : pattern, motif the general design of the epic
b : a plan or protocol for carrying out or accomplishing something (such as a scientific experiment) also : the process of preparing this
6 : the arrangement of elements or details in a product or work of art … his sense of structure, both in the general design of *Paradise Lost* and *Samson*, and in his syntax …— T. S. Eliot
7 : a decorative pattern a floral design
8 : the creative art of executing aesthetic or functional designs studied design in college

↓ Other Words from *design*   ↓ Synonyms   ↓ Choose the Right Synonym   ↓ More Example Sentences ↓
Learn More about *design*

Keep scrolling for more

# Other Words from *design*

Verb

designedly \ di-ˈzī-nəd-lē 🔊 \ adverb

# Synonyms for *design*

Synonyms: Verb

- aim,
- allow
- [chiefly Southern & Midland],
- aspire,
- calculate,
- contemplate,
- go
- [chiefly Southern & Midland],
- intend,
- look,
- mean,
- meditate,
- plan,
- propose,
- purport,
- purpose

Synonyms: Noun

- arrangement,
- blueprint,
- game,
- game plan,

Page: 3 of 8    Date Filed: 06/08/2021    USCA11 Case: 18-14515

- <u>ground plan</u>,
- <u>master plan</u>,
- <u>plan</u>,
- <u>program</u>,
- <u>project</u>,
- <u>road map</u>,
- <u>scheme</u>,
- <u>strategy</u>,
- <u>system</u>

<u>Visit the Thesaurus for More</u> ⓥ

## Choose the Right Synonym for *design*

Noun

<u>intention</u>, <u>intent</u>, <u>purpose</u>, <u>design</u>, <u>aim</u>, <u>end</u>, <u>object</u>, <u>objective</u>, <u>goal</u> mean what one intends to accomplish or attain. <u>intention</u> implies little more than what one has in mind to do or bring about. announced his *intention* to marry <u>intent</u> suggests clearer formulation or greater deliberateness. the clear *intent* of the statute <u>purpose</u> suggests a more settled determination. being successful was her *purpose* in life <u>design</u> implies a more carefully calculated plan. the order of events came by accident, not *design* <u>aim</u> adds to these implications of effort directed toward attaining or accomplishing. her *aim* was to raise film to an art form <u>end</u> stresses the intended effect of action often in distinction or contrast to the action or means as such. willing to use any means to achieve his *end* <u>object</u> may equal <u>end</u> but more often applies to a more individually determined wish or need. his constant *object* was the achievement of pleasure <u>objective</u> implies something tangible and immediately attainable. their *objective* is to seize the oil fields <u>goal</u> suggests something attained only by prolonged effort and hardship. worked years to reach her *goals*

<u>plan</u>, <u>design</u>, <u>plot</u>, <u>scheme</u>, <u>project</u> mean a method devised for making or doing something or achieving an end. <u>plan</u> always implies mental formulation and sometimes implies graphic representation. *plans* for a house <u>design</u> often suggests a particular pattern and some degree of achieved order or harmony. a *design* for a new dress <u>plot</u> implies a laying out in clearly distinguished sections with attention to their relations and proportions. the *plot* of the play <u>scheme</u> stresses calculation of the end in view and may apply to a plan motivated by craftiness and self-interest. a *scheme* to defraud the government <u>project</u> often stresses imaginative scope and vision. a *project* to develop the waterfront

## Examples of *design* in a Sentence

Verb A team of engineers *designed* the new engine. Who *designed* the book's cover?

See More

Recent Examples on the Web: Verb The two are currently looking for someone to *design* and build the ring composed of the gems Liden mined on the trip. — Lauren M. Johnson, *CNN*, 30 May 2021 For those lucky enough to *design* and build their own house, there is a lot that goes into the planning. — Chris Hachey, *BGR*, 25 May 2021

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'design.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. <u>Send us feedback</u>.

See More

## First Known Use of *design*

USCA11 Case: 18-14515    Date Filed: 06/08/2021    Page: 4 of 8

Verb

14th century, in the meaning defined at <u>transitive sense 3</u>

Noun

1565, in the meaning defined at <u>sense 1a</u>

## History and Etymology for *design*

Verb and Noun

Middle English, to outline, indicate, mean, from Anglo-French & Medieval Latin; Anglo-French *designer* to designate, from Medieval Latin *designare*, from Latin, to mark out, from *de-* + *signare* to mark — more at <u>sign</u>

Keep scrolling for more

## Learn More about *design*

Share *design*

  

<u>Post the Definition of design to Facebook</u>   <u>Share the Definition of design on Twitter</u>

Time Traveler for *design*



## The first known use of *design* was in the 14th century

<u>See more words from the same century</u>

## Dictionary Entries near *design*

<u>desideratum</u>

<u>desiderium</u>

<u>desight</u>

<u>design</u>

<u>designable</u>

<u>designado</u>

<u>designata</u>

<u>See More Nearby Entries</u>

Page: 5 of 8   Date Filed: 06/08/2021   USCA11 Case: 18-14515

Case 9:17-cv-81152-BB   Document 125   Entered on FLSD Docket 08/13/2021   Page 146 of 153

Page: 6 of 8   Date Filed: 06/08/2021   USCA11 Case: 18-14515

# Phrases Related to *design*

by design

have designs on

# Statistics for *design*

Last Updated

2 Jun 2021

Look-up Popularity

Top 1% of words

Cite this Entry

"Design." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/design. Accessed 7 Jun. 2021.

**Style:** MLA

MLA⊘ Chicago⊘ APA⊘ Merriam-Webster⊘

Keep scrolling for more

More Definitions for *design*

design

*verb*
🔊

# English Language Learners Definition of *design*

(Entry 1 of 2)

: to plan and make decisions about (something that is being built or created) : to create the plans, drawings, etc., that show how (something) will be made
: to plan and make (something) for a specific use or purpose
: to think of (something, such as a plan) : to plan (something) in your mind

design

*noun*

English Language Learners Definition of *design* (Entry 2 of 2)

: the way something has been made : the way the parts of something (such as a building, machine, book, etc.) are formed and arranged for a particular use, effect, etc.
: the process of planning how something will look, happen, be made, etc. : the process of designing something
: a drawing of something that is being planned or created

See the full definition for *design* in the English Language Learners Dictionary

Case 9:17-cv-81152-BB   Document 125   Entered on FLSD Docket 08/13/2021   Page 147 of 153

USCA11 Case: 18-14515   Date Filed: 06/08/2021   Page: 7 of 8

design

<u>verb</u>

de·sign | \ di-ˈzīn 🔊 \
designed; designing

# Kids Definition of *design*

(Entry 1 of 2)

1 : to think up and plan out in the mind Our engineers have *designed* a new engine.
2 : to set apart for or have as a special purpose : <u>intend</u> The Web site is *designed* for fun.
3 : to make a pattern or sketch of She *designs* clothes.

design

<u>noun</u>

Kids Definition of *design* (Entry 2 of 2)

1 : an arrangement of parts in a structure or a work of art The *design* of the house suits a large family.
2 : the art or process of planning and creating something His job is Web page *design*.
3 : a sketch, model, or plan of something made or to be made Architects studied the *design* for the building.
4 : a decorative pattern
5 : <u>plan entry 1 sense 1</u>, <u>scheme</u>
6 : a planned intention As if by *design*, they both stopped at the same spot …— Jerry Spinelli, *Maniac Magee*
7 : a secret purpose : <u>plot</u> I know you have *designs* on my money.

design

<u>noun</u>

de·sign | \ di-ˈzīn 🔊 \

# Medical Definition of *design*

: a plan or protocol for carrying out or accomplishing something (especially a scientific experiment) also : the process of preparing this

Other Words from *design*

design transitive verb

More from Merriam-Webster on *design*

Thesaurus: <u>All synonyms and antonyms for *design*</u>

Nglish: <u>Translation of *design* for Spanish Speakers</u>

Britannica English: <u>Translation of *design* for Arabic Speakers</u>

## WORD OF THE DAY

---

# <u>solipsism</u> 🔊

### <u>See Definitions and Examples</u> »

Get Word of the Day daily email!

Your email address          SUBSCRIBE

---

### <u>Test Your Vocabulary</u>

Words You Should Know Quiz, Vol. 1



- **Pedantic** means:

| <u>completely confused or disordered</u> | <u>scathingly harsh</u> |

| <u>having or showing great love and support for your country</u> | <u>narrowly, stodgily, and often ostentatiously learned</u> |



Test your visual vocabulary with our 10-question challenge!

<u>TAKE THE QUIZ</u>

This website uses cookies to improve the user experience. By using this website you consent to all cookies in accordance with our cookie policy.

I understand



THE
NOBEL
PRIZE

The Nobel Prize in Literature 1949

Explore 

Page: 1 of 4   Date Filed: 06/08/2021   USCA11 Case: 18-14515

# William Faulkner Banquet speech

William Faulkner's speech at the Nobel Banquet at the City Hall in Stockholm, December 10, 1950 *

Ladies and gentlemen,

I feel that this award was not made to me as a man, but to my work – a life's work in the agony and sweat of the human spirit, not for glory and least of all for profit, but to create out of the materials of the human spirit something which did not exist before. So this award is only mine in trust. It will not be difficult to find a dedication for the money part of it commensurate with the purpose and significance of its origin. But I would like to do the same with the acclaim too, by using this moment as a pinnacle from which I might be listened to by the young men and women already dedicated to the same anguish and travail, among whom is already that one who will some day stand here where I am standing.

Our tragedy today is a general and universal physical fear so long sustained by now that we can even bear it. There are no longer problems of the spirit. There is only the question: When will I be blown up? Because of this, the young man or woman writing today has forgotten the problems of the human heart in conflict with itself which alone

Case 9:17-cv-81152-BB    Document 125    Entered on FLSD Docket 08/13/2021    Page 150 of 153

Page: 2 of 4    Date Filed: 06/08/2021    USCA11 Case: 18-14515

can make good writing because only that is worth writing about, worth the agony and the sweat.

He must learn them again. He must teach himself that the basest of all things is to be afraid; and, teaching himself that, forget it forever, leaving no room in his workshop for anything but the old verities and truths of the heart, the old universal truths lacking which any story is ephemeral and doomed – love and honor and pity and pride and compassion and sacrifice. Until he does so, he labors under a curse. He writes not of love but of lust, of defeats in which nobody loses anything of value, of victories without hope and, worst of all, without pity or compassion. His griefs grieve on no universal bones, leaving no scars. He writes not of the heart but of the glands.

Until he relearns these things, he will write as though he stood among and watched the end of man. I decline to accept the end of man. It is easy enough to say that man is immortal simply because he will endure: that when the last dingdong of doom has clanged and faded from the last worthless rock hanging tideless in the last red and dying evening, that even then there will still be one more sound: that of his puny inexhaustible voice, still talking.

I refuse to accept this. I believe that man will not merely endure: he will prevail. He is immortal, not because he alone among creatures has an inexhaustible voice, but because he has a soul, a spirit capable of compassion and sacrifice and endurance. The poet's, the writer's, duty is to write about these things. It is his privilege to help man endure by lifting his heart, by reminding him of the courage and honor and hope and pride and compassion and pity and sacrifice which have been the glory of his past. The poet's voice need not merely be the record of man, it can be one of the props, the pillars to help him endure and prevail.

From *Nobel Lectures, Literature 1901-1967*, Editor Horst Frenz, Elsevier Publishing Company, Amsterdam, 1969

* The speech was apparently revised by the author for publication in *The Faulkner Reader.* These minor changes, all of which improve the address stylistically have been incorporated here.

** Disclaimer
Every effort has been made by the publisher to credit organizations and individuals with regard to the supply of audio files. Please notify the publishers regarding corrections. Copyright © The Nobel Foundation 1950

To cite this section
MLA style: William Faulkner – Banquet speech. NobelPrize.org. Nobel Media AB 2021. Sun. 6 Jun 2021.
<https://www.nobelprize.org/prizes/literature/1949/faulkner/speech/>

Back to top ↑

The Nobel Prize in Literature 1949

William Faulkner

Share this

🅕  🅣  🅛  ...

## Learn more

# Nobel Prizes 2020

Twelve laureates were awarded a Nobel Prize in 2020, for achievements that have conferred the greatest benefit to humankind.

Their work and discoveries range from the formation of black holes and genetic scissors to efforts to combat hunger and develop new auction formats.

See them all presented here.

## Explore prizes and laureates

Look for popular awards and laureates in different fields, and discover the history of the Nobel Prize.

Literature                                                                                        ▽

-                                            1949                                              +

Explore

Page: 4 of 4

Date Filed: 06/08/2021

USCA11 Case: 18-14515

# About the Nobel Prize organisation

### The Nobel Foundation

Tasked with a mission to manage Alfred Nobel's fortune and has ultimate responsibility for fulfilling the intentions of Nobel's will.

### The prize-awarding institutions

For more than a century, these academic institutions have worked independently to select Nobel Laureates in each prize category.

### Nobel Prize outreach activities

Several outreach organisations and activities have been developed to inspire generations and disseminate knowledge about the Nobel Prize.

| Press | Privacy policy | For developers | Join us |
| Contact | Technical support | Media player | |
| FAQ | Terms of use | | |

   

THE NOBEL PRIZE                                    Copyright © Nobel Prize Outreach AB 2021

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
**Bill of Costs**

Court of Appeals Docket No. __18-14515__

DONALD BURNS                          vs.   TOWN OF PALM BEACH

A Bill of Costs should only be filed when the Clerk's Office has advised a party that the party is entitled to costs.  FRAP 39 and 11th Cir. R. 39-1 govern costs taxable in this court and the time for filing the Bill of Costs.  A motion for leave to file out of time is required for a Bill of Costs not timely received.

**INSTRUCTIONS**

The appellate docketing fee is set in the fee schedule issued pursuant to 28 U.S.C. § 1913.  However, the $5 fee for filing a notice of appeal is recoverable as a cost in the district court.  In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced.  Multiply this number by the cost per copy ( $.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| | Repro. Method (Mark One) | | No. of Original Pages | Total No. Documents Reproduced | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
| | In-House | Comm* | | | | | |
|---|---|---|---|---|---|---|---|
| Appellate Docketing Fee | — | — | — | — | — | | |
| Appellant's Brief | | | | | | | |
| Appendix | | | | | | | |
| Appellee's Brief | x | | 68 | 7 | 476 | $71.40 | $71.40 |
| Reply Brief | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| *Note: If reproduction was done commercially, receipt(s) must be attached. | | | | **TOTAL** | | $ 71.40 REQUESTED | $ $71.40 ALLOWED |

I hereby swear or affirm that the costs claimed were actually and necessarily incurred in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Signature: OConnor, Joanne M.    Digitally signed by OConnor, Joanne M. ...

Date Signed: June 22, 2021

Attorney Name: Joanne M. O'Connor
(Type or print your name)

Attorney for: Town of Palm Beach
(Type or print name of client)

E-mail: joconnor@jonesfoster.com

Phone: (561) 650-0498

Street Address/City/State/Zip: Flagler Center Tower, 505 South Flagler Drive, Suite 1100 West Palm Beach, Florida  33401

**FOR COURT USE ONLY**

Costs are hereby taxed in the amount of $ ____$71.40____ against ____Appellants____

and are payable directly to ____Appellee____

David J. Smith, Clerk of Court

Issued on: _____  By: __/S/ Tresa A. Porter__  DATE: 6/24/2021
Deputy Clerk

BOC Rev.: 6/17

ISSUED AS MANDATE 08/13/2021